

Filed
RECEIVED IN CLERK'S OFFICE
U.S.D.

AUG 18 2025

KEVIN P. WEIMER, Clerk
By Matthew Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

MATTHEW THOMAS HARVEY )
)
Plaintiff, pro se )
)
vs. )                Civil Action No.: _____
)
CLAIRE M. HARVEY, ANGELA Z. )        **1 : 25 -CV- 4 6 8 8**
BROWN, JASON D. MARBUTT; )
JEFFREY M. GORE, BRANDY J. )
DASWANI, KIM C. OPPENHEIMER, )
KESSLER & SOLOMIANY, LLC, )
STEFANIE S. POTTER, MOLLY Y. )
TEPLITZKY, GEORGIA DEPARTMENT)
OF HUMAN SERVICES, BRIAN P. )        **TRIAL BY JURY DEMANDED**
KEMP, in his official Capacity as )
Governor of Georgia )
)
Defendants. )

## VERIFIED COMPLAINT FOR EMERGENCY INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, DAMAGES

COMES NOW Matthew Thomas Harvey (Plaintiff), and states his Verified

Complaint against the above-named Defendants as follows:

### I. NATURE OF ACTION

1.    Plaintiff brings this action at law and in equity for emergency temporary and

permanent injunctive relief, declaratory judgment, equitable remedies, and

monetary damages under the Constitution and laws of the United States of

America. He seeks to halt ongoing violations and obtain redress for past

infringements of liberty, property, and parental rights carried out under color of

state law and without lawful jurisdiction, due process, and/or evidentiary basis.

2.     The case arises from a sustained pattern of misconduct by judicial officers, prosecutors, court-appointed professionals, private attorneys, state agencies, and other individuals acting in concert since November 2020. These actions deprived Plaintiff of rights secured by the First, Second, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the Constitution for the United States of America (U.S. Constitution), as well as parallel provisions of the Georgia Constitution.

3.     Defendants' concerted actions and/or deliberate inaction resulted in the deprivation of Plaintiff's liberty, dignity, parental authority, property rights, financial stability, and access to legal protections. These were not isolated or incidental missteps. Rather, they reflect a systemic failure to safeguard due process, equal protection, and the rights of a fit and loving parent—further compounded by discriminatory animus based on Plaintiff's gender, religious beliefs, and disabilities.

4.     Plaintiff seeks immediate judicial intervention to:

   a. Enjoin enforcement of unconstitutional and void state court orders and judgments;

   b. Declare specific acts, rulings, and judicial determinations void ab initio;

   c. Restore parental rights unlawfully restricted without findings of unfitness or harm;

   d. Award damages for reputational, financial, and emotional injury; and

   e. Hold accountable persons not shielded by judicial or state immunity.

5.     This case also invokes enduring maxims of equity and foundational legal doctrines, including:

2

a. "Equity will not suffer a wrong without a remedy";

b. "Equity regards as done that which ought to have been done"; and

c. "No one can gain advantage from his own wrong."

These principles are essential where public and private actors procure judicial action through fraud, misrepresentation, or exceed jurisdictional authority. Orders obtained in such a manner are void ab initio and afford no lawful benefit or protection. See *United States v. Throckmorton*, 98 U.S. 61 (1878); *Valley v. Northern Fire & Marine Ins. Co.*, 254 U.S. 348, 353 (1920). As affirmed in *Marbury v. Madison*, 5 U.S. 137 (1803), *ubi jus ibi remedium*—where there is a right, there must be a remedy. Equity does not permit state actors—or private parties acting under color of law—to retain benefits secured through ultra vires conduct or fraud upon the court. Such outcomes offend the Organic Laws of the United States of America and demand federal corrective intervention where state remedies are inadequate or unavailable.

6.     Plaintiff's ability to timely assert claims was materially impaired by documented neurodivergent and trauma-related disabilities, as well as by systemic interference with his legal functioning, access to courts, and physical liberty. These claims are timely filed under doctrines of continuing violation, equitable tolling, and delayed accrual, based on ongoing constitutional injuries and concealment.

## II. JURISDICTION AND VENUE

7.     This Court has original jurisdiction pursuant to 42 U.S.C. §§ 1983, 1985, 1986, 1988; 28 U.S.C. §§ 1331, 1343(a)(3)-(4) (civil rights enforcement); and 28

U.S.C. §§ 2201–2202 (declaratory relief). Supplemental jurisdiction exists under 28
U.S.C. § 1367 over related state law claims. Plaintiff also invokes this Court's
equitable jurisdiction under *Ex parte Young*, 209 U.S. 123 (1908), to enjoin ongoing
violations of federal law by state actors.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as a
substantial portion of the events and omissions giving rise to the claims occurred in
Cobb County, Georgia, which is within the Northern District of Georgia, Atlanta
Division.

9.     Federal review is appropriate where state forums are constitutionally
inadequate or where systemic bias, concealment of evidence, or deprivation of
fundamental rights is evident. See *Mitchum v. Foster*, 407 U.S. 225, 242 (1972);
*Gibson v. Berryhill*, 411 U.S. 564, 577 (1973). Such circumstances overcome
principles of comity or abstention.

10.    Plaintiff brings this action because no adequate remedy exists under state
law. The relevant state court proceedings— including custody, contempt, protective,
and criminal orders— were issued without lawful service, jurisdiction, evidentiary
hearing, or opportunity to be heard. Federal equity review is necessary to prevent
further irreparable harm and to vindicate rights secured by the U.S. Constitution.

### III. PARTIES

11.    Plaintiff Matthew Thomas Harvey (Plaintiff) is a native Californian and
peaceful, non-combative inhabitant of Georgia. He appears pro se and sui juris.
Plaintiff is a medically documented individual with neurodivergent and trauma-

4

related disabilities, including Post-Traumatic Stress Disorder (PTSD), Attention-Deficit/Hyperactivity Disorder (ADHD), and Autism Spectrum Disorder (ASD). These disabilities are central to the claims herein, including alleged discrimination, coercion, and denial of accommodations in civil and criminal proceedings.

12.     Defendant Claire M. Harvey (Claire) is a native South Carolinian and Plaintiff's former spouse. She is sued in her individual capacity for knowingly submitting false allegations, interfering with Plaintiff's parental rights, engaging in retaliatory legal action, and coordinating with public and private actors to obtain unlawful custody orders, restraining provisions, and financial penalties through fraud and procedural misconduct.

13.     Defendant Angela Z. Brown (Brown) is a judicial officer of the Cobb County Superior Court. She is named in her individual capacity for conduct under color of state law that exceeded the bounds of lawful judicial authority, including issuance of void orders, suppression of exculpatory material, and retaliatory conduct toward Plaintiff. Said conduct is not protected by judicial immunity as it was nonjudicial in nature, undertaken in clear absence of jurisdiction or in violation of well-established constitutional law.

14.     Defendant Jason D. Marbutt (Marbutt) is a judicial officer of the Cobb County Superior Court. He is named in his individual capacity for acts undertaken under color of state law that exceeded the bounds of lawful judicial authority, including contempt rulings, imposition of psychiatric conditions, and retaliatory criminal enforcement. Said conduct is not protected by judicial immunity as it was

nonjudicial in nature, undertaken in clear absence of jurisdiction or in violation of well-established constitutional law.

15.    Defendant Jeffrey M. Gore (Gore) is a prosecuting attorney in the Cobb County District Attorney's Office. He is sued in his individual capacity for acts undertaken under color of state law that exceeded his lawful authority, including pursuing retaliatory criminal charges against Plaintiff, suppressing exculpatory material, and exhibiting deliberate indifference to Plaintiff's disabilities and procedural rights.

16.    Defendant Brandy J. Daswani (Daswani) served as Guardian ad Litem (GAL) in the underlying custody matter. She is sued in her individual capacity for acts undertaken under color of state law that exceeded the scope of GAL authority, including ex parte communications, factual misrepresentations, and discriminatory treatment on the basis of Plaintiff's disability, gender, and religious beliefs.

17.    Defendant Kim C. Oppenheimer (Oppenheimer) is a court-appointed psychologist. She is sued in her individual capacity for acts undertaken under color of state law, including failure to conduct evaluations in good faith, issuing biased and defamatory conclusions, and participating in improper or prejudicial communications with officers of the court.

18.    Defendant Kessler & Solomiany, LLC (K&S) is a private family law firm based in Atlanta, Georgia. The firm is named for its participation—through its attorneys and agents—in coordinated and unlawful acts with public officials under color of state law. These acts included misuse of legal process, knowing

6

advancement of fabricated claims, suppression of exculpatory evidence, and improper ex parte communications with judicial officers. K&S is named as a defendant under principles of vicarious liability and direct participation, as its attorneys acted within the scope of their employment while engaging in conduct that contributed to constitutional and statutory violations alleged herein, rendering the firm jointly and severally liable for resulting harm.

19.     Defendant Stefanie S. Potter (Potter) is an attorney with K&S. She is sued in her individual capacity for acts undertaken under color of state law, including the knowing advancement of false claims, engaging in unlawful communications, and using state machinery to secure coercive and retaliatory legal actions.

20.     Defendant Molly Y. Teplitzky (Teplitzky) is an attorney with K&S. She is sued in her individual capacity for similar acts to that of Potter, undertaken under color of state law.

21.     Defendant Georgia Department of Human Services (DHS) is a state executive agency responsible for implementing and enforcing domestic relations orders. DHS is solely named for prospective injunctive and declaratory relief under *Ex parte Young*, due to its ongoing collection efforts and enforcement of constitutionally infirm child support and contempt orders.

22.     Defendant Brian P. Kemp (Kemp) is the Governor of Georgia. He is sued in his official capacity only, based on formal notice he received of the constitutional violations and his failure to act, which constitutes constructive ratification.

Prospective injunctive relief is sought to enjoin future enforcement of the unlawful acts and schemes alleged herein.

## IV. FACTUAL ALLEGATIONS

### Marriage, Childbirth, and Domestic Life

23.     Plaintiff was lawfully married to Claire in 2015, and fathered one child, Wells Allen Harvey (Wells), in 2018. Throughout the marriage, the parties were domiciled in Cobb County, Georgia, during which time Plaintiff served as the primary financial provider and a dedicated father, caring for Wells daily and maintaining a close emotional bond. Wells, like Plaintiff, displayed heightened sensitivity to environmental changes and relational stress from a young age and was diagnosed with ASD at age 3. Their shared neurodivergence allowed Plaintiff to provide uniquely attuned, structured, and nurturing care essential to Wells' development.

24.     Although Plaintiff did not receive a formal ASD diagnosis until January 2024, he has displayed hallmark traits since childhood—traits also present in four of his siblings, who were also formally diagnosed—facts known to Claire prior to the marriage. These traits include mild difficulty with emotional regulation during high-stress situations, inflexible and rigid thought patterns, heightened sensory sensitivity, and challenges in social situations. While Claire initially accommodated these traits, she later exploited them to provoke and destabilize Plaintiff during high-conflict periods. Despite these challenges, Plaintiff consistently provided safe, structured, and loving care to his son.

25.     During the marriage, and beginning in 2017, Plaintiff experienced an

escalating pattern of emotional, physical, and psychological abuse by Claire. This

included acts of coercive control, gaslighting, verbal/physical assaults, and threats

of self-harm and murder-suicide. In response to Claire's acts of aggression, Plaintiff

would leave from, or isolate himself within, the marital home in an attempt to

deescalate the situation whenever possible.

26.     Eventually, Plaintiff began modifying his behavior ("walking on eggshells") in

order to prevent provoking Claire and preserving a stable environment for Wells,

but also to the detriment of his own mental health. Despite the abuse, Plaintiff did

not seriously contemplate divorce or formal separation until late October 2020, due

to his religious convictions and the negative impact he perceived a broken home

would have on Wells' development.

## Legal Ambush and the Silver Bullet Strategy

27.     On or about November 3, 2020, a few days after Plaintiff requested a formal

separation due to her continued abuse, Claire filed for divorce citing "irreconcilable

differences," as well as obtaining an ex parte protective order (TPO) based on

fabricated allegations of abuse by Plaintiff. The Cobb County Sheriff's Office

immediately effectuated the TPO, removing Plaintiff from his home, dispossessing

him of his property (including firearms which are in their possession to this date),

and denying him access to his son. See *Doe v. Heck*, 327 F.3d 492, 518 (7th Cir.

2003) ("removal of a child without a pre-deprivation hearing violates due process

absent exigent circumstances"); *Lehr v. Robertson*, 463 U.S. 248, 261 (1983)

9

("[Biological fathers] with substantial parent-child relationships are entitled to constitutional protection."); *In re Gault*, 387 U.S. 1, 36 (1967) (right to counsel and notice essential in proceedings where liberty or family rights are at stake).

28.     The fraudulently acquired TPO—issued without jurisdictional findings, notice, or evidentiary review—became the predicate act in a cascading pattern of retaliatory and constitutionally infirm rulings, including coerced psychiatric evaluation, extortion via civil contempt, criminal prosecution, and deprivation of parental rights. Entered solely on Claire's uncorroborated allegations and without findings of harm or unfitness, the order circumvented fundamental due process and served as strategic leverage rather than legitimate protection. See *Roper v. Roper*, 336 Ga. App. 707, 709–10 (2016) (noting that TPOs may be "used as leverage" in custody disputes and must be carefully scrutinized); *Frantz v. Frantz*, 278 Ga. 793, 794 (2005) (holding that courts must guard against improper use of TPOs in domestic matters).

29.     This misuse of emergency relief—absent exigent circumstances or procedural safeguards—triggered a series of unlawful proceedings across civil and criminal forums. As recognized in both federal and Georgia jurisprudence, foundational defects of this kind render all subsequent actions legally infirm. See *Doe v. Heck*, 327 F.3d 492, 518 (7th Cir. 2003) ("Removal of a child without a pre-deprivation hearing violates due process absent exigent circumstances."); *Kasey v. Molybdenum Corp.*, 336 F.2d 560, 563 (9th Cir. 1964) ("A judgment obtained by fraud is not entitled to the respect accorded judgments of a court of competent jurisdiction.").

30.    In mid-November 2020, Plaintiff was coerced into signing a Temporary

Consent Order (TCO) under threat of prolonged deprivation of access to his son,

Wells. The order was entered without a hearing, without findings of unfitness or

harm, and without adversarial safeguards. It imposed restrictive and unjustified

visitation conditions, unsupported by record evidence or legal justification.

Plaintiff's counsel told him that Claire would dismiss the accompanying TPO if he

"agreed" to the TCO, confirming it had been used as strategic leverage rather than

legitimate protection. Consent obtained through coercion is not voluntary and is

voidable under constitutional and equitable principles. See *Perry v. Sindermann*,

408 U.S. 593, 597 (1972) (government may not condition access to fundamental

rights on surrender of constitutional protections); *United States v. Vonn*, 535 U.S.

55, 62 (2002) ("A waiver is ordinarily an intentional relinquishment or

abandonment of a known right.").

31.    On December 5, 2020—after the TPO had been dismissed and the TCO was

in effect—Plaintiff lawfully recorded Claire making several statements that directly

contradicted her sworn allegations of abuse in the TPO. When asked why Plaintiff's

visitation was restricted to every other weekend, Claire admitted that Potter told

her this was simply "standard" for fathers in Georgia post-divorce. This admission

exposed that the restrictions were not the result of judicial findings of harm or

danger but reflected an extrajudicial norm applied under color of law, bypassing

individualized due process protections.

32.    In the same recording, when asked about her claims in the TPO petition that Plaintiff had "choked," Claire casually replied, "You say restrained, I say choked," referencing past incidents in which Plaintiff had intervened to stop her from harming herself, him, Wells, or property. These admissions not only undermined the credibility of Claire's prior allegations, but also illuminated the misuse of emergency protective orders as tools for tactical advantage in family litigation, absent genuine threat or danger.

33.    Plaintiff promptly submitted the recording and transcript to his counsel, believing them to be materially exculpatory. He also instructed counsel to assert a counterclaim for "cruel treatment" and demand a jury trial to preserve his right to impartial adjudication.

34.    Plaintiff's counsel did file the counterclaim, but dismissed the audio recording as irrelevant and failed to request a jury trial—despite Plaintiff's express request. This was the first of three such requests to his counsel, all ignored, effectively depriving Plaintiff of his right to trial by jury and adversarial process. The denial of these procedural safeguards contributed to the systemic erosion of Plaintiff's constitutional rights, including the rights to present evidence, confront adverse claims, and be heard by an impartial tribunal. See *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970) ("The fundamental requisite of due process of law is the opportunity to be heard... at a meaningful time and in a meaningful manner."); *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) (recognizing the right to jury trial as a fundamental safeguard against government oppression).

### GAL Appointment and Misconduct

35.    On or about December 28, 2020, during court-ordered mediation, Plaintiff was pressured by his counsel into consenting to the appointment of Daswani as Guardian ad Litem (GAL), based on assurances that this would expedite expanded parenting time. Plaintiff was not advised of his right to object or to request a hearing prior to the finalization of her appointment—thus forfeiting a meaningful opportunity to evaluate or contest the suitability of a court officer whose recommendations would substantially affect his parental rights. See *Powell v. Alabama*, 287 U.S. 45, 69 (1932) (recognizing the constitutional violation when a party is "denied the right of effective and substantial aid" of counsel).

36.    In Plaintiff's first and only substantive meeting with Daswani on or about January 6, 2021, he described in detail Claire's prolonged pattern of emotional and physical abuse toward him, her threats of self-harm, and the psychological harm being inflicted on himself and Wells as individuals with neurodivergent disabilities. He provided corroborating physical evidence and the names of multiple witnesses— many of whom Daswani subsequently contacted and confirmed his statements. Despite this corroboration, Daswani took no remedial action, filed no report, and failed to recommend any protective steps.

37.    Around this same time, Plaintiff's family reported that Daswani had asked them during interviews whether they "also shared [Plaintiff's] biblical views on marriage," suggesting improper ideological bias in the performance of her duties.

38.    On or about February 1, 2021, Claire contacted Plaintiff in an emotional and distressed state, stating she was incapacitated due to a sudden spinal injury and unable to care for Wells on her own. Concerned for Wells' safety and stability, Plaintiff immediately notified Daswani's office and offered to assume temporary care responsibilities. Daswani's office later responded that "everything was fine" and dismissed the matter without explanation. This perfunctory response—despite Claire's own admission of incapacity—demonstrated a disregard for the child's welfare and a failure to meaningfully investigate a credible threat to his care.

39.    In the weeks and months following the February 1, 2021 incident, Plaintiff observed a continued pattern of psychological manipulation by Claire, which was guided by Potter, and compounded by inaction from Daswani. Claire routinely withheld critical information regarding Wells' wellbeing, while communicating in a manner designed to provoke confusion and distress.

40.    Despite clear signs of emotional strain in Wells and Plaintiff's repeated efforts to intervene constructively, Daswani failed to act, restore parenting time, or document these escalating concerns. Instead, Plaintiff remained in a prolonged state of legal and parental exclusion, denied updates, dismissed when raising concerns, and functionally removed from his son's life. The cumulative result reflected not impartial investigation, but apparent alignment by the GAL with one parent—contrary to her duty as trustee to serve the child's best interest. See *Thompson v. Thompson*, 291 Ga. 197, 200 (2012) (GAL may not act as advocate for either party; role is investigatory and advisory to the court).

14

41.    Between February and June 2021, Claire and Plaintiff engaged in more than

a dozen peaceful in-person interactions inside the marital home with Wells present,

some lasting for extended periods. Claire never expressed fear during these visits,

nor did she call law enforcement or raise concerns of risk or harm. The voluntary

and repeated unsupervised contact with Plaintiff contradicts any claim of ongoing

danger or domestic violence. Nonetheless, Daswani continued to treat Plaintiff as a

threat and maintained the custody restrictions without evidentiary basis or legal

justification, reinforcing a narrative unsupported by the actual conduct of the

parties and revealing the GAL's improper bias.

### Plaintiff's Mental Decline

42.    By June 2021, Plaintiff's psychological health had deteriorated

significantly—experiencing insomnia, anxiety, and paranoia daily—due to

prolonged exclusion from his son, coercive court orders, and the continued inaction

of the GAL. Making matters worse, around this time, Claire's behavior also became

increasingly erratic, which Plaintiff soon discovered was the result of her abrupt

discontinuation of her prescribed antipsychotic medication—presumably in an effort

to appear more stable during court proceedings.

43.    As a result of the aforementioned compounded psychological distress and

Plaintiff's undiagnosed PTSD from enduring years of abuse, Plaintiff engaged in

two isolated, nonviolent actions in June and July 2021. These actions—taken

during a period of extreme emotional trauma and a complete absence of

institutional protection—stemmed from a legitimate concern for Wells' safety. While

Plaintiff now realizes and acknowledges through mental health treatment that these incidents were misguided and how they could have been misinterpreted in hindsight, they were not criminal in nature (*mens rea*). They were the direct result of genuine fear due to consistent provocation, coercion, and systemic neglect by those entrusted to protect his son.

## Judicial and Procedural Misconduct

44.   On July 20, 2021, Plaintiff appeared in Cobb County Superior Court for a contempt hearing initiated by Claire. Unbeknownst to Plaintiff, and just minutes before the hearing commenced, Daswani was granted a private, off-the-record meeting in Judge Marbutt's chambers. Present were Marbutt, Daswani, Claire's attorney Potter, and Plaintiff's own counsel—yet Plaintiff himself was excluded. No transcript or contemporaneous documentation of this closed-door meeting exists. This ex parte communication violated due process principles requiring impartial adjudication and full party participation. See *Tumey v. Ohio*, 273 U.S. 510, 523 (1927) (due process is violated when the decisionmaker has been influenced by improper communication or bias).

45.   According to a later verbal summary provided by Plaintiff's counsel, Daswani used the in-chambers meeting to portray Plaintiff as mentally unstable and dangerous—contrary to contemporaneous statements made by Plaintiff's licensed therapist just one week prior, who had explicitly advised Daswani that Plaintiff posed no risk to himself or others, as well as questioning Daswani's own impartiality.

46.     During this secretive meeting, Daswani also unlawfully disclosed Plaintiff's confidential therapy records, which he later discovered had been altered and incomplete. These disclosures occurred without Plaintiff's consent, violating federal privacy laws and Georgia procedural safeguards. Daswani's conduct deprived Plaintiff of a fair hearing and created a prejudicial narrative that tainted all proceedings thereafter. See *Doe v. Gallinot*, 486 F. Supp. 983, 991 (C.D. Cal. 1979).

47.     When the contempt hearing began, Plaintiff was denied a meaningful opportunity to explain the context of his conduct or mount a full defense. His attempts to testify about Claire's history of abuse, her abrupt discontinuation of antipsychotic medication, and the psychological toll of watching his son suffer for over eight months were interrupted or dismissed by Marbutt.

48.     During cross-examination, Potter, questioned Plaintiff about his religious beliefs regarding marriage—suggesting that his Christian convictions contributed to his alleged instability and dangerousness. This line of inquiry was not relevant to the underlying issues, reflected improper religious bias, and were knowingly false.

49.     Marbutt ultimately held Plaintiff in contempt of the TCO, despite Plaintiff's sworn testimony that the order had been signed under duress, coercion, and without adversarial proceedings. Under well-established law, consent obtained under duress is not valid and renders the resulting agreement voidable. See *Tidwell v. Critz*, 248 Ga. 201, 204 (1981); *Restatement (Second) of Contracts* § 175 (1981). Marbutt's ruling ignored these legal standards and further cemented the deprivation of Plaintiff's parental rights without proper adjudication.

17

50.    Marbutt ordered Plaintiff incarcerated for up to 20 days, with the option to purge the contempt by voluntarily admitting himself into inpatient psychiatric treatment. This civil contempt sanction functioned in effect as a punitive and coercive criminal penalty, restricting Plaintiff's liberty based on speculative mental health allegations—without adversarial process, without findings beyond a reasonable doubt, and without any individualized evidence of risk or unfitness. The order also indefinitely severed all of Plaintiff's contact with Wells, which virtually all of the named Defendants would leverage going forward in an attempt to bend and submit Plaintiff to their collective will.

51.    Upon arrival at the Cobb County Jail, Plaintiff immediately alerted the attending nurse that he faced serious medical risks due to the abrupt cessation of his prescribed medications, including treatment for depression and anxiety. Although the nurse acknowledged the foreseeable consequences, she took no corrective action.

52.    Within twelve hours, Plaintiff began to exhibit severe symptoms of Antidepressant Discontinuation Syndrome—including nausea, dizziness, "brain zaps," and acute psychological distress—resulting in a condition tantamount to physical and mental torture. The jail's loud, overcrowded, and inhumane conditions further exacerbated his suffering. See *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (deliberate indifference to serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment).

**Involuntary Psychiatric Treatment and Coercive Prosecution**

18

53.    After approximately three days in jail, Plaintiff was transported to Ridgeview Institute in Smyrna, Georgia, an involuntary compliance with the purge condition of Marbutt's contempt order. Upon intake, Ridgeview's clinicians determined that inpatient psychiatric treatment was neither necessary nor appropriate. Instead, they recommended Plaintiff participate in an intensive outpatient program (IOP). Despite Plaintiff's good faith participation, the program was prematurely terminated after he tested positive for COVID-19—an illness he contracted during his confinement in jail. This preventable exposure further underscored the punitive and medically baseless nature of the contempt enforcement, and constituted a violation of Plaintiff's right to health and safety while in state custody.

54.    Unbeknownst to Plaintiff, around July 23, 2021—shortly after his transfer to Ridgeview—Marbutt personally contacted the MPD to request a criminal investigation and prosecution arising from Plaintiff's trauma-induced conduct in June and July. This ex parte communication triggered the issuance of two felony warrants—aggravated stalking and terroristic threats—without any independent investigation, grand jury indictment, or adversarial hearing. During a deposition conducted on August 16, 2021, the officer who signed the warrants testified that he did so at the direction of his superior, who had received a direct phone call from Marbutt. This confirmed that the charges did not originate from law enforcement discretion, but from judicial retaliation.

55.    Further compounding the impropriety, Assistant District Attorney John Tulley—a former colleague of Marbutt—unsuccessfully attempted to quash the

deposition of the officer who had signed the warrants. This procedural maneuver appeared calculated to shield Marbutt from scrutiny and obstruct discovery into the unlawful origins of the criminal charges. See *Dennis v. Sparks*, 449 U.S. 24, 28 (1980) (judges are not immune from suit under § 1983 when they conspire with others to deprive individuals of constitutional rights); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (state actors may be liable under § 1983 for constitutional violations committed under color of law).

### Punitive and Coercive Pretrial Conditions

56.    In late October 2021, Plaintiff was arrested in Rabun County, Georgia, following a minor traffic offense. Upon discovery of the outstanding felony warrants, he was transported to Cobb County Jail, where bail was initially denied without adequate justification. After three days of confinement, bail was granted following intervention by defense counsel Melvin S. Nash (Nash), and at the behest of Plaintiff's family. The conditions of confinement—including extreme sensory overstimulation, denial of basic medical care, and prolonged legal uncertainty— severely aggravated his PTSD and ASD, further adding to the ongoing retaliatory and punitive character of the state's enforcement actions.

57.    As a condition of pretrial release, the court imposed a sweeping protective order that extended not only to Claire, but also—without evidentiary findings or any articulated basis—to Daswani and Potter. Plaintiff was further ordered to wear a GPS ankle monitor, a condition later confirmed to have been requested directly by Daswani in coordination with the Cobb County District Attorney's Office. These

measures were imposed without a judicial hearing, individualized risk assessment, or finding of danger or flight risk. Instead, they functioned as punitive sanctions designed to chill Plaintiff's exercise of rights.

58.    Following release, Plaintiff remained subject to intrusive electronic surveillance and broad legal constraints. The cumulative psychological toll of incarceration, public stigma, and continuous GPS monitoring exacerbated his PTSD—manifesting in insomnia, panic attacks, severe depression, and persistent fear of renewed retaliation and incarceration. Traumatized by the loss of his son, instability, and institutional betrayal, Plaintiff relocated to Albany, Georgia, to seek familial support. This involuntary displacement—compelled by fear rather than volition—impaired his ability to assert parental rights, participate in legal proceedings, or recover from the trauma inflicted by coordinated individual and state actors. See *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (government restrictions must serve legitimate, nonpunitive aims); *Hernandez v. Texas*, 347 U.S. 475, 478–79 (1954) (equal protection prohibits systemic exclusion and targeted treatment).

## Discrimination and Judicial Recusal Irregularities

59.    In November 2021, during a deposition convened by Claire's counsel and attended by Potter, Daswani, and his counsel, Plaintiff was subjected to invasive and irrelevant questioning concerning his religious beliefs again—specifically, whether he believed women were meant to "submit" to their husbands and were generally inferior to men. These inquiries bore no relation to the best interests of

the child and appeared designed to stereotype and stigmatize Plaintiff for his

sincerely held Christian convictions. See *Church of the Lukumi Babalu Aye v. City*

*of Hialeah*, 508 U.S. 520, 534 (1993) (government may not target religious beliefs);

*Employment Div. v. Smith*, 494 U.S. 872, 877 (1990) (state action may not penalize

sincere religious expression).

60.     In mid-December 2021, Senior Judge A. Gregory Poole granted Plaintiff's

long-pending motion to recuse Marbutt, originally filed in August on grounds of

judicial bias and extrajudicial conduct. However, the recusal order deviated from

standard practice by including unsolicited language defending Marbutt's conduct

and minimizing the appearance of impropriety. This irregularity further eroded

Plaintiff's confidence in judicial impartiality and suggested a reluctance to hold

public officers accountable for constitutional misconduct. See *Liljeberg v. Health*

*Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988) (recusal is required when

impartiality might reasonably be questioned).

**Psychological Evaluation Misconduct and Coerced Monitoring**

61.     Plaintiff first contacted psychologist Kim Oppenheimer in June 2021—weeks

prior to the formal entry of the court's Order for Psychological Evaluation on July

12, 2021—and began the evaluation in mid-September. Between September and

December 2021, Plaintiff participated in several sessions and engaged in good faith,

expecting a neutral, clinical assessment. By contrast, Claire delayed scheduling her

evaluation until after Marbutt's recusal in December. Oppenheimer's conduct in the

months that followed would raise serious concerns about ex parte influence, objectivity, and procedural fairness.

62.    Shortly after meeting with Claire—and following a documented phone call with Daswani in January 2022—Oppenheimer abruptly canceled Plaintiff's final follow-up session without explanation. This unexplained termination, occurring after known ex parte communication, raised serious concerns about Oppenheimer's impartiality and professional independence. See *In re Marriage of Goodlow*, 221 Cal. App. 3d 620, 627 (1990) (evaluators must conduct fair and unbiased assessments).

63.    In mid-April 2022, after Judge Brown replaced Marbutt, a case conference was convened with Brown, Oppenheimer, Daswani, Potter, and Plaintiff's counsel. During the call, Oppenheimer verbally delivered her conclusions—exonerating Claire while portraying Plaintiff as unstable—despite substantial evidence to the contrary. Plaintiff was told that the session had been recorded at his counsel's request, but the recording was later reported "lost," depriving Plaintiff of a vital record of an adverse proceeding in which he played no direct role. This loss further undermined procedural integrity and cast doubt on the fairness of the evaluative process.

64.    Plaintiff promptly requested a written report, as explicitly required under the court's evaluation order. Oppenheimer responded that the report would cost $8,000 and that Plaintiff would bear the full burden of payment. This exorbitant demand, coupled with the refusal to produce a required judicial record, denied Plaintiff any

meaningful opportunity to rebut or challenge the evaluator's conclusions. The absence of a written report violated Plaintiff's rights to transparency and adversarial testing.

65.     On April 14, 2022, during a hearing on Plaintiff's motion to remove his GPS ankle monitor, Cobb County Magistrate Judge Michael E. McLaughlin (McLaughlin) acknowledged on the record that the condition had been imposed at the request of Daswani—an adversarial actor with no standing in the pending criminal matter. Her coordination with the District Attorney's Office, despite her civil appointment, influenced the McLaughlin's decision without Plaintiff's knowledge or opportunity for rebuttal. This improper cross-proceeding influence violated the principle of party neutrality and blurred the lines between advocacy and judicial process.

66.     Although McLaughlin denied Plaintiff's motion, he indicated reconsideration might occur only after the divorce had been finalized. This conditional denial confirmed that Plaintiff's pretrial liberty was not being restricted based on individualized findings of danger or flight risk, but rather tethered to an unrelated civil judgment. The court's entanglement of civil and criminal proceedings, at the urging of a nonparty, amounted to punitive pretrial restraint lacking constitutional justification. See *United States v. Salerno*, 481 U.S. 739, 747 (1987) (pretrial restrictions must be grounded in compelling governmental interest); *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006) (release conditions must not serve punitive ends).

## Prejudicial and Biased Adjudication

67.    The final divorce trial took place over four nonconsecutive days in late April
and early May 2022, culminating in a proceeding marred by prejudice and
procedural imbalance. Before trial, Plaintiff's counsel discovered that Daswani had
engaged in ex parte communications with Judge Brown's chambers—reportedly
expressing fear of Plaintiff and requesting enhanced courtroom security. These
communications, made outside the presence of Plaintiff and without disclosure,
tainted the tribunal's neutrality and violated the due process right to a fair and
impartial hearing. Despite this, Plaintiff's motion in limine to disqualify Daswani
and compel access to her full GAL file was summarily denied by Brown. See *Georgia
Code of Judicial Conduct, Rule 2.9(A); United States v. Castellanos*, 716 F.3d 828,
832 (4th Cir. 2013).

68.    At trial, psychologist Oppenheimer testified first—before the introduction of
Claire's later admissions under oath regarding her extensive psychological and
physical abuse of Plaintiff. This scheduling foreclosed any meaningful cross-
examination of Oppenheimer's findings against contradictory evidence, especially
Claire's own testimony that she had told Plaintiff, just prior to the initiation of the
divorce while he was struggling with depression, to commit suicide; a statement
qualified by saying that Wells would be "better off" if he did so.

69.    During Plaintiff's cross-examination, Potter used the opportunity to further
probe and demean his sincerely held Christian beliefs—particularly his conviction
that marriage is a biblical covenant and that the husband bears spiritual leadership

within the home. These lines of questioning bore no relevance to custody, posed improper religious bias, and appeared designed to caricature Plaintiff's faith as patriarchal or controlling. Brown allowed this line of inquiry without intervention, thereby signaling tacit approval of religious hostility in violation of Plaintiff's First Amendment rights. See *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018).

70.    Throughout trial, Brown exhibited conduct demonstrating a pattern of judicial bias and lack of impartiality. She repeatedly curtailed Plaintiff's own testimony, his counsel during witness examination, excluded key exculpatory evidence, and adopted a prosecutorial tone inconsistent with the role of a neutral adjudicator. As a result, Plaintiff's audio recording of Claire's admissions and the text message evidence proving she had threatened him with murder-suicide previously, were never introduced into evidence.

71.    During her closing remarks on the final day of trial, Brown repeatedly referred to Wells by the incorrect name—"Miles"—roughly a dozen times, signaling a profound lack of attentiveness to the specific facts and individuals in the case. She also decided that Claire's admitted and well-documented conduct of abuse towards Plaintiff did not meet the classification of "cruel treatment" under Georgia law.

72.    The selective application of standards applied, undermined the fairness of the adjudication and betrayed a systemic double standard. See *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984); *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). These actions collectively eroded the appearance of fairness and reinforced Plaintiff's belief that

the proceedings were predetermined. See *In re Murchison*, 349 U.S. 133, 136 (1955); *Liteky v. United States*, 510 U.S. 540, 555 (1994).

73.    On June 22, 2022, Judge Brown entered a Final Judgment and Decree of Divorce awarding Claire sole physical and primary legal custody of Wells, while restricting Plaintiff to supervised visitation through a third-party facility every other weekend, as well as other unfounded humiliating and degrading conditions. This arrangement imposed extreme logistical and financial burdens, particularly in light of the neurodivergent needs of both father and son, and was ordered without any evidentiary findings justifying such restrictions.

74.    The decree further imposed a child support obligation approximately 50% above the statutory guideline amount, without findings to support the upward deviation. This occurred despite Claire's higher income and no indication that she required public assistance. See *Wehunt v. Ledbetter*, 875 F.2d 1558 (11th Cir. 1989). No finding of unfitness, danger, or harm was entered against Plaintiff, nor were the statutory best interest factors under O.C.G.A. § 19-9-3(a)(3). The result was a punitive and unsupported decree, lacking evidentiary and legal foundation.

### Retaliation for Redress

75.    Following entry of the Final Decree, Plaintiff—having lost faith in the adversarial process and recognizing pervasive misconduct among all appointed professionals—chose to proceed pro se. On July 19, 2022, he filed a Motion for Reconsideration, to Set Aside, and for New Trial. The motion challenged both procedural and substantive defects in the underlying proceedings, including the

suppression of exculpatory evidence, repeated violations of due process, and the biased conduct of Oppenheimer, Daswani, Potter, and Claire. It further asserted that the decree rested on findings unsupported by law or fact and was entered in a manner that violated Plaintiff's constitutionally protected rights to a fair trial and meaningful participation in decisions affecting his parental relationship.

76.     Shortly after filing the motion, during a status hearing on Plaintiff's pending criminal charges, Plaintiff overheard prosecutor Gore tell defense attorney Nash that he was "considering revoking [Plaintiff's] bond" in response to the pro se filing. This thinly veiled threat—unprovoked and unrelated to any new conduct—was intended to chill Plaintiff's exercise of his right to seek judicial redress. Nash later criticized Plaintiff for filing the motion independently, despite the filing being procedurally valid and constitutionally protected. These reactions constituted prosecutorial retaliation, undermining Plaintiff's rights and exemplifying the institutional hostility he faced for asserting his legal claims.

77.     On December 19, 2022, under extreme psychological distress and persistent threats of incarceration, Plaintiff entered an Alford plea to a reduced misdemeanor charge of stalking under Georgia's First Offender Act. The other felony charge of terroristic threats was dismissed. This plea—while not an admission of guilt—was a coerced act of self-preservation, extracted in the context of prolonged prosecutorial pressure and cumulative legal trauma. At the time of the plea, Plaintiff had given Gored his recent clinical diagnosis of PTSD (August 2022), and attempted to provide Gore with the trial transcript of Claire's admitted abuse towards him. Nonetheless,

28

Gore continued to pursue aggressive prosecution, leveraging Plaintiff's mental health vulnerability to secure the plea in a process that fundamentally undermined the voluntariness required for a constitutionally valid agreement. See *North Carolina v. Alford*, 400 U.S. 25, 37 (1970); *Brady v. United States*, 397 U.S. 742, 755 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242 (1969).

78.    As part of the plea agreement, Plaintiff was sentenced to one year of probation and subjected to a broad and permanent protective order covering Claire, her mother Deborah Marsh, Daswani, and Potter. This sweeping order—entered without evidentiary findings, adversarial testing, or individualized risk assessment—functioned not as a legitimate protective measure, but as a punitive restraint. Its intent was to gag and prevent Plaintiff from engaging in lawful civil redress, shielding the named individuals from scrutiny and impeding Plaintiff's constitutional right to petition the courts. The order thus operated as a tool of suppression, not safety, further compounding the long-standing deprivation of Plaintiff's due process and parental rights.

79.    In January 2023, Judge Brown summarily denied Plaintiff's pro se motion. Again, the motion had detailed significant due process violations, suppression of exculpatory evidence, and the cumulative impact of judicial and procedural misconduct. Rather than engaging with the merits, Brown dismissed the filing as procedurally defective and harassing—a characterization that ignored the documented record and Plaintiff's good faith attempt to seek redress. Plaintiff timely filed a notice of appeal; however, the Georgia Court of Appeals denied the

application without explanation, compounding the appearance of institutional indifference and reinforcing Plaintiff's perception of systemic bias.

80.     In or around March 2023, while still burdened by probation and the sweeping protective order, Plaintiff was notified that a civil contempt action had been initiated by the Georgia Division of Child Support Services (DCSS), a division of DHS, alleging an arrearage of approximately $4,000. This sum had accrued during periods of unemployment and medical crisis, both directly stemming from the psychological and legal trauma described herein. In a desperate effort to avoid incarceration, Plaintiff's mother paid the full amount on his behalf—under significant emotional duress. The action exemplified the continued misuse of state authority to penalize conditions created by state actors themselves, transforming the child support enforcement mechanism into a retaliatory tool rather than a means of ensuring genuine support or compliance.

81.     Around the same time, Claire's attorney filed a retaliatory motion for attorney's fees, targeting Plaintiff's pro se filings that challenged the final divorce decree. Although Plaintiff submitted a written response, the motion was granted following a hearing in or about June 2023—without proper notice to Plaintiff and without affording him a meaningful opportunity to appear, present evidence, or contest the allegations. The court entered a $17,000 judgment against Plaintiff, not based on any substantiated finding of bad faith or frivolity, but as a punitive sanction for exercising his constitutionally protected right to petition the courts.

This proceeding reflected a broader institutional hostility toward Plaintiff's efforts to expose prior misconduct and seek lawful redress.

82.     In mid-July 2023, Plaintiff learned that Potter had reported him to his probation officer for protected legal acts: (1) sending a courtesy copy of his appellate filing, and (2) submitting a written response to her motion for attorney's fees. These communications were routine, nonthreatening, and constitutionally protected expressions of legal advocacy. Nevertheless, based solely on Potter's report—and without any judicial finding, evidentiary hearing, or adversarial motion—the probation office unilaterally issued a warrant for violation of probation. The warrant was issued ex parte, without Plaintiff's knowledge or opportunity to contest it, further illustrating the unchecked power granted to adverse parties and the erosion of procedural fairness in Plaintiff's ongoing ordeal.

83.     Fearing retaliatory incarceration and severe psychological harm, Plaintiff voluntarily admitted himself into an intensive trauma-focused treatment program for PTSD. This decision—made in the absence of any formal judicial intervention—was driven by a credible and well-founded fear of arbitrary detention stemming from the probation office's unauthorized warrant. During his time in treatment, Plaintiff lost his job and his ability to maintain financial or emotional stability. Upon discharge, Plaintiff discovered that no official record of the alleged probation violation warrant had ever been filed with the court or entered into the public record. This confirmed Plaintiff's suspicion that the warrant was not a lawful

enforcement tool, but an extrajudicial and retaliatory act issued outside the scope of due process or lawful authority.

84.    Still fearing arbitrary arrest and unable to trust a judicial system that had repeatedly disregarded his rights, Plaintiff left Georgia in a state of involuntary internal exile. For approximately eight months, he lived in isolation from family, friends, and his son—unable to assert his parental rights, participate in ongoing litigation, or safely return home without risking arbitrary detention. This period of forced displacement, precipitated by unconstitutional enforcement tactics and a pervasive pattern of legal retaliation, caused profound emotional distress and further destabilized Plaintiff's ability to recover from trauma, maintain a livelihood, or meaningfully engage in civic or familial life.

85.    Based on the original sentencing order, Plaintiff believes his probation expired in December 2023; however, no formal confirmation was ever provided, and no steps were taken by any relevant agency to clarify his status. The continued uncertainty—combined with a persistent threat of renewed retaliation—reflected a gross failure of procedural safeguards and a fundamental breakdown of the rule of law.

86.    On or about September 29, 2023, attorney Teplitzky filed a civil contempt motion against Plaintiff based on his alleged failure to pay the attorney's fees judgment previously entered. The contempt action was not grounded in any willful disobedience, as required under Georgia law, but was plainly retaliatory in nature. In June 2024, after failing to effectuate personal service, Teplitzky moved to

proceed via publication under Georgia's long-arm statute, despite lacking any legitimate basis for extraterritorial jurisdiction. These actions were not made in good faith, but constituted strategic misuse of procedural rules to entrap Plaintiff, bypass notice requirements, and secure punitive sanctions without adversarial testing or due process.

87.    On October 15, 2024, Plaintiff filed a timely, verified Notice of Special Appearance in the contempt action, expressly preserving his jurisdictional objections, challenging the sufficiency of service, and alerting the court to his medical and financial disabilities. The filing also included factual rebuttals to the constitutionally infirm orders, invoked Plaintiff's unalienable rights, warned against further actions under color of law, and demanded that the action be dismissed. Under both federal and Georgia law, a special appearance is the proper procedural mechanism to challenge jurisdiction without waiving defenses. See *Burnham v. Superior Court*, 495 U.S. 604, 609 (1990) (jurisdiction must be based on valid service and presence or consent); *Commercial Credit Plan, Inc. v. Parker*, 152 Ga. App. 409, 411 (1980) (special appearance preserves jurisdictional defenses and must be addressed before merits); *Sosebee v. State*, 169 Ga. App. 370, 372 (1984) (failure to establish jurisdiction renders all subsequent orders void).

88.    Rather than address the substance of Plaintiff's appearance, Teplitzky immediately moved to strike the filing and sought default judgment—treating Plaintiff's verified legal notice as a nullity. This maneuver typified a pattern of procedural exploitation in which critical constitutional objections were bypassed,

33

and judgments obtained through tactical omission and non-meritorious default, rather than adjudication on the merits. See *Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 86–87 (1988) (a judgment entered without affording a meaningful opportunity to be heard is void under the Due Process Clause); *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinée*, 456 U.S. 694, 702 (1982) (jurisdictional requirements are fundamental and cannot be presumed or ignored).

89.     In October 2024, Plaintiff received a notice from DCSS regarding alleged arrears. In response, Plaintiff promptly sent a verified notice back to the agency informing them of the unlawful custody and support orders, as well as the relevant reasoning and case law to support his claims. To date, DCSS has never responded to his notice and occasionally still sends harassing notices to Plaintiff regarding alleged arrears.

90.     In November 2024, Plaintiff submitted a formal Notice of Rights Violations and Request for Protection to Georgia Governor Brian Kemp, which was delivered on November 22, 2024. The notice outlined the ongoing constitutional violations, including unlawful contempt proceedings, retaliatory filings, and coercive attempts to imprison Plaintiff for a debt—despite verified claim of indigency, lack of lawful service, or jurisdiction. Plaintiff invoked Art. I, Sec. I, Para. XXIII of the Georgia Constitution ("There shall be no imprisonment for debt") and O.C.G.A. § 15-1-4(b), which prohibits incarceration for contempt based on nonpayment unless willful disobedience is shown through adversarial proof. The notice also cited violations

under 42 U.S.C. §§ 1983 and 1985. Despite the urgency and legal grounding, no investigation or protective action was taken to the best of Plaintiff's knowledge.

### Ongoing Abuse of Civil and Criminal Procedures

91.    Around the same time, and well after Plaintiff's special appearance had been docketed, Claire filed a sworn criminal complaint in Cobb County Magistrate Court accusing Plaintiff of misdemeanor child abandonment under O.C.G.A. § 19-10-1. Relying solely on Claire's uncorroborated affidavit, the court issued an arrest warrant following an ex parte hearing on or about December 30, 2024—without providing Plaintiff proper notice, an opportunity to be heard, or any inquiry into his ability to pay.

92.    The warrant was issued despite the fact that Plaintiff had been involuntarily and unlawfully separated from Wells for over three years, which expressly released him from any enforceable support obligation under principles of reciprocal duty. See *Hooten v. Hooten*, 168 Ga. 86 (1929). This warrant exemplified the continued abuse of state power to retaliate against Plaintiff's protected conduct, extort via threat, and to criminalize poverty under a pretext of parental responsibility.

93.    On March 10, 2025, without Plaintiff's knowledge or opportunity to appear, Brown granted both of Teplitzky's pending motions—striking Plaintiff's special appearance as "irrelevant" and entering a default contempt judgment of approximately $59,000. This ruling was issued despite fatal jurisdictional defects, including improper service and the court's failure to first determine whether it possessed subject-matter or personal jurisdiction—rendering the judgment void ab

initio. See *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998); *Arbaugh v. Y & H Corp.*, 546 U.S. 500 (2006).

94.     By treating Plaintiff's lawful jurisdictional challenge as a nullity and awarding default judgment without evidentiary testing, the court bypassed constitutional safeguards and permitted an end-run around due process. The contempt ruling rested not on any finding of willful disobedience, but on default—engineered through retaliatory tactics, procedural evasion, and denial of access to adversarial process. See *Turner v. Rogers*, 564 U.S. 431, 447 (2011) ("A defendant may not be incarcerated for civil contempt absent express findings and evidence of ability to pay.").

95.     On May 7, 2025, and without any notice to Plaintiff, the Cobb County Superior Court convened a status hearing at which it issued an incarceration order based solely on the void March 10 default judgment. Plaintiff was neither summoned nor given an opportunity to appear, contest jurisdiction, or present a defense. No judicial review of the procedural record occurred prior to issuance of the order, which authorized Plaintiff's arrest and detention.

96.     The proceeding took place entirely ex parte and in violation of core constitutional principles—including the right to notice, to be heard, and to challenge the deprivation of liberty. The court acted ultra vires, without subject-matter jurisdiction, factual foundation, or lawful authority. The resulting incarceration order constituted an egregious deprivation of liberty and marked the culmination of a multi-year campaign of retaliatory enforcement, judicial overreach, and systemic

36

denial of due process. See *Hicks v. Feiock*, 485 U.S. 624, 637 (1988); *Murphy v. Murphy*, 295 Ga. 376, 381 (2014).

### Conclusion and Final Remarks

97.    Plaintiff is a peaceful, law-abiding citizen who has always tried to conduct himself with respect for others and for the rule of law. Raised in a patriotic and nurturing home, he has strived to live according to principles of faith, conscience, and civic responsibility. That said, he has never claimed to be perfect or without fault.

98.    Plaintiff has never—nor would he ever—engage in any act of intentional harm against another person, except in the lawful defense of life, liberty, or property. While Plaintiff recognizes the legitimate interests of the state in protecting vulnerable individuals and regulating conduct where genuine threats exist, he respectfully asserts that he is not a person whose private life, moral character, or fitness as a parent justifies state intrusion absent lawful cause, due process, and adjudicated necessity.

99.    Prior to the events giving rise to this action, Plaintiff had no criminal record, no history of violence, and no experience with civil litigation. The legal and psychological trauma he has endured over the past four years stands in sharp contrast to his lifelong conduct and core values. Any perceived instability or hardship during this time is the direct result of state-sanctioned deprivation and prolonged institutional abuse—not the conduct of a dangerous or irresponsible man.

37

100.   As of the date of this filing, Plaintiff has not had any contact with his son,

Wells, since July 18, 2021. Despite consistent efforts to be a part of Wells' life—

including limited outreach through intermediaries, extended family, and formal

legal motions—all access has been wholly denied and conditioned upon Plaintiff's

compliance with void and insuperable provisions in the underlying divorce decree.

Contact between Wells and his paternal grandparents and extended family has

likewise been effectively severed. In many instances, even the possibility of

communication has been conditioned upon payment of disputed child support or

other financial preconditions—creating a de facto "pay-to-play" arrangement. This

scheme has inflicted avoidable emotional harm and violated state and federal

protections guaranteeing familial association.

101.   The cumulative harm caused by the events described herein has been

devastating. Plaintiff suffers daily from chronic symptoms of PTSD, including

recurring night terrors, anxiety attacks, and persistent emotional distress, which

requires extensive medical treatment. He has lost meaningful contact with his only

child, been publicly stigmatized, financially ruined, and psychologically

destabilized. Once an engaged and contributing member of society, Plaintiff has

been reduced to a state of involuntary dependence on his family—all as a direct

result of systemic misconduct, unlawful state action, and the weaponization of civil

and criminal legal processes.

102.   Plaintiff has no plain, adequate, or effective remedy in state court. The

underlying civil and criminal proceedings were conducted in violation of both the

Georgia Constitution and the Organic Laws of the United States of America, rendering the acts described herein ultra vires and legally void. The record reflects systemic disregard for constitutional safeguards, including jurisdictional defects, denial of due process, and routine suppression of exculpatory evidence.

103.   As the Supreme Court has affirmed, "[n]o state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it." *Cooper v. Aaron*, 358 U.S. 1, 18 (1958). In light of the entrenched procedural irregularities, demonstrated institutional bias, and continued enforcement of void orders, Plaintiff reasonably fears that access to meaningful relief within the state forum is foreclosed.

104.   Plaintiff brings this action in good faith — not to inflame conflict or pursue personal vengeance — but to vindicate the enduring promise that constitutional limits apply equally to all, especially those entrusted with state power. This filing is not borne of controversy or harassment, but stands as a final resort in the pursuit of justice, equity, and accountability.

105.   Again, no judicial finding of unfitness, harm, or risk has ever been entered to justify this complete severance of Plaintiff's relationship with his son, nor has any admissible evidence ever been introduced into the record to substantiate Claire's claims of abuse by Plaintiff. See *Stanley v. Illinois*, 405 U.S. 645 (1972); *Santosky v. Kramer*, 455 U.S. 745 (1982); *Troxel v. Granville*, 530 U.S. 57 (2000).

106.   As a self-represented litigant with documented disabilities, Plaintiff respectfully invokes the longstanding precedent requiring courts to liberally

39

construe pro se filings. He further asks this Court to consider that his

neurodivergent condition may affect the structure or tone of his pleadings, and

requests that all submissions be evaluated on their substantive merit rather.

than formal defects in style or structure. See *Haines v. Kerner*, 404 U.S. 519, 520

(1972) (per curiam); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Baines v. City of

Atlanta*, 634 F. App'x 699, 701 (11th Cir. 2015).

## V. CLAIMS FOR RELIEF

### COUNT I: Private Actors as State Actors for Constitutional Torts

### (42 U.S.C. § 1983)

107.    Plaintiff realleges and incorporates all preceding paragraphs.

108.    Defendants Claire, Daswani, Oppenheimer, K&S, Potter, and Teplitzky—

though private individuals or entities—engaged in coordinated conduct with state

officials to effectuate constitutional violations.

109.    Their joint participation in state-initiated legal actions, misuse of public legal

machinery, and substantial influence over judicial outcomes constituted action

under color of law for purposes of § 1983 liability, consistent with judicial standards

in *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).

110.    This claim affirms the principle that private misuse of public authority, when

undertaken in concert with state officials, is actionable under § 1983.

111.    Plaintiff seeks declaratory and injunctive relief, as well as compensatory and

punitive damages, based on their liability as de facto state actors.

## COUNT II: Retaliatory Prosecution and Denial of Access to Courts

### (U.S. Const. amend. I & XIV; 42 U.S.C. § 1983)

112.    Plaintiff realleges and incorporates all preceding paragraphs.

113.    Defendants Claire, Brown, Marbutt, Gore, Daswani, K&S, Potter, Teplitzky, acting individually and under color of state law, retaliated against Plaintiff for exercising his First Amendment rights, including:

    a.  Filing motions, pleadings and legal challenges;

    b.  Exposing judicial and administrative misconduct; and

    c.  Petitioning the courts and seeking redress of grievance.

114.    This retaliatory campaign included the misuse of protective orders, contempt rulings, criminal prosecution, and financial sanctions, and was intended to chill Plaintiff's continued exercise of constitutional rights and to obstruct access to fair adjudication.

115.    As a direct and proximate result, Plaintiff suffered reputational harm, emotional distress, financial injury, deprivation of access to judicial remedies, and interference with familial relations. Plaintiff accordingly seeks declaratory and injunctive relief, as well as compensatory and punitive damages under 42 U.S.C. § 1983.

## COUNT III: Equal Protection Violations and Religious Discrimination

### (U.S. Const. amend. I & XIV; 42 U.S.C. § 1983)

116.    Plaintiff realleges and incorporates all prior paragraphs.

117.    Defendants Claire, Brown, Marbutt, Gore, Daswani, Oppenheimer, K&S, Potter, and Teplitzky, acting under color of state law, subjected Plaintiff to disparate treatment on the basis of gender, disability, and religious beliefs. These actions included disparate parenting restrictions, denial of accommodations, biased evaluations, and dismissal of claims based on animus. Because the private Defendants acted in concert with state officials, they are also liable under § 1983.

118.    As a direct and proximate result of this unlawful discrimination, Plaintiff suffered reputational harm, emotional distress, financial loss, denial of legal redress, and interference with familial relationships. Plaintiff accordingly seeks declaratory and injunctive relief, and compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

## COUNT IV: Deprivation of Second Amendment Rights

### (U.S. Const. amend. II & XIV; 42 U.S.C. § 1983)

119.    Plaintiff realleges and incorporates all preceding paragraphs.

120.    Defendants Claire, Brown, Marbutt, Gore, Daswani, Oppenheimer, K&S, and Potter, acting individually and under color of state law, caused or conspired to deprive and restrict Plaintiff of his right to keep and bear arms.

121.    These restrictions were imposed without adjudicated findings that Plaintiff posed a threat to himself or others, and were undertaken in retaliation for constitutionally protected activity and/or based on disability discrimination. This conduct violates Plaintiff's clearly established rights under the Second and Fourteenth Amendments.

122.   As a direct and proximate result, Plaintiff suffered emotional distress, reputational harm, loss of property, and unlawful restriction of fundamental rights. Plaintiff accordingly seeks declaratory and injunctive relief, compensatory and punitive damages, and all other relief available under 42 U.S.C. § 1983.

### COUNT V: Unlawful Seizure and Deprivation of Liberty
### (U.S. Const. amend. IV & XIV; 42 U.S.C. § 1983)

123.   Plaintiff realleges and incorporates all preceding paragraphs.

124.   Defendants Claire, Brown, Marbutt, Gore, Daswani, K&S, Potter, and Teplitzky caused the issuance or threat of incarceration orders, criminal prosecutions, unwarranted protective orders, and pretrial restrictions on Plaintiff without indictment or lawful jurisdiction. These actions, taken in concert between public and private parties, deprived Plaintiff of liberty and family integrity in violation of the Fourth and Fourteenth Amendments.

125.   As a direct and proximate result, Plaintiff suffered reputational harm, emotional distress, financial loss, deprivation of liberty, and denial of meaningful judicial redress. Plaintiff accordingly seeks declaratory and injunctive relief, as well as compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

### COUNT VI: Violation of Substantive and Procedural Due Process
### (U.S. Const. amend. V & XIV; 42 U.S.C. § 1983)

126.   Plaintiff realleges and incorporates all preceding paragraphs.

127.   Defendants Claire, Brown, Marbutt, Gore, Daswani, Oppenheimer, K&S, Potter, Teplitzky, acting individually and under color of state law, deprived Plaintiff

43

of protected liberty and property interests —including familial association and physical liberty—without due process of law. This included:

a. Conducting or permitting proceedings without notice or a meaningful opportunity to be heard;

b. Imposing custody, contempt, and psychiatric orders absent findings, jurisdiction, or adversarial safeguards;

c. Suppressing exculpatory evidence;

d. Failing to accommodate Plaintiff's disabilities during hearings, pleadings, or discovery; and

e. Allowing or facilitating judgments and orders that were materially influenced by fraud upon the court or extrinsic deception.

These acts, committed by both public officials and private actors operating in concert, violated Plaintiff's rights under the Fifth and Fourteenth Amendments.

128.    As a direct and proximate result, Plaintiff suffered reputational harm, emotional distress, financial injury, deprivation of access to judicial remedies, and interference with familial relations. Plaintiff accordingly seeks declaratory and injunctive relief, as well as compensatory and punitive damages under 42 U.S.C. § 1983.

## COUNT VII: Denial of Sixth Amendment Rights in Criminal Proceedings

### (U.S. Const. amend. VI & XIV; 42 U.S.C. § 1983)

129.    Plaintiff realleges and incorporates all preceding paragraphs.

130.    Defendants Claire, Brown, Marbutt, Gore, Daswani, K&S, Potter, and Teplitzky, acted individually and under color of state law, to deprive Plaintiff of his right to a speedy and public trial before a fair and impartial tribunal, to confront witnesses and evidence against him, and to effective and unbiased assistance of counsel or meaningful self-representation, especially in light of Plaintiff's disabilities.

131.    These violations occurred during civil and criminal proceedings that lacked jurisdiction, evidentiary basis, or procedural integrity, and were undertaken in retaliation for Plaintiff's protected speech and efforts to defend his parental rights— all in violation of the Sixth and Fourteenth Amendments.

132.    As a direct and proximate result of these violations, Plaintiff suffered reputational harm, emotional and psychological trauma, financial damages, deprivation of liberty, and continued erosion of legal protections. Plaintiff accordingly seeks declaratory and injunctive relief, and compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

## COUNT VIII: Excessive Punishment and Cruel Conditions of Confinement
### (U.S. Const. amend. VIII & XIV; 42 U.S.C. § 1983)

133.    Plaintiff realleges and incorporates all preceding paragraphs.

134.    Defendants Claire, Brown, Marbutt, Gore, Daswani, K&S, Potter, and Teplitzky, acting under color of state law, subjected Plaintiff to punitive restrictions, including confinement threats, coercive psychiatric mandates, and deprivations of liberty—absent any finding of willful misconduct or danger. These

conditions served no legitimate state purpose, amounting to punishment without conviction or adjudication in violation of the Eighth and Fourteenth Amendments.

135.    As a direct and proximate result of these punitive and coercive measures, Plaintiff suffered reputational harm, emotional distress, financial loss, denial of legal redress, and interference with familial relationships. Plaintiff accordingly seeks declaratory and injunctive relief, and compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

## COUNT IX: Denial of Parental Rights Without Findings of Unfitness
## (U.S. Const. amend. XIV, with Ninth Amendment as interpretive authority;
### 42 U.S.C. § 1983)

136.    Plaintiff realleges and incorporates all prior paragraphs.

137.    Defendants Claire, Brown, Marbutt, Daswani, K&S, and Potter, imposed restrictions on Plaintiff's parental rights without judicial findings of unfitness or harm. These deprivations violated Plaintiff's fundamental rights under the Ninth and Fourteenth Amendments. Both judicial and non-judicial actors, working together, created and enforced these unconstitutional restrictions.

138.    As a direct and proximate result, Plaintiff suffered emotional distress, financial injury, interference with familial bonds, and denial of meaningful legal redress. Plaintiff accordingly seeks declaratory and injunctive relief, as well as compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

## COUNT X: Conspiracy to Interfere with Civil Rights
### (42 U.S.C. §§ 1983 & 1985)

46

139.   Plaintiff realleges and incorporates all preceding paragraphs.

140.   Defendants Claire, Brown, Marbutt, Gore, Daswani, Oppenheimer, K&S, Potter, and Teplitzky, engaged in a conspiracy to deprive Plaintiff of rights under color of state law. Their coordinated acts—across both public and private spheres, and through misuse of state procedural mechanisms—were aimed at restricting access to courts, retaliating for protected expression, and depriving Plaintiff of familial and legal rights. These efforts included knowingly submitting or endorsing false evidence, obstructing legal process, and procuring judicial outcomes through extrinsic fraud. The conspiracy violated clearly established constitutional protections.

141.   As a direct and proximate result of this unlawful conspiracy, Plaintiff suffered reputational harm, emotional distress, financial injury, deprivation of parental rights, and denial of legal redress. Plaintiff accordingly seeks declaratory and injunctive relief, as well as compensatory and punitive damages pursuant to 42 U.S.C. §§ 1983 and 1985.

### COUNT XI: Neglect to Prevent Conspiracy to Interfere with Civil Rights (42 U.S.C. § 1986)

142.   Plaintiff realleges and incorporates all preceding paragraphs.

143.   Defendants Brown, Marbutt, Gore, Daswani, Oppenheimer, K&S, Potter, and Teplitzky, as well as DHS and Kemp in their official capacities, failed to act on knowledge of ongoing constitutional violations. Their refusal to intervene facilitated continued injury and violated duties under 42 U.S.C. § 1986.

47

144.    Despite having the legal authority and opportunity to intervene or prevent
further harm, these Defendants failed or refused to act, thereby allowing the
continuation of actions that violated Plaintiff's clearly established rights.

145.    This willful neglect facilitated ongoing injury, including emotional distress,
reputational harm, financial loss, and unlawful deprivation of liberty and familial
bonds.

146.    Plaintiff accordingly seeks:

   a. Declaratory and injunctive relief against Defendants DHS and Kemp, in their
      official capacities, to halt ongoing constitutional violations and ensure non-
      repetition; and

   b. Compensatory and punitive damages from the remaining individual
      Defendants pursuant to 42 U.S.C. § 1986.

### COUNT XII: Abuse of Process and Ultra Vires Acts

### (42 U.S.C. § 1983)

147.    Plaintiff realleges and incorporates all preceding paragraphs.

148.    Defendants Brown, Marbutt, and Gore, acting without lawful jurisdiction and
for improper purposes, used legal process to achieve retaliatory aims. These
included void orders, arrests, and prosecutions disconnected from any legitimate
state interest. Several such actions were procured or sustained through
misrepresentation, deception, or fraud upon the court. The abuse of state machinery
for non-public purposes constituted violations of clearly established rights and is
actionable under § 1983.

149.    As a direct and proximate result, Plaintiff suffered reputational harm, emotional distress, financial harm, deprivation of liberty and familial bonds, and ongoing denial of legal redress. Plaintiff accordingly seeks:

   a. Declaratory relief that the challenged orders and prosecutions were ultra vires and constitutionally void;

   b. Expungement of all associated civil and criminal records;

   c. Preliminary and permanent injunctive relief against continued enforcement of such orders; and

   d. Compensatory and punitive damages pursuant to 42 U.S.C. § 1983.

### COUNT XIII: Fraud Upon the Court and Void Judgments

### (U.S. Const. amend. V & XIV; Supervisory Equity Jurisdiction;

### 42 U.S.C. § 1983)

150.    Plaintiff realleges and incorporates all preceding paragraphs.

151.    Defendants Claire, Brown, Marbutt, Gore, Daswani, Oppenheimer, K&S, Potter, and Teplitzky, acting individually and in concert with state officials under color of law, knowingly engaged in conduct that constituted fraud upon the court, which included:

   a. Submitting or enabling materially false, misleading, or concealed information to influence judicial decisions;

   b. Procuring orders through perjury, ex parte misrepresentations, or suppression of evidence; and

c. Engaging in systematic deception designed to mislead judicial officers and interfere with impartial adjudication.

152. The conduct alleged herein constituted not merely adversarial or intrinsic fraud between parties, but a coordinated and systemic fraud upon the court. Unlike ordinary litigation misconduct, this form of fraud directly compromised the court's ability to function as a neutral arbiter. The deception involved officers of the court and was designed to corrupt the judicial process itself. As the Supreme Court held in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245–46 (1944), "tampering with the administration of justice... is a wrong against the institutions set up to protect and safeguard the public," and therefore requires vacatur of all resulting judgments as void ab initio under the Court's inherent and equitable powers.

153. As a direct and proximate result, Plaintiff was subjected to unlawful restrictions, void orders, reputational and emotional harm, deprivation of liberty and parental rights, and financial injury.

154. Plaintiff accordingly seeks:

a. Declaratory relief that judgments and orders procured through fraud upon the court are void ab initio;

b. Injunctive relief halting their continued enforcement;

c. Expungement of all related records; and

d. Compensatory and punitive damages from responsible parties under 42 U.S.C. § 1983.

## COUNT XIV: Violation of the Americans with Disabilities Act (Title II)

## (42 U.S.C. § 12131 et seq.; 28 C.F.R. Part 35; 29 U.S.C. § 794a for remedies)

155.   Plaintiff realleges and incorporates all preceding paragraphs.

156.   Plaintiff is a qualified individual with disabilities under the ADA, including but not limited to: PTSD, ADHD, and ASD. These conditions affect major life activities and are documented by medical professionals.

157.   Defendants Brown, Marbutt, Gore, Daswani, and DHS—acting under color of state law and subject to Title II of the ADA—failed to provide reasonable accommodations for Plaintiff's documented disabilities, including procedural modifications, communication supports, or cognitive access mechanisms. Their refusal to modify procedures or ensure meaningful participation in legal proceedings constituted unlawful discrimination.

158.   As a direct and proximate result of Defendants' failure to provide reasonable accommodations, Plaintiff suffered emotional and psychological harm, denial of access to justice, financial damages, reputational injury, and erosion of parental and other rights.

159.   Plaintiff accordingly seeks declaratory and injunctive relief, compensatory damages, and attorneys' fees and costs pursuant to 42 U.S.C. § 12133 and 29 U.S.C. § 794a, which provides the remedies framework for Title II of the ADA.

## COUNT XV: Intentional Infliction of Emotional Distress

## (Georgia Common Law)

160.   Plaintiff realleges and incorporates all preceding paragraphs.

161.    Defendants Claire, Daswani, Oppenheimer, K&S, Potter, and Teplitzky, acting individually and/or under color of law, engaged in extreme and outrageous conduct causing severe emotional distress. Their actions—including defamation, custody interference, and malicious legal tactics—were intentional or recklessly indifferent to the harm caused.

162.    As a direct and proximate result of this extreme and outrageous behavior, Plaintiff suffered severe emotional distress, reputational harm, financial injury, loss of liberty, and interference with familial bonds. Plaintiff accordingly seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

**COUNT XVI: Violation of Georgia Constitution – No Imprisonment for Debt**

**(Ga. Const. Art. I, Sec. I, Para. XXIII)**

163.    Plaintiff realleges and incorporates all preceding paragraphs.

164.    Defendants Claire, Brown, K&S, Potter, Teplitzky, and DHS attempted to incarcerate Plaintiff through civil contempt arising from void debt obligations—without findings of willfulness or proper procedure. These acts violated Article I, Sec. I, Para. XXIII of the Georgia Constitution, which forbids imprisonment for debt absent lawful process.

165.    The issuance and attempted enforcement of incarceration orders based solely on civil debt—absent lawful findings or due process—violated Plaintiff's constitutional rights and Georgia's public policy. Plaintiff accordingly seeks:

    a.  Declaratory relief that such orders are void;

    b.  Expungement of associated civil and/or criminal records;

c. Restitution of all amounts involuntarily collected by DHS in connection with the unlawful contempt and support actions; and

d. Compensatory and punitive damages for severe emotional distress.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.   **Declaratory Relief,** pursuant to 42 U.S.C. § 1983, 28 U.S.C. §§ 2201–2202 and the equitable powers of this Court, a declaration that:

1. Defendants violated Plaintiff's protected rights under the First, Second, Fourth, Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the Constitution for the United States of America;

2. Defendants violated Plaintiff's protected rights under Article I, Section I, Paragraphs I, II, III, IV, V, VI, VII, IX, XI, XII, XIII, XIV, XVII, XXIII, XXV, and XXVIII of the Georgia Constitution;

3. All custody, support, consent, contempt, protective, and criminal orders/judgments issued against Plaintiff since November 3, 2020, are void ab initio due to fraud upon the court, extrinsic deception, lack of subject-matter or personal jurisdiction, and systemic denial of due process;

4. The coordination among public officials and private parties constituted fraud upon the court, unlawful conspiracy, and breach of legal duty;

5. Defendant Claire M. Harvey's documented pattern of abuse—including conduct that contributed to Plaintiff's PTSD, her exploitation and disregard

53

for the neurodivergent needs of both Plaintiff and Wells, her obstruction of their lawful parent-child relationship absent any adjudicated finding of unfitness or harm, and her use of Wells as leverage for coercion and financial gain—constitutes a sustained course of conduct fundamentally incompatible with Plaintiff's constitutionally protected rights and with the best interests of Wells;

6. Plaintiff's fundamental rights as a fit father are constitutionally protected, and may not be denied absent lawful adjudication consistent with due process and equal protection guarantees, in accordance with foundational constitutional and common-law principles;

7. Defendants' conduct violated Plaintiff's right to reasonable accommodations and full participation in state proceedings under the ADA, entitling Plaintiff to declaratory relief under 42 U.S.C. § 12133 and 29 U.S.C. § 794a;

8. Any firearms-related restrictions imposed on Plaintiff were unconstitutional and void under the Second and Fourteenth Amendments and must be lifted, with records corrected accordingly; and

9. For such declarations as are necessary to establish that all claims were timely filed under doctrines of equitable tolling and continuing violation.

These declarations and findings are necessary to guide and support the adjudication of Plaintiff's claims for injunctive relief, monetary damages, and other equitable remedies, as well as to ensure that federal protections are not nullified through continuing state enforcement or collusion.

B.    **Injunctive Relief**, based on the foregoing declaratory findings, Plaintiff

requests the following injunctive relief:

1. Enjoining Defendants from enforcing unconstitutional or void orders;

2. Prohibiting retaliation against Plaintiff for asserting his rights;

3. Restraining further efforts by Defendants to deprive Plaintiff of liberty,

   property, or parental rights;

4. Ordering restoration of Plaintiff's constitutionally protected parental

   relationship and access, consistent with due process and absent any

   adjudicated finding of unfitness or harm;

5. Declaring that continued obstruction of Plaintiff's relationship with his child

   based on void orders or discriminatory animus violates federal law and

   cannot lawfully continue under color of state authority; and

6. Direct the Cobb County Sheriff's Office to return Plaintiff's lawfully owned

   firearm(s) or other seized property, forthwith, unless retained pursuant to a

   lawful, adjudicated basis consistent with due process, equal protection, and

   the Second Amendment.

C.    **Expungement and Record Clearance:**

1. Order the expungement of all civil and criminal records arising from void,

   unlawfully induced, or unconstitutional orders or proceedings; and

2. Direct removal or sealing of Plaintiff's identifying or biological information

   from any state or federal database (including GCIC and NCIC) linked to such

unlawful proceedings, including all third-party repositories and law

enforcement databases that maintain such data; and

3. Direct removal of Plaintiff's data from firearm disqualification databases and

registries where entered unlawfully, without adjudication of danger or due

process.

D.    **Compensatory Damages**, in an amount to be determined at trial, for loss of

liberty, emotional distress, reputational harm, and financial injury.

E.    **Punitive Damages**, against individual Defendants whose conduct was

willful, malicious, oppressive, or in reckless disregard for Plaintiff's rights, and to

deter similar conduct.

F.    **Attorney's Fees and Costs**, including but not limited to:

1. Fees and expenses incurred for prior legal representation in related civil,

family, and criminal proceedings—including divorce, custody, contempt, and

defense counsel—necessitated by the unconstitutional acts and coordinated

conduct alleged herein;

2. All costs associated with this action, including pro se litigation expenses,

research, filing, service, and discovery; and

3. Any other attorney's fees and costs recoverable under 42 U.S.C. § 1988 or

other applicable federal or state fee-shifting statutes.

G.    **Other Equitable and Legal Relief**, including:

1. Restitution for any earnings, property, or opportunities unlawfully taken or

denied;

2. Referral to appropriate disciplinary, administrative, or prosecutorial authorities for investigation of misconduct by public and private actors where supported by the record;

3. That the Court exercise its equitable authority to require each Defendant to file a sworn response, under penalty of perjury, to Plaintiff's Verified Complaint, confirming or denying the specific factual allegations asserted against them, in the interest of judicial economy, transparency, and early resolution of material disputes; and

4. Leave to amend this Complaint as justice may require.

H.    **Demand for Trial by Jury**, pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

I.    **Any Further Relief**, that equity and justice require to restore Plaintiff's dignity, liberty, and full enjoyment of his rights.

I, Matthew Thomas Harvey, hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 31st day of July, 2025.

**Matthew Thomas Harvey**
Plaintiff, pro se
All Rights Reserved

Matthew Thomas Harvey
c/o 501 North Slappey Boulevard
#1112
Albany, Georgia [31701]
Mharvey7744@gmail.com
(912) 346-5299