FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

AUG 0 6 2026

KEVIN P. WEIMER, Clerk
By: _____ Deputy Clerk

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| MATTHEW THOMAS HARVEY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 1:25-cv-04688-JPB |
| v. | ) | |
| | ) | |
| CLAIRE M. HARVEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT KIM C. OPPENHEIMER'S MOTION FOR ATTORNEY'S FEES AND REASONABLE COSTS [DOC. 75]

COMES NOW Plaintiff Matthew Thomas Harvey, proceeding pro se, respectfully opposes Defendant Kim C. Oppenheimer's Motion for Attorney's Fees and Reasonable Costs [Doc. 75]. The motion should be denied. It treats an adverse Rule 12 ruling as though it were itself a Rule 11 violation, but the dismissal order did not find that Plaintiff fabricated facts, concealed authority, disobeyed an order, or litigated in bad faith. The Court instead resolved disputed questions of quasi-judicial immunity, state action, and pleading sufficiency. [Doc. 73 at 14–21].

The motion also materially understates Plaintiff's factual basis. Plaintiff did not sue merely because he disliked an unfavorable opinion. He challenged a process in which he paid more than $12,000 for a court-

1

appointed "full and complete evaluation," received no written evaluative product or diagnosis, was told that diagnoses were "more prejudicial than helpful," and then heard severe oral risk opinions that were based in part on disputed source material, acknowledged uncertainty, and factual assumptions subject to substantial cross-examination. Those oral opinions were then incorporated into the guardian ad litem's safety and custody positions before Plaintiff received any reviewable analysis explaining how the testing and contradictory evidence had been weighed.

The underlying domestic-relations materials are offered here for one limited purpose: to answer Defendant's accusation that Plaintiff had no reasonable factual basis and acted only to harass her. Plaintiff does not ask this Court to revisit custody, decide which former spouse was more credible, or determine whether Defendant's professional opinions were ultimately correct.

The requested $19,985 blanket award independently fails for lack of proof. Every meaningful billing narrative is redacted. The case never progressed to an answer, discovery, deposition, evidentiary hearing, summary judgment, or trial, and virtually no substantive activity involving Defendant occurred after early March 2026. Yet Defendant seeks all 75.9 hours billed through May 31, 2026 without identifying the work performed or tying any charge to a particular alleged Rule 11 violation.

2

## I. GOVERNING STANDARDS

**A. Rule 11 addresses objectively unreasonable filings, not every unsuccessful claim.**

Rule 11 requires a reasonable prefiling inquiry and asks whether factual contentions had evidentiary support or were likely to obtain support after a reasonable opportunity for investigation or discovery, and whether legal contentions were warranted by existing law or a nonfrivolous argument for changing it. Fed. R. Civ. P. 11(b)(2)–(3). The inquiry is made from the circumstances existing when the challenged paper was presented, not through hindsight after dismissal. Baker v. Alderman, 158 F.3d 516, 524 (11th Cir. 1998). A court therefore asks whether the position was objectively frivolous and, if so, whether the signer should have known it was frivolous after reasonable inquiry. Peer v. Lewis, 606 F.3d 1306, 1311 (11th Cir. 2010).

Even if a violation is found, Rule 11 is deterrent rather than an automatic fee-shifting device. A sanction must be limited to what suffices to deter repetition, and an attorney-fee award may include only reasonable fees and expenses "directly resulting from the violation." Fed. R. Civ. P. 11(c)(4). The Court must identify the particular conduct found to violate the Rule. Fed. R. Civ. P. 11(c)(6).

**B. Inherent-power fees require subjective bad faith and but-for causation.**

The Court's inherent power is narrower in the respect that matters here. It requires subjective bad faith, proved either directly or through

3

conduct so egregious that it could only have been committed in bad faith; recklessness alone is insufficient. Purchasing Power, LLC v. Bluestem Brands, Inc., 851 F.3d 1218, 1223–25 (11th Cir. 2017). Because inherent powers are potent, they must be exercised with restraint and with notice and an opportunity to respond. In re Mroz, 65 F.3d 1567, 1575–76 (11th Cir. 1995).

A compensatory inherent-power award must also satisfy but-for causation. Goodyear Tire & Rubber Co. v. Haeger, 581 U.S. 101, 108–10 (2017). A blanket award of every defense dollar is permissible only in the exceptional circumstance where the entire litigation was initiated or continued in bad faith such that all fees would have been avoided but for the misconduct.

## C. Rule 54(d) does not independently create a right to fees.

Defendant also cites Rule 54(d), but that rule supplies no substantive entitlement to sanctions. Its ordinary fee-motion provisions expressly do not govern claims for fees sought as sanctions for violating the Federal Rules. Fed. R. Civ. P. 54(d)(2)(E). Defendant must therefore satisfy Rule 11 or the Court's inherent-power standard; Rule 54(d) cannot substitute for either.

## II. PLAINTIFF'S LEGAL POSITIONS WERE NOT OBJECTIVELY FRIVOLOUS

### A. The Court accepted Plaintiff's central Rooker-Feldman distinction.

Defendant characterizes the entire action as an improper attempt to relitigate a divorce. The dismissal order did not. It held that "most" of Plaintiff's claims focused on alleged constitutional violations during the state proceedings and fell outside Rooker-Feldman, while only portions of Counts VII and VIII seeking relief directed at state orders were barred. [Doc. 73 at 14–15]. That conclusion substantially accepted the claim-by-claim jurisdictional distinction Plaintiff advanced in his consolidated opposition. [Doc. 53 at 4–6].

That ruling does not establish that every claim against Defendant was sufficient. It does foreclose the premise necessary for a blanket award: that the whole suit was an obviously forbidden domestic-relations appeal brought with no reasonable legal foundation.

### B. Plaintiff disputed the scope and application of immunity; he did not conceal it.

Plaintiff expressly addressed quasi-judicial immunity and argued that the inquiry is functional and limited to conduct within the official's authorized role. [Doc. 53 at 18–20]. The Court agreed with the legal proposition that nonjudicial officials must act within the scope of their authority, but concluded that the acts pleaded here remained within that

scope. [Doc. 73 at 15–17 (citing Roland v. Phillips, 19 F.3d 552, 555 (11th Cir. 1994))]. That is a losing application of doctrine, not a failure to acknowledge binding law of the type discussed in DeSisto College, Inc. v. Line, 888 F.2d 755 (11th Cir. 1989).

The precise immunity rule applied to Defendant was not so self-evident that disagreement was sanctionable. Defendant relied on an unpublished guardian-ad-litem decision, witness-immunity principles, and district-court authority concerning court-appointed professionals. [Doc. 46 at 6–10; Doc. 75 at 7–8]. Plaintiff argued that conduct outside a neutral evaluative function and alleged joint participation required a function-specific inquiry. The Court rejected that argument, but Rule 11 does not punish every unsuccessful effort to define the boundary of an immunity doctrine.

## C. Plaintiff's joint-participation allegations were based on an evidentiary sequence he sought discovery to test.

The First Amended Complaint [Doc. 44] alleged communications between Defendant and the guardian ad litem, cancellation of Plaintiff's final appointment, oral feedback delivered through a court-related conference, and the rapid use of Defendant's conclusions in later proceedings. [Doc. 44 ¶¶ 43–47]. Plaintiff did not possess the participants' private communications. He sought discovery into them, but no defendant answered, discovery never opened, and no communication was produced.

The Court ultimately found those allegations insufficient to establish state action or conduct outside Defendant's protected role. [Doc. 73 at 16–21]. Rule 11(b)(3), however, expressly permits a factual contention that is reasonably expected to obtain evidentiary support after discovery. The absence of evidence held exclusively by the opposing participants cannot, without more, establish that seeking discovery was itself sanctionable.

### III. PLAINTIFF POSSESSED A DOCUMENTED, GOOD-FAITH FACTUAL BASIS

The following evidence is not offered to retry the divorce. It is offered only because Defendant's sanctions motion says Plaintiff had no factual basis other than disagreement with her opinion. [Doc. 75 at 6–7]. The record shows a concrete dispute about the scope, transparency, methodology, and neutrality of the evaluation.

### A. The appointment contemplated a complete and reviewable evaluation, but Plaintiff received no written evaluative product.

The July 12, 2021 appointment order required Defendant to conduct such testing and use such clinical tools as she deemed necessary to perform a "full and complete evaluation." It provided that, upon completion, "all evaluations, reports, etc." would be delivered to the guardian ad litem and distributed to counsel under detailed confidentiality protections for attorney consultation, expert review, trial preparation, and potential evidentiary use. It also provided that each party would initially pay his or her own evaluation fees, subject to later judicial reallocation. [Ex. E at 1–3].

Plaintiff does not contend that the order expressly mandated a particular diagnosis or a separately titled written report. The order's structure nevertheless contemplated a reviewable evaluative product. Defendant's office confirmed that Plaintiff had paid $12,256.24. [Doc. 75-1 at 2]. Defendant then requested an additional $8,000 retainer to prepare a written report and explained that Plaintiff's existing retainer was being consumed by document review, cataloging, and test scoring. [Ex. C-2]. Plaintiff ultimately received no written analysis of the testing, source material, or contradictory evidence.

After the oral feedback, Defendant wrote that she considered diagnoses "more prejudicial than helpful" in these evaluations and therefore assigned no diagnosis to either party. [Ex. C-4]. Yet her oral testimony included far more consequential characterizations: distorted reality, severe judgment concerns, and worst-case predictions of homicide, harm to W.H., and suicide. Plaintiff had an objectively reasonable basis to question why highly prejudicial oral risk conclusions were delivered without a written clinical explanation capable of meaningful review and rebuttal.

## B. The testimony disclosed acknowledged uncertainty and concrete methodological concerns.

Defendant acknowledged that Plaintiff had never harmed W.H., that Claire Harvey had never claimed he physically harmed W.H., that no therapist or family member reported such harm, and that Plaintiff made no

8

direct threat against the child. She also acknowledged that, during the feedback session, she had said something to the effect that Plaintiff would "never" harm W.H. [Ex. A-1, Apr. 25 Tr. 110–17]. She nevertheless testified that harm to the child was a "possibility" if Plaintiff became desperate after losing contact, while admitting she could not assign any likelihood or percentage and that her risk assessment was an unscored clinical judgment. [Id. at 71, 75–77, 96].

Other concrete issues were likewise exposed on cross-examination. Defendant treated an ambiguous reference to ownership of "an AR-15 and a handgun no longer in his possession" as proof that Plaintiff currently possessed the AR-15, and said that learning neither firearm was in his possession would not change her conclusion because guns were generally accessible. [Id. at 133–35]. She relied on a Global Assessment of Functioning score while acknowledging that the GAF was subjective, was no longer used in DSM-5, and had been discontinued for reliability concerns. [Id. at 128–31]. She testified that Claire's Seroquel was prescribed for sleep but could not identify a provider note confirming that purpose and stated that she was not qualified to address withdrawal from antipsychotic medication. [Id. at 103–08].

Defendant publicly described herself as a "Clinical/Forensic Psychologist," while acknowledging under oath that she possessed no certification in forensic psychology. [Id. at 137; Ex. D]. Plaintiff does not

contend that board certification is legally required for every forensic service. The point is narrower: the transcript itself documented material limits on the specialized credentials and opinions that Plaintiff questioned.

**C. Plaintiff supplied Defendant with significant contrary evidence before she completed the evaluation.**

Plaintiff provided Defendant contemporaneous messages and recordings bearing on Claire Harvey's conduct and on whether she genuinely viewed him as an immediate lethal danger. On January 22, 2022, he sent an email and text-message exhibit from September 2019, in which Claire had threatened to kill him and then herself after he proposed separation/divorce the first time. [Ex. B at 1–3]. In a February 16, 2022 email, Plaintiff further advised Defendant that, while he was undergoing treatment for major depressive disorder and experiencing suicidality, Claire had told him that she and W.H. would be better off if he committed suicide. [Ex. C-1]. He later supplied the corresponding audio excerpt; in the recorded exchange, Claire acknowledged that she had made a "very cruel" and "very unkind" statement. [Ex. C-2].

That same January, Plaintiff sent Defendant a contemporaneous exchange between Claire and Plaintiff's mother in which Claire expressed interest in settling the divorce, selling the marital residence, dividing the proceeds, and refocusing on co-parenting W.H. Defendant acknowledged receipt of the update. [Ex. C-3]. Plaintiff does not contend that this exchange,

10

standing alone, conclusively disproved subjective fear. Its significance lay in the broader history supplied to Defendant: although Claire had previously alleged sufficient fear and danger to obtain an ex parte protective order, Plaintiff thereafter entered the marital home on dozens of occasions through July 2021 with Claire's knowledge and participation, often while only Claire and W.H. were present and sometimes while Claire's mother was also present.

Claire's repeated acceptance of those private, in-person interactions—together with her later proposal to settle and refocus on co-parenting—was materially inconsistent with the subsequent presentation of Plaintiff as a continuous and immediate lethal threat. A neutral evaluator could therefore reasonably be expected to address and reconcile that inconsistency before offering extreme dangerousness opinions.

The source evidence Defendant used against Plaintiff was also genuinely disputed. Therapist Shana Adkins testified that she did not consider Plaintiff appropriate for a Georgia 1013 emergency commitment, did not believe he was in imminent danger of harming himself, knew of no act of violence against Claire, had no concern that he would harm W.H., and never spoke with Defendant. [Ex. A-2, Apr. 26 Tr. 139–40, 164–67]. Defendant had nevertheless relied extensively on Adkins's notes and acknowledged during cross-examination that counsel had raised a discrepancy concerning a statement attributed to those notes. [Ex. A-1, Apr. 25 Tr. 115–17].

11

At the same time, Defendant acknowledged that Claire was substantially defensive on testing, that her PAI protocol was invalid because of defensiveness, and that the record included incidents involving hitting, smashed plates, knives, pacing, and obsessive thoughts. [Id. at 89–93, 112–15, 125–26]. Defendant was free to weigh that evidence differently. Plaintiff was likewise entitled, without being sanctioned, to question the marked difference between the treatment of uncertainty concerning each party—especially where Defendant testified that she had no concerns about Claire. [Id. at 89–93].

## D. Defendant's oral opinions immediately became the lens for the guardian's safety position.

Defendant now emphasizes that she did not formally recommend a custody schedule. That distinction is true but incomplete. The guardian ad litem testified that Defendant's evaluation showed concerns that Plaintiff could harm Claire, Claire's mother, W.H., and himself; interpreted Plaintiff's writings as resembling "suicide notes" when viewed through the "lens of the psychological evaluation"; and relied on Defendant's conclusions in advocating safety restrictions. [Ex. A-3, May 4 Tr. 50–52]. The guardian also acknowledged that Defendant was not conducting a custody evaluation and that the guardian had not personally interacted with Plaintiff since July 2021. [Id. at 82–83].

12

Thus, Plaintiff's concern was not simply that Defendant reached an answer he disliked. It was that severe oral opinions, delivered without a reviewable written analysis and while significant contrary evidence remained unresolved, became the evidentiary foundation for recommendations affecting his liberty and parent-child relationship.

**E. The sequence supported a reasonable inference to be tested in discovery, not a proven conspiracy.**

Plaintiff does not ask the Court in this response to find that Defendant, the guardian ad litem, counsel, or the state judge rehearsed testimony or entered a secret agreement. The sequence nevertheless gave Plaintiff an objectively reasonable basis to seek discovery. The July 12, 2021, order required each party to schedule an initial appointment "as soon as practicable," cooperate fully, and refrain from delaying the evaluations. Plaintiff promptly participated, while Claire did not contact Defendant to begin her evaluation until late December 2021—approximately five months after entry of the order and only after Judge Marbutt's recusal. Plaintiff reasonably viewed that prolonged noncompliance as intentional. Defendant then postponed Plaintiff's remaining appointment while proceeding with additional sessions with Claire, after which Defendant's oral conclusions were rapidly incorporated into the guardian ad litem's safety position. Together with the participants' common reliance on disputed sources, that sequence supplied a reasonable basis to suspect non-neutral coordination and

13

to seek the underlying communications. Whether the inference could ultimately be proved was a discovery question; those communications remained under Defendants' control, and Plaintiff never received discovery.

## IV. THE RECORD DOES NOT SUPPORT AN IMPROPER-PURPOSE OR SUBJECTIVE-BAD-FAITH FINDING

The First Amended Complaint [Doc. 44] expressly disclaimed any request for this Court to determine custody or act as an appellate court over the divorce decree. [Doc. 44 ¶¶ 2–5]. Plaintiff removed parties, narrowed his theories after the TRO ruling, and sought damages for alleged independent injuries. Those actions are inconsistent with Defendant's claim that the lawsuit served no purpose other than harassment.

Defendant relies heavily on Plaintiff's May 2022 reimbursement demand. [Doc. 75 at 3 n.1; Doc. 75-1]. By then, however, Plaintiff had paid $12,256.24, received no written evaluative product or diagnosis, was told that a report required another $8,000, and could not reconcile the allocation of charges under an order providing that each party would pay his or her own evaluation costs unless the court later reallocated them. The email was forcefully worded, but it arose from a real dispute over performance, deliverables, and accounting. Threatening to pursue a lawful civil claim does not establish that a federal action was fabricated.

Defendant also cites the number of Plaintiff's motions. Those filings addressed distinct matters—emergency relief, service, electronic filing,

14

amendment, and recusal. Some were unsuccessful, but the number of requests does not establish that the complaint itself was presented for an improper purpose. Nor does Plaintiff's refusal to withdraw after the safe-harbor demand prove bad faith. Rule 11 gave him an opportunity to reconsider; it did not require surrender where he continued to believe, in good faith, that the claims and requested discovery were nonfrivolous.

Most importantly, the dismissal order contains no finding of fabrication, deceit, abuse of discovery, violation of a court order, or subjective bad faith. Defendant's inherent-power request therefore requires findings and evidence that the Rule 12 dismissal did not supply.

## V. DEFENDANT HAS NOT PROVED THAT $19,985 IS REASONABLE OR CAUSED BY SANCTIONABLE CONDUCT

### A. Complete narrative redactions make the request impossible to test.

The fee applicant bears the burden of establishing entitlement and documenting reasonable hours and rates. Norman v. Housing Authority of City of Montgomery, 836 F.2d 1292, 1303 (11th Cir. 1988). To the extent Defendant invokes Rule 54(d), Northern District of Georgia Local Rule 54.2 likewise requires a detailed specification and itemization with supporting documentation. Defendant instead removed every meaningful task description from the invoices and offered the unredacted records only for private in-camera review. [Doc. 75-2 at 5–31].

15

Without neutral task descriptions, Plaintiff cannot determine whether an entry involved reviewing a pleading, communicating with an insurer, coordinating with other defendants, duplicating another lawyer's work, performing clerical activity, preparing the sanctions motion, or working on an unrelated matter. Privilege may justify limited redaction of strategy or substance; it does not justify concealing the nature of every task while seeking to impose the resulting charge on the opposing party. At minimum, Defendant must provide meaningfully redacted descriptions that permit adversarial review.

## B. The hours are unexplained in light of the limited procedural posture.

Defendant seeks payment for 75.9 hours even though her participation consisted principally of waiver and service matters, two motions to dismiss, preliminary reports, and coordination concerning pending motions. She filed no answer. Discovery never opened. There were no depositions, written discovery, discovery disputes, evidentiary hearings, experts retained in this action, summary-judgment proceedings, or trial.

The invoices include 20.7 hours in December, 19.3 hours in February, a six-hour partner entry on February 23, and six hours concentrated on May 27 and May 29. [Doc. 75-2 at 12–24, 28–30]. After the March 2 scheduling order, the invoices reflect only 0.9 hours in March and then six hours in late May, when no substantive merits activity involving Defendant appeared on the

16

docket. [Id. at 25–30]. The proposed Rule 11 motion was served on June 18. The timing strongly suggests that at least some late-May work concerned sanctions preparation, but the complete redactions prevent confirmation.

Time reasonably spent preparing a successful Rule 11 motion may sometimes be recoverable. It must still be identified, segregated, and shown to be reasonable. It cannot be hidden among ordinary defense charges and then included automatically in a blanket request.

## C. Defendant has not performed the claim- and task-specific causation analysis Rule 11 requires.

Rule 11(c)(4) permits only fees directly resulting from the violation. Defendant does not identify a particular count, factual allegation, or filing and connect it to corresponding work. She instead assumes that every dollar billed since October 2025 resulted from sanctionable conduct.

That assumption cannot be reconciled with the dismissal order. The Court agreed with Plaintiff on the narrow reach of Rooker-Feldman, decided immunity through a contested functional analysis, and did not adopt several other defenses. Counsel also performed ordinary administrative work, coordinated with other defendants, and apparently prepared the sanctions request itself. A blanket award would require a finding that the entire action was pursued in complete bad faith and that every claimed hour would have been avoided but for that bad faith. Goodyear, 581 U.S. at 108–10. The record does not permit that finding.

17

## D. The affidavit leaves additional material questions unresolved.

Counsel's affidavit states that the fees were incurred "by Defendant Oppenheimer or on Defendant Oppenheimer's behalf," and the invoices identify her as an "insured." [Doc. 75-2 at 1–7]. The filing does not identify amounts actually paid, any insurer payment, write-offs, reductions, outstanding balances, or the person to whom an award would be payable. Insurance involvement does not necessarily bar recovery, but the applicant must establish the actual reasonable expense for which compensation is sought and avoid any double recovery.

The affidavit also offers a blanket reasonableness opinion while withholding the task information necessary to test that opinion. The Court should not impose a personal monetary judgment on this record.

## VI. THE COURT SHOULD DENY THE MOTION OR DEFER IT PENDING POST-JUDGMENT REVIEW

Plaintiff intends to file a timely motion under Federal Rule of Civil Procedure 59(e) seeking alteration or amendment of the dismissal judgment and, if necessary after disposition of that motion, to pursue appellate review. Plaintiff does not contend that a Rule 59(e) motion automatically deprives this Court of authority over collateral sanctions matters. The point is practical: Defendant's motion depends on the premise that the dismissal rulings were so obvious that no reasonable litigant could dispute them.

18

If the judgment is altered, vacated, or later remanded on immunity, state action, pleading sufficiency, dismissal with prejudice, or leave to amend, the foundation for sanctions will materially change. The Court should deny the motion now or, at minimum, defer adjudication until the Rule 59(e) motion and any necessary appellate review are complete.

## VII. ALTERNATIVE REQUEST FOR DISCLOSURE, SUPPLEMENTAL BRIEFING, AND A HEARING

If the Court does not deny the motion on the present record, Plaintiff respectfully requests an order requiring the following before any monetary sanction is considered:

1. production to Plaintiff of unredacted or meaningfully redacted billing records containing neutral task descriptions;

2. identification of the payor, amounts actually paid, reductions, write-offs, insurer involvement, outstanding balances, and intended recipient of any award;

3. segregation of work concerning the sanctions request, collective-defense coordination, administrative tasks, and any matter unrelated to Defendant's own defense;

4. identification of each alleged Rule 11 violation and each fee claimed to have resulted directly from it;

5. an opportunity to file a supplemental response after disclosure; and

6. an evidentiary hearing at which Plaintiff may examine the fee affiant concerning billing judgment, reasonableness, causation, and the affidavit's factual assertions.

If the Court considers any monetary sanction, Plaintiff also requests an opportunity to submit evidence of his financial circumstances. Ability to pay and the resources of the person sanctioned are relevant to an amount designed to deter rather than destroy. <u>Baker</u>, 158 F.3d at 528.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court DENY Defendant Kim C. Oppenheimer's Motion for Attorney's Fees and Reasonable Costs [Doc. 75]. Alternatively, Plaintiff requests that the Court defer the motion pending disposition of his Rule 59(e) motion and, if necessary, subsequent appellate review, or require adequate billing disclosure, supplemental briefing, and an evidentiary hearing before considering any monetary award.

Respectfully submitted this 3rd day of August, 2026.

*/s/ Matthew Thomas Harvey*
**Matthew Thomas Harvey**
Plaintiff, pro se

c/o 501 North Slappey Blvd. #1112
Albany, Georgia 31701
Mharvey7744@gmail.com
(912) 346-5299

20

## CERTIFICATE OF SERVICE

I certify that on the date below, I served the foregoing *Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's Motion for Attorney's Fees and Reasonable Costs* as follows:

Via Email (counsel of record):

- Noah Green, counsel for Claire M. Harvey —

  ngreen@henefeldgreen.com

- Christine L. Mast & Jamie McDowell, counsel for Kessler & Solomiany, LLC; Stefanie S. Potter; Molly Y. Teplitzky — cmast@hpylaw.com; jmcdowell@hpylaw.com

- Courtney B. Walker; Alex M. Battey; Tia M. Brown, counsel for Kim C. Oppenheimer — cwalker@hallboothsmith.com; abattey@hallboothsmith.com; tbrown@hallboothsmith.com

- James R. Doyle, II, counsel for Brandy J. Daswani — james.doyle@lewisbrisbois.com

This 3rd day of August, 2026.

/s/ *Matthew Thomas Harvey*
**Matthew Thomas Harvey**
Plaintiff, pro se

c/o 501 North Slappey Boulevard #1112
Albany, Georgia 31701
Mharvey7744@gmail.com
(912) 346-5299

21

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **MATTHEW THOMAS HARVEY,** | **CIVIL ACTION NO.** |
| Plaintiff, | |
| | **1:25-CV-04688-JPB** |
| v. | |
| **CLAIRE M. HARVEY, et al.,** | |
| Defendants. | |

# EXHIBIT A-1

---

## Selected Excerpts from the April 25, 2022 Final-Hearing Transcript

*Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's*
*Motion for Attorney's Fees and Reasonable Costs [Doc. 75]*

Matthew Thomas Harvey - Plaintiff, pro se

ID# 2022-0149298-CV
⚜ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**20106987**

Angela Brown - 66
NOV 18, 2022 09:42 AM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

CLAIRE MARSH HARVEY,                    ) CIVIL ACTION FILE
                                        )
                  Plaintiff,            ) NO.: 20-1-06987-66
                                        )
      vs.                               )
                                        )
MATTHEW THOMAS HARVEY,                  )
                                        )
                  Defendant.            )
_____)

CIVIL NONJURY PROCEEDINGS
April 25, 2022

Heard before Judge Angela Z. Brown
Cobb County Superior Court
Sixth Floor, Courtroom 6300
70 Haynes Street
Marietta, Georgia 30090

APPEARANCES OF COUNSEL:

On Behalf of Plaintiff:

Stefanie S. Potter, Esq.
Molly Teplitzky, Esq.

On Behalf of Defendant:

Leah J. Zammit, Esq.

Guardian ad Litem:

Brandy Daswani, Esq.

Deborah Fedorchak
Official Court Reporter
Cobb County Superior Court
70 Haynes Street
Marietta, Georgia 30090
Deborah.Fedorchak@cobbcounty.org

1

**INDEX TO EXAMINATIONS**

Examination                                                    Page

**KIMBERLY CRANE OPPENHEIMER, PH.D.**

Direct Examination by Ms. Potter                                58

Cross-Examination by Ms. Zammit                                 97

Examination by Ms. Daswani                                     142

Redirect Examination by Ms. Potter                            145

Recross-Examination by Ms. Zammit                             146


**MATTHEW HARVEY**

Cross-Examination by Ms. Potter                               149

- - -

2

Q     Did you discover during your evaluation that Mr. Harvey had made threats to Ms. Harvey?

A     Yes.

Q     And what do you recall those threats to be?

A     I believe they were text messages.  They all centered around if something happened to their son that he would kill Ms. Harvey.  And I think one that she would need to dig a 6-foot pit if Wells were harmed in any way.

Q     Did you see any evidence during your evaluation that Mr. Harvey has been violent in the past?

A     He choked Ms. Harvey.

Q     Anything else?

A     No, not that I recall.

Q     We talked already, and you testified about Mr. Harvey -- my question about Mr. Harvey harming Ms. Harvey. Do you have concerns about Mr. Harvey harming Ms. Harvey's mother?

A     I think it's possible.

Q     And can you tell us why?

A     Mr. Harvey seems laser focused on Ms. Harvey and her mother.  He has a strong dislike for her.  He is concerned that she is incapable of taking care of their son.  And, again, if something happens to Wells, he has threatened harm.

Q     Do you have -- is there anything that you saw in the evaluation or determined in the evaluation that would lead you

certainly has more social support down in Albany -- and the fact that he said that he's still employed and has been for over a year.

THE COURT:  All right.  I'm going to interrupt, and we're going to stop at this point so we can do a lunch break.  We will return at 1:30.  And the doctor will return.  You can come and sit back -- oh, you know what, wait outside, and we'll see if we have anything preliminary before we put you back on the stand.

The way we'll do it -- we'll allow Mr. Harvey to go first, and then we'll wait some time and then allow Ms. Harvey.  Y'all can leave everything in here.  It will be locked.

MS. ZAMMIT:  Thank you.

MS. POTTER:  Thank you, your Honor.

THE COURT:  We're adjourned until 1:30.

(Recess from 12:06 p.m. to 1:30 p.m.)

THE COURT:  All right.  I take it, counsel, there's nothing that -- any preliminary we need to --

MS. POTTER:  I don't believe so.

THE COURT:  All right.  Doctor, I remind you you're under oath.

You may continue.

BY MS. POTTER:

Q    Okay.  So before we left, you were talking about the

risk assessment and going through the factors that you looked at. Can you tell us what were the results of your risk assessment on Mr. Harvey?

A So in terms of previous threats, no. To my knowledge, he's never been in a physical altercation with anyone except for Ms. Harvey. The threats are present, given the text messages that he sent to her in the event that Wells should be harmed. He has expressed hopelessness on many occasions and desperation. His use of alcohol is a disinhibiting factor. He has stated many times that, you know, that Wells is the most important thing to him and he would be willing to sacrifice himself for Wells.

The positives in terms of social support -- he's got good family support, and he said that he's been employed with the same employer now for over a year. So those are -- those are positive.

Q And, overall, what was the result of your risk assessment? Does it give you a score, or what is -- what is -- doing your analysis, what did that lead you to believe about Mr. Harvey?

A Well, it's a clinical assessment, so it's not scored in any way. But given his history -- and I think I explained this in the feedback -- that the probabilistic statements -- and I cannot assign a numeric value to how likely it is that he could hurt himself and/or Ms. Harvey or anyone in her family.

Q    Given that evaluation, does it give you concern about Mr. Harvey's propensity to harm himself, Ms. Harvey, or someone in their family?

A    I'm concerned that if he, quote, loses Wells that he will become very hopeless and very desperate and feels he has nothing to lose.

Q    In that situation, do you fear that he would cause physical harm to Ms. Harvey?

A    It is a possibility, yes.

Q    Do you fear in that situation that he may cause physical harm to Wells?

A    I think it's a possibility as a way of hurting Ms. Harvey.

Q    When you said -- you testified earlier, I believe, that you said that he may feel that Wells would be better off, what did you mean when you said that?

A    Could you explain the context?  I'm not sure I understand.

Q    Sure.  I believe I had asked you if you thought there was any concern that he may harm Wells or harm himself, and your answer, I believe, was he may feel that Wells may be better off and that could be a reason why that would motivate him to potentially cause harm?

A    Well, based on everything that he has said to me and the medical records that I reviewed, he does not believe that

then himself.

Q    Did you also or do you also believe if that scenario were to happen that it could also involve harming the child?

A    It could.

Q    Has Mr. Harvey made references to you about allegations of bias in this case?

A    Yes.

Q    What has he told you?

A    He thought that Judge Marbutt was biased.  He thought that the guardian was biased.

Q    When I was asking you questions about the guardian not giving you information, did she give you a reason as to why she didn't want to talk to you in detail about the case or give you information?

A    She did not want to be accused of bias.

Q    Has Mr. Harvey made references to allegations of conspiracies in the legal system?

A    Vaguely.  He referred to the girls' club.

Q    And what do you understand that to mean?

A    The female professionals on the case.

Q    Did you review Ms. Harvey's medical records as part of your evaluation?

A    I reviewed -- and I think I misspoke earlier -- when you use medical records, I think of medical records as containing psychological, psychiatric records.  I reviewed

those.

Q    Did you also review her psychiatric records from the time during her pregnancy?

A    Yes.

Q    Did you talk to Ms. Harvey's providers?

A    I talked to Leslie Arrowsmith and Ken Johnson, who was the coparenting therapist.

Q    And who is Leslie Arrowsmith?

A    She was the marital therapist, also Claire's psychotherapist.  And I'm not sure whether individual sessions with Mr. Harvey or as collateral or whether he was also in treatment.  But she at least saw him several times with Ms. Harvey.

Q    Based on your evaluation, do you have any concerns about Ms. Harvey?

A    No.

Q    Did any of her providers mention any concerns about her?

A    No.

Q    Do you feel that she is stable?

A    Yes.

Q    Do you feel that Ms. Harvey is able to care for herself and her child?

A    I have not seen Ms. Harvey with the child, but all my data would suggest yes.

Q    Did any of her providers indicate that she would not be able to care for the child?

A    No.  They all thought that she was a very fit parent.

Q    Is there anything that you uncovered during your evaluation that led you to believe that Ms. Harvey has bipolar disorder?

A    No.

Q    Do you believe that -- did you discover that Ms. Harvey was misdiagnosed as bipolar at some point?

A    Yes.

Q    Can you explain what you discovered about that?

A    Shortly before the end of the evaluation, she noticed that there was a diagnostic code, an ICD code, on her superbill.  She looked it up, said it was bipolar.  She had been previously diagnosed with generalized anxiety disorder. She has been treated for an anxiety disorder and for perhaps depression, as well, given the medications that she was on. She went back to her psychiatrist, Dr. Naidu -- I believe is how you pronounce it -- and he said that was not an accurate diagnosis.

When I talked with Leslie Arrowsmith, she did believe that that diagnosis was accurate.  I asked her to describe the symptomology, and it is not consistent with bipolar disorder. It's more consistent with a crisis response.  She was pacing, couldn't organize her thoughts, you know, just in generalized

distress.

I looked at her records from Emory, and the psychiatrist, Dr. Kaufman, also felt there was no evidence of bipolar disorder and thought it was better explained by anxiety.

Q    Did you do your own diagnosis of Ms. Harvey?

A    I did an assessment for bipolar disorder, and all her responses were negative.

Q    Based on your own evaluation and diagnosis, do you believe Ms. Harvey has bipolar disorder?

A    I do not.

Q    Does Ms. Harvey meet the criteria for mania, in your opinion?

A    No.

Q    Are you aware that Ms. Harvey was taking Seroquel at one point?

A    Yes.

Q    Can you explain what your understanding is of why she was taking that medication?

A    For sleep.

Q    Based on your evaluation, do you believe that Ms. Harvey has an issue with alcohol?

A    Not currently.  I think at one point she and Mr. Harvey both drank too much.

Q    Did any of Ms. Harvey's providers state to you or did

you review in anyone's records a problem with alcohol for Ms. Harvey?

A    Ms. Arrowsmith did not think she had a problem with drinking.  Mr. Johnson said that he thought both of them drink too much.

Q    Did you conduct any of your own substance abuse testing on Ms. Harvey?

A    I did.

Q    And what were the results of that?

A    I gave her a SASSI.  It indicated moderate defensiveness, was very similar to Mr. Harvey's, low probability of substance use disorder.  On the PAI, which is what indicated Mr. Harvey had problems with alcohol, if I can double-check that, I don't believe that was an issue.  Her PAI indicated considerable defensiveness, so that's going to throw the scales within normal limits.  However, there were some problems noted:  failures in close relationship, some problems with her health, some feelings of grandiosity, and some suspiciousness.

Q    Did Ms. Harvey's PAI results indicate the substance abuse disorder that Mr. Harvey's indicated?

A    No.  But, again, because the results were invalid, she was so defensive on it, that is unlikely to show up.

Q    Has Ms. Harvey -- in your opinion and based on everything you've reviewed, has she been proactive in receiving

Mr. Harvey has been in any inpatient program since July of 2021?

A    I didn't see any, no.

Q    Following his time at Ridgeview, to your knowledge, has Mr. Harvey continued in therapy?

A    Yes.  I believe he has seen somebody near where he lives.

Q    And did Mr. Harvey provide you with the names of his current providers?

A    He did.

Q    And were you able to speak to them?

A    I was not.

Q    Why not?

A    I got the information on April the 12th, and we did feedback on April 13th.

Q    So prior to April 12th, had Mr. Harvey not given you the names of his current providers?

A    He had not.

Q    Are you aware that following the receipt of your oral feedback to the attorneys that Ms. Harvey went into hiding with her mother and the child?

A    I heard that today in the courtroom, and Ms. Daswani said that there was going to be a motion before judge and said that Ms. Harvey was in hiding.

Q    And based on your evaluation, do you believe that

A    I believe so.

Q    And Dr. -- or Ms. Adkins is also a practitioner there?

A    I believe so.  I didn't pay a lot of attention to where they work.

Q    So, again, just so I'm clear, did you review Dr. Naidu's records from Dr. Naidu or did you review Dr. Naidu's records in what Ms. Arrowsmith put in her notes? You said there was interspersing, so I just to --

A    Yeah, it looked to me like there's an electronic medical record that Roots Wellness facility uses, and so it looked to me like they entered their own notes into that portal, the way that they were printed out.

Q    Okay.  So it looks as though Dr. Naidu and/or Dr. -- or Ms. Arrowsmith's notes were transcribed by some unknown person into Roots Wellness database?

A    No.

Q    Okay.

A    No.  They were electronically entered because it would say record complete.

Q    Okay.  Do we know who electronically entered them? I'm trying to just understand the process.

A    From my understanding -- I don't use electronic medical records, but it's like if you go to any healthcare, you know, professional, they usually type while you're talking,

input your, you know, ID number.  They cannot be altered once they're typed in.  And so just the way they were, you know, typed in, it looked to me that they were done by the providers themselves.

Q    Now, with Emory and Dr. Kaufman, you were pretty clear that from August 2016 to May 2019 Ms. Harvey was under the care of Dr. Kaufman?

A    Yes.

Q    Is he a psychologist, psychiatrist?

A    She was a psychiatrist.

Q    She.  Psychiatrist?

A    Yes.

Q    Was Ms. Harvey under the care of a psychologist at the same time?

A    Not that I'm aware of.

Q    And did Dr. Kaufman prescribe medication to Ms. Harvey?

A    She did.

Q    Okay.  What medications did she prescribe?

A    As I recall, they were antidepressants.  She may have prescribed some Risperidone.

Q    What's Risperidone?

A    It's an antipsychotic.

Q    Okay.  So antidepressants.  She may have prescribed Risperidone.  Anything else?

A    Not that I recall.

Q    When was the first time your records indicate that Seroquel was prescribed for Ms. Harvey?

A    I would have to go back and check.  I believe it was from Dr. Naidu.  Yes, July 16th, 2021.  He added a hundred milligrams of Seroquel.

Q    And you have no way of knowing -- or let me rephrase that.  Do you have any way of knowing whether or not she was still taking Risperidone at the time she was taking the Seroquel?

A    They probably would not have been given concurrently.

Q    Probably would not have been, but do you know?

A    Well, I'm not a psychiatrist.  But they're two antipsychotics, so that would be pretty unusual.  And the Seroquel was prescribed for sleep.

Q    Okay.  And a hundred milligrams for sleep?

A    Yes.

Q    And you're -- are you aware -- let me rephrase that.  You said it was prescribed for sleep.  Is that in the notes from Dr. Naidu?

A    No.  But a hundred milligrams, 50 milligrams is typically given for sleep.  An antipsychotic dose is 400 to 600 milligrams.

Q    You're not a psychiatrist; right?

A    I am not a psychiatrist.

Q    You don't know the drug effects pursuant to -- well, let me rephrase it.  Do you know the dosages and protocols, I guess is the right word, associated with prescribing Seroquel at all?

A    I have a general familiarity as a clinical psychologist and having had many patients on it, but I am not a psychiatrist.

Q    Let me ask you this:  Would you agree with me that Seroquel is approved by the FDA for schizophrenia, bipolar disorder, and again, psychotic types of diagnosis?

A    Yes.

MS. POTTER:  I'm going to object because she just said she --

THE COURT:  Stand up and give the legal objection.

MS. POTTER:  My objection is that she just stated she's not a psychiatrist.  This is out of the scope of her appointment as an expert, as a psychologist.

THE COURT:  Technically she hasn't been tendered as an expert, so I will overrule the objection.

MS. ZAMMIT:  Thank you.

THE COURT:  She has her on cross.

You may continue.

MS. POTTER:  Your Honor, can I state one thing?  We have a consent order appointing her as an expert.

MS. ZAMMIT:  Your Honor, may I respond?

106

THE COURT:  One second.

You may respond.

MS. ZAMMIT:  Thank you.

The witness testified that Seroquel was prescribed for sleep.  She made very specific determination, opinion, and I am cross-examining her on that comment. And I think that whether -- just asking if she knows, whether or not what Seroquel is prescribed for and what it is permitted to be prescribed for.  So she made a -- Dr. Oppenheimer made a statement of fact that this medication was prescribed for this thing, and I'm asking why she believes that, where that comes from.  I'm allowed to cross-examine her on her opinion.

THE COURT:  Well, two separate things.  As to -- since both parties have agreed and consent that she would be the expert for this -- let me make sure for the record.  Both parties have agreed that she would be deemed an expert for purposes of this hearing; is that correct?

MS. POTTER:  That's correct.

MS. ZAMMIT:  I need to review the consent order, but I don't dispute what my colleague --

THE COURT:  Okay.  That being said, she can give an opinion.  I'm going to overrule the objection because she does have her on cross.  She's entitled to a thorough and

sifting cross.  I'll give her some leeway.

You may answer the question.

MS. ZAMMIT:  Let me try to remember what the question was, if I may.

BY MS. ZAMMIT:

Q    Really it boils down to, Dr. Oppenheimer, do you have a note or a doctor commentary in what you reviewed that states that the Seroquel prescribed to Ms. Harvey was for sleep?

A    I don't recall.

Q    Okay.  Is Risperidone -- and I'm sure I'm pronouncing it incorrectly.  I apologize -- but to your knowledge, is that prescribed for sleep?

A    It can be.

Q    At what dosage; do you know?

A    I don't know.

Q    Okay.  Do you have any reason to believe that it was prescribed to Ms. Harvey for sleep?

A    I don't know.

Q    Do you know if she was on the antipsychotic Risperidone from August 2016 through 2019?

A    I didn't review those notes in that detail, no.

Q    When we had our, I guess, Zoom meeting going over your recommendations and thoughts, did you indicate that Ms. Harvey was actually on 40 milligrams of Seroquel?

A    No.

She's not a coparenting therapist, as well, is she, or is she?

A    In this capacity, I don't know if she does coparenting, but at least in the capacity she saw the Harveys, it was for marital therapy.

Q    All right.  So she saw both Mr. and Mrs. Harvey for marital therapy?

A    To the best of my knowledge, yes.

Q    And those were the records that you reviewed?

A    Yes.

Q    Okay.  And then at some point, did she just treat Mrs. Harvey?

A    Yes.

Q    Do you know when that occurred, when that transitioned from marriage counseling to solo counseling with Mrs. Harvey occurred?

A    I believe it was -- may I go back to my interview with her?

Q    Sure.

A    Because I think I asked that.  She saw -- she saw them in 2021 for a couple of sessions.

Q    Together?

A    Yes.

Q    Okay.  I thought you said that Ms. Harvey was seeing Ms. Arrowsmith from August 2019 forward.  So is it 2021 for a couple of sessions?

A    I don't think so.  Again, I wasn't really focused on the dates.  Let's see.  I did marriage counseling -- she saw them for a couple times.  She did marriage counseling.  And then at end of 2019, she worked with them as a couple.  And then she saw them in 2021 for a couple of sessions.

Q    Now, is Dr. Naidu the only prescription provider for Ms. Harvey?

A    To the best of my knowledge, yes.

Q    Did you review any of her medical records outside of Dr. Kaufman, Dr. Naidu, Ms. Arrowsmith, or Mr. Johnson?

A    No.

Q    When we were on the Zoom discussion or Zoom meeting on April 13th, do you recall saying that Mr. Harvey would never ever harm Wells?  Never ever harm Wells?  I know you potentially qualified that later, but do you recall saying that he would never harm Wells?

A    I did qualify it.  Yes, I did say something to that effect.

Q    And I understand that you qualified it, but you did indicate that he would never harm Wells?

A    Yes.

Q    And would you agree with me that he has never harmed Wells?

A    To the best of my knowledge, that is correct.

Q    Well, has Ms. Harvey suggested he's physically harmed

111

Wells?

A    No.

Q    Okay.  Did Mr. Harvey say anything to suggest he's physically harmed Wells?

A    No.

Q    In any of the interviews you conducted with any of the therapists or any of the family members, was there ever any suggestion that Mr. Harvey physically harmed his child?

A    No.

Q    Now, you indicate that potentially he would harm Wells.  And I don't want to put words in your mouth.  You said -- what would be the circumstance again that you indicate he could potentially harm Wells?

A    My concern stems more that he is infused -- he is fused and meshed with Wells and can't separate his own identify from that of his child.  And if he truly believes that life is not living without the child, that from a clinician standpoint concerns me.

Q    When you made the determination that Mr. Harvey was -- saw himself as his child -- I'm not sure the layman way to phrase that. -- but that they were -- he had a hard time distinguishing himself --

A    Yes.

Q    -- from his child?  When did you make that determination?

112

A    That was during the course as I was reviewing documents and putting everything together for feedback.

Q    So April of this year?

A    Probably I'd have to look at the records when I started reviewing for feedback, but it was probably right around the beginning of April.

Q    Okay.  From which records did you -- which records did you review that led you to that conclusion?

A    Statements that he made to me, primarily.

Q    Can you give us some examples.

A    He said all I care about is my son.  I see myself in him and vice versa.  When he couldn't sleep, I rubbed his arm or head.  I do that to myself when I sleep to self-soothe.  And then he said another time I'll do whatever it takes, but I'm not going to stop fighting for Wells.  He believes that Claire is going to kill him and then himself -- herself -- I'm sorry. I don't know if I could go on living if something happened to Wells.  I'm scared he's going to die.  Wells and I have a connection.  He's on the spectrum; I'm on the spectrum.  The way for Claire to get to me is to hurt me -- is to hurt Wells -- I'm sorry.

Q    All I care about's my son?

A    Yes.

Q    Do you know most parents that would say the same type of thing, that they care about their children more than

113

themselves?  Isn't that a normal parental comment?

A    That wasn't the context in which it was presented. It was very fear-based.

Q    Fear-based that Mrs. Harvey was going to harm the child?

A    Yes.

Q    Okay.  And did you receive any information from, for example, Dr. Kaufman or Ms. Arrowsmith that shared Mrs. Harvey hitting Mr. Harvey in the car, for example, where she hit him? Did you ever hear about that?

A    Yes.

Q    Okay.  And did you hear about her smashing plates and -- in an aggressive way?

A    Yes.

Q    And did you hear about her taking knives out to potentially cause self-harm to herself?

A    I heard about -- she told me that she had taken knives out and called for Matt to come downstairs.  She denied any intention of hurting herself.

Q    I understand that she did, but did you hear from any of the treating -- of her treating physicians that this event happened?

A    Yes.

Q    Okay.  Which treating physician shared with you that that happened?

114

A    Ms. Arrowsmith said.  She also qualified it by saying that Ms. Harvey did that in response to Mr. Harvey being physically aggressive with her.  She also said the same thing about Ms. Harvey hitting Mr. Harvey, that he was being aggressive with her in the car.

Q    Physically, mentally, verbally?  How was it portrayed to you?

A    I think she said physically, but I -- but I'm not positive of that.

Q    And that would have been historically what Mrs. Harvey reported to her therapist, Ms. Arrowsmith; correct?

A    She also -- Ms. Arrowsmith told me -- because I asked her:  Were there any allegations of physical abuse?  Yes.  She addressed it in front of him.  I don't know how far back my notes go.  He choked her.  Matt was drinking heavily.  I could tell he'd been drinking the night before.  I could smell the alcohol.  I knew his temper flared up when he had been drinking.

And then I asked if Claire had abused Matt, and Ms. Arrowsmith said:  She said that she got upset with him.  I don't know if she hit him or threw something.  She either hit him.  I think they were in the car.  It was in response to him coming at her physically.  It might be in my notes.  The story happened before they came into counseling.  I do know at times that Claire became so upset that she would hit herself.  That

115

was obvious when she first came in.  Her behavior was completely different than it was in 2019.

Q    Did it indicate what her behavior was like in 2019?

A    She said that she was very childlike and that she was clearly very frightened of Mr. Harvey.

Q    Are those in notes or pursuant to your conversation?

A    This is in my conversation with her.

Q    And did you take notes of that conversation?

A    I did.  I type contemporaneously with my interviews.

Q    And you mentioned the choking a couple of times, both on direct exam and on cross.  What physical evidence was ever identified in any notes that any choking took place?

A    I don't believe there was any physical evidence.

Q    Was there any police report that stated that Mr. Harvey choked his wife?

A    I don't recall the one police report that I reviewed. I don't think -- if so, it were an allegation, an accusation that he did that.  But it was not observed.  Police did not observe that behavior.

Q    They didn't observe any marks, to your knowledge?

A    No.

Q    And he was not arrested for anything; correct?

A    No.

Q    You mentioned specific threats to Ms. Harvey, and just so we're clear, any specific threat to Wells?

116

A    No, not that I recall.

Q    You mentioned specific threats to -- I'm assuming you mean Mrs. Harvey?

A    Yes.

Q    Okay.  What specific threats are you referring?

A    If -- if you hurt Wells, I will kill you.  And then what I had read earlier about if he's harmed -- I'm paraphrasing -- but if he were harmed, you may as well dig a 6-foot pit for yourself.

Q    Other than the two examples that you just provided what you consider to be threats to Ms. Harvey, any other direct threats made by Mr. Harvey?

A    To me?

Q    Did you review anything?  Did he ever directly threaten you, Ms. Daswani, myself, Ms. Potter, Ms. Harvey, Ms. Harvey's mother?  Was there ever any threat?

A    He made a threat, as I read earlier, to Ms. Adkins that he would -- he said to Ms. Adkins that if anything happened to Wells that he would harm Ms. Harvey.

Q    And you're aware -- we talked about this on the call -- that there was some discrepancy or disagreement with that comment; correct?

A    We did talk about that in the call.

Q    Okay.  And would you agree with me that Ms. Adkins denies saying that?

117

similarity there -- leads to emptiness and rejection.  He is very alert to signs of hostility and rejection.  And a few of his relationships are long-lasting, even though he has an intense need for them.

Q    Let me go back to one thing that you said.  You said that he easily -- and I know I'm incorrectly paraphrasing, so please correct me -- something to the effect that he is very overly sensitive to hostility.  Is that --

A    He's overly sensitive to rejection.

Q    Okay.  So there was something about hostility that --

A    He's alert to signs of hostility.

Q    Alert.

A    And that's consistent with his MMPI-2, scored in the clinical range on the paranoia scale.  That scale is passing feelings of persecution, suspiciousness, rigidity, externalization of blame.

Q    And I think -- just want to go back a little bit and with respect to the threats of violence against Mrs. Harvey, I know we spoke about the text messages and we spoke about the choking behavior.  Did Mr. Harvey explain to you that he did not choke Mrs. Harvey?

A    Let me look.  As I recall, he admitted to grabbing her arms, and he admitted to restraining her.  So on two occasions.

Q    And did he explain when he was making those

A    No.   The -- both Mr. Johnson and Ms. Arrowsmith talked about how he would quote scripture.  And Ms. Arrowsmith, in particular, said that it made no sense, that that's when she thought he was either manic or having psychotic break or both. And both of them talked about Biblical submission.  So I did not really get into that with him.

Q    When you said both of them spoke about Biblical submission, you mean that Ms. Harvey and Mr. Harvey had the same -- I was going to say thought process, but that may not be the right phrase -- the same belief system with respect to female submission?

A    The therapist talked about that in relation to Mr. Harvey weaponizing the Bible and scripture as a way to hurt her, calling her an adulterous, a sinner, Satan.  It was not in the context of we believe this.

Q    According to Ms. Arrowsmith or Mr. --

A    And Mr. -- and Mr. Johnson, who identified himself as a Christian counselor.

Q    Mr. Johnson.  But not Ms. Arrowsmith?

A    No.  Mr. Johnson self-reported that.  I didn't ask him about that.

Q    Let's go -- move forward a little bit in time. Mr. Harvey's last therapeutic assessments, if you will, Ridgeview and the one in March, NG -- MG?

A    Something like that.

128

Q    Something like that.  Okay.  Ridgeview occurred when?

A    July 2021.

Q    And you agree with me that they did a Global Assessment of Functioning?

A    Yes.

Q    And you agree with me that you incorporated the results of that testing into some of your opinion?

A    Well, that was a clinical assessment.  They didn't do any psychological testing.

Q    Okay.  Is the clinical assessment called the Global Assessment of Functioning?

A    That is one of the dimensions that they assessed, along with four others.  That's pretty typical in terms of an evaluation for admission to an inpatient program.

Q    Okay.  But that was the one where you said he scored 20?

A    Yes.

Q    Okay.  So you incorporated the results of that testing in your -- in formulating your opinion or in your -- conducting your evaluation?

A    So it's not testing.  It's a subjective assessment that the psychiatrist did, and what that says is that he was functioning very poorly at that time.  And because he denied any active suicidality or homicidality is why he went to a PHP program as opposed to an inpatient admission.

Q    Do me a favor -- we'll talk about that.  I promise. But I just want to focus on this initial testing, because you brought it up in our Zoom call and you brought it up today before the Court.  I understood it to be that he only scored 20 out of -- between one and a hundred, and that suggested certain psychosis or behavior problems, and you incorporated that into your evaluation?

A    Yes.  I guess the point I'm trying to make is that it's not a test.  Okay.  So that's an incorrect -- I mean, testing means something very specific to a psychologist.  So I'm not trying to be argumentative; I'm just trying to explain that this was the psychiatrist's opinion that he was functioning poorly.  And this -- in July of 2021, yes, he was functioning very poorly.

Q    How do you know a psychiatrist did this and not an intake counselor at Ridgeview?  Is there a doctor's name?

A    Yes, Dr. Weichbrodt, Gary Weichbrodt.  He's a psychiatrist.

Q    And are you -- you alluded to it, but you didn't really go too much into it that -- what is DSM-5?

A    That is the Diagnostic and Statistical Manual that psychiatrists and psychologists use for diagnoses.

Q    Is that the current version?

A    Yes.

Q    And you are aware, are you not, that the Global

130

Assessment of Functioning assessment is not to be used; are you not, in DSM-5?

A    It is not used in DSM-5.

Q    Because of reliability; correct?

A    Yes.

Q    You spoke, I think, as well about -- so that was Ridgeview.  So he was admitted initially for inpatient; is that your understanding?

A    I think he was admitted directly to intensive outpatient, IOP program.

Q    After Dr. -- I'm not going to try to pronounce his last name -- Gary from Ridgeview assessed him, met with him, did an intake?

A    Correct.

Q    So instead of putting him in inpatient, they put him in an outpatient -- an intense outpatient treatment.  And as far as you understand, is that like a full day?

A    Yes.

Q    And after a week, he was released from that program? Five days?

A    He was stepped down to a partial program.

Q    Okay.  And how long did it take between he was in intensive outpatient to a partial?

A    I believe a week.

Q    Do you have notes that show that he was only being

treated by Ridgeview for a period of seven days total?

A    Mr. Harvey told me two weeks, I believe.  I only saw records for the evaluation and the first week.  Mr. Harvey said that he left the program because he had COVID.

Q    Okay.  Did you see any -- did you contact Ridgeview directly for records?

A    Yes.

Q    And what you received was one week?

A    As I recall, yes.

Q    And there were no follow-up therapeutic recommendations to your recollection?

A    No.

Q    No concerns that he was suicidal?

A    No.

Q    And then the next assessment, other than your evaluation, took place by this D -- DQ -- DV -- what is it called -- in March 2022?

A    Yeah, that would have been after my testing, my evaluation.

Q    So we've got Ridgeview, your evaluation, and then this entity that no one seems to be able to recall the name of. What is your understanding that it's called?

A    I don't recall.  It was -- I'm not even sure.  I don't recall who conducted it, but I believe she had an LPC. An LPC, Licensed Professional Counselor.

Q    Did you incorporate the results from -- I know I'm saying it wrong -- DV -- DM -- the March 2022 evaluation, did you incorporate any of the notes or tests or evaluations from that review into your recommendation?

A    Yes.

Q    Okay.  Which ones?

A    Well, I think I looked at it, one for thoroughness, did they do any other testing besides self-report, basically was all self-report.  I looked for the accuracy of the information he provided them with what I had.  So it was more of a global assessment, their assessment of how he was doing.

Q    And you indicated, I think, that you felt that he was not forthcoming with his pancreatitis -- alcohol-induced pancreatitis?

A    There were a lot of things that he was not forthcoming about in that evaluation.

Q    Okay.  And other than the pancreatitis, the suicidal ideation?

A    I can tell you he said that he had no self-admission of problematic drinking.  Well, the records that I have are replete with heavy drinking, increased alcohol usage, withdrawal symptoms.

Q    Do we know if the questions are -- or were the records to that particular moment in time?  For example, was the -- do we know, was the question:  Are you currently having

issues with alcohol, or is the question:  Have you ever had issues with alcohol?  Do you know what I'm saying?  Are you able to discern what the specific questions were in order to evaluate the response?

A    No.

Q    So we talked about whether or not Mr. Harvey ever had any suicidal ideation.  He responds no in March 2022.  We don't know if they asked him, as of this moment, do you have any suicidal ideation, or if they asked him have you ever; correct?

A    Again, the inference from how the answer was phrased can be telling in terms of the question that was asked.  So --

Q    You don't know the question; you're just inferring from the answer?

A    Correct.

Q    And let's talk about this weapon issue, because we talked about it in great length, both in Zoom and I referenced it to the Court in some of my arguments earlier.

When you had -- strike that.  Which assessment were you giving Mr. Harvey when you utilized this belief that he was currently in possession of weaponry?

A    I was reading the anger and violence assessment that was done.

Q    And in the anger and violence assessment, how many categories are there?

A    Well, it looks like --

134

Q    I know that you reference several, have given examples of several, but I'm not -- is there a specific number for the assessment?

A    So the categories that they assessed:  alcohol and drug clinical observation.

Q    I'm so sorry.  You said that they assessed.  Did you do the assessment?  I thought you did the assessment.

A    I did a risk assessment.  Okay.  And I would have done the risk assessment before I saw this, and then once I saw that he did this, I did not go any further with it.

Q    Okay.  So you did a risk assessment, but then you saw the anger and violence assessment?

A    The whole time I saw Mr. Harvey, because of the statements that he made to me, the admissions, that is an ongoing part of my clinical assessment.

Q    So was it your own risk assessment that you felt that Mr. Harvey might be violent which incorporated that he had current access to guns; do you recall that?

A    Yes.  And the current access to guns was based on this assessment that was done March 2022.

Q    Are you aware now after our conversations that Mr. Harvey does not have access to any weapons, that he does not have an AR-15 in his possession?

A    I have no knowledge of that.

Q    You agree with me, though, that the phrase or the

sentence from the anger and violence assessment was he was in possession of an AR-15 and a handgun, which are now in the police possession, and you took that to mean just the handgun was?

A     That's not what it says.

Q     Okay.  Tell me again.

A     Mr. Harvey discloses ownership of an AR-15 and a handgun no longer in his possession.  This staff member has informed client that he must remove any and all weapons currently in client's possession.

Q     So the phrase no longer in his possession, you still took that to mean that he had the AR-15?

A     I did.

Q     And if it came to be that neither the AR-15 or the handgun were in his possession, would that change your evaluation?

A     No, not with the easy access to guns.

Q     To your knowledge, has Mr. Harvey ever pointed a pistol or a gun at someone threatening violence?

A     Not that I'm aware of, no.

Q     All of the family members that you interviewed, no one suggested he ever had any violent behavior, no fist-fighting, no -- nothing of that sort; correct?

A     That is correct.

Q     You spoke about -- at least in our Zoom call --

about, again, the risk assessment -- you spoke about family history of suicide?

A    Yes.

Q    Okay.  Is the family history of suicide that is a risk factor, does someone have to observe the suicide, or is it just a genetic type of thing?  Can you qualify or explain that a little bit more.

A    That's a speculation, but there does seem to be suicide that runs in families.  And so when a first-degree relative has committed suicide, that does increase the risk of an individual.

Q    And you're aware that Mr. Harvey's biological father committed suicide?

A    Yes.

Q    And you are aware that there was an allegation that Mrs. Harvey's biological father committed suicide?

A    I'm aware of the allegation.

Q    Okay.  And you saw a death certificate that said accident; correct?

A    I did not see a death certificate.

Q    Were you told that there was a death certificate that said accident?

A    I don't -- I think you said that.  I don't recall saying that.

Q    Okay.  Then what made you determine it was an

137

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MATTHEW THOMAS HARVEY,

Plaintiff,

v.

CLAIRE M. HARVEY, et al.,

Defendants.

CIVIL ACTION NO.

1:25-CV-04688-JPB

# EXHIBIT A-2

## Selected Excerpts from the April 26, 2022 Final-Hearing Transcript

*Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's
Motion for Attorney's Fees and Reasonable Costs [Doc. 75]*

Matthew Thomas Harvey - Plaintiff, pro se

ID# 2022-0149299-CV
**EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
**20106987**
Angela Brown - 66
NOV 18, 2022 09:43 AM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

CLAIRE MARSH HARVEY,                 )    CIVIL ACTION FILE
                                     )
                Plaintiff,           )    NO.: 20-1-06987-66
                                     )
        vs.                          )
                                     )
MATTHEW THOMAS HARVEY,               )
                                     )
                Defendant.           )
_____)

CIVIL NONJURY PROCEEDINGS
April 26, 2022

Heard before Judge Angela Z. Brown
Cobb County Superior Court
Sixth Floor, Courtroom 6300
70 Haynes Street
Marietta, Georgia 30090

APPEARANCES OF COUNSEL:

On Behalf of Plaintiff:

Stefanie S. Potter, Esq.
Molly Teplitzky, Esq.

On Behalf of Defendant:

Leah J. Zammit, Esq.

Guardian ad Litem:

Brandy Daswani, Esq.

Deborah Fedorchak
Official Court Reporter
Cobb County Superior Court
70 Haynes Street
Marietta, Georgia 30090
Deborah.Fedorchak@cobbcounty.org

1

## INDEX TO EXAMINATIONS

Examination                                                        Page


**MATTHEW HARVEY**

Cross-Examination by Ms. Potter (continued)              4


**CLAIRE HARVEY**

Direct Examination by Ms. Potter                        20

Cross-Examination by Ms. Zammit                         55

- - -

2

## INDEX TO EXAMINATIONS

Examination                                                      Page


**RENEE MCDONALD**

Direct Examination by Ms. Zammit                                 126

Cross-Examination by Ms. Potter                                  135


**SHANA ADKINS**

Direct Examination by Ms. Zammit                                 139

Cross-Examination by Ms. Potter                                  141

Examination by Ms. Daswani                                       143

Redirect Examination by Ms. Zammit                               164


**KAREN HARVEY AUSTIN**

Direct Examination by Ms. Zammit                                 170

Cross-Examination by Ms. Potter                                  176

Examination by Ms. Daswani                                       182

Redirect Examination by Ms. Zammit                               192


**MATTHEW HARVEY**

Direct Examination by Ms. Zammit                                 196

- - -

hand so we can -- so the clerk can swear you in first.

SHANA ADKINS,

having been duly sworn, was examined and testified as follows:

THE COURT:  All right.  Thank you.  Put your hand down.  That microphone there is movable, so you can adjust it so that you're able to speak into it.  And just make sure that you answer the questions out loud because they're being taken down.

THE WITNESS:  Yes, ma'am.

THE COURT:  All right.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Your witness.

DIRECT EXAMINATION

BY MS. ZAMMIT:

Q    Can you state your name for the record, please?

A    Yes, Shana Adkins.

Q    And Ms. Adkins -- is it Ms. or Dr. or --

A    Just Shana Adkins, yes, ma'am.

Q    Ms. Adkins, how are you employed?  What's your job?

A    Oh, okay.  I currently work for a company called Sedgwick as a certified rehabilitation counselor.

Q    At some point, were you working at Roots Wellness?

A    Yes.  That was my previous employment.  As a licensed professional counselor, I hold both credentials.

Q    And did you at one point have Mr. Matt Harvey as a

139

patient?

A    Yes, ma'am.

Q    Do you recall as you sit there today what dates or approximate dates that you saw Mr. Harvey?

A    Yes, ma'am.

Q    What dates were those?

A    January 2021 through September 2021 when I left Roots Wellness practice.

Q    Do you know what a 1013 means?

A    Yes, ma'am, I do.

Q    Can you briefly explain to the Court -- well, obviously, I think the Court knows, but for the record, can you identify what a 1013 is and your understanding of what it is?

A    Yes.  I'll do my best.  So it's when the licensed professional counselor feels the professional obligation or opinion to have their client be sent to a mental facility just to be evaluated for their safety and the safety of others.

Q    So would you agree with me that if the counselor has a belief that their client is a danger to himself or to others, the process for the therapist to require or seek evaluation is a 1013?

A    Yes, that's correct.

Q    At any time, did you believe Mr. Harvey should be 1013'd?

A    No.

THE COURT:  Any redirect?

MS. ZAMMIT:  Yes, your Honor, hopefully brief.

REDIRECT EXAMINATION

BY MS. ZAMMIT:

Q    In your practice, can you -- is there a difference between someone who has thoughts of suicide or suicide ideation versus those who will actually act out or are proactive with respect to any harm to themselves?

A    Yes, there's a difference.

Q    Okay.  Is it a clinical difference, or is it just something you garner from your experience?

A    Both.

Q    Okay.  Did you describe Mr. Harvey as ever having suicidal ideation to your recollection?

A    I don't recall.  I would have to refer to my notes.

Q    At any time, did you believe that he was in imminent danger of harming himself?

A    No.

Q    And at any time, did you believe that he would act out any type of anger, aggression, or violence towards Mrs. Harvey, Claire?

A    Yes.

Q    And did he act out on any violent thoughts that you were concerned about?  Did he actually act out on them to your knowledge?

164

A    No.

Q    Do you have any concerns that he would harm the child, Wells?

A    No.

Q    Did you speak to Dr. Oppenheimer, or do -- did y'all have a phone call?

A    No.

Q    To your knowledge, did she try to call you?

A    Yes.

Q    Is there a reason why you didn't respond to her?

A    No.

Q    Do you know when she tried to contact you?

A    I would have to look at my phone records.  I know there was a voicemail left by he or she -- I'm not sure -- by the assistant.  And I actually was going to call back to just discuss -- to see if she still needed to talk to me, because the message kind of alluded to that I was still meeting therapeutically with Matt.  And since we were no longer meeting therapeutically, I didn't know if she still needed to speak with me.  So I never had a phone discussion.

Q    Was there -- okay.  Was there progression in what you would say Matt's mental health -- and forgive me if I'm using the wrong terminology.  I'm not a psychologist.  But when you were meeting with him back in July of 2021 and the notes that Ms. Daswani has referred to and shown you, from that time until

you ceased meeting with him in September, would you agree or disagree that there was some progression positively in his mental health?

A    In some ways.

Q    In what ways?

A    I feel like we were definitely working on ways for him to control his anger and other therapeutic methods.  So, you know, every therapeutic session I do try.  I'm very, you know, positive results driven, so I do try and focus not only on the negative aspects of the therapeutic session but also the positive aspects and, you know, focusing on both and seeing what we need to work on together therapeutically.

Q    And in your opinion, was Mr. Harvey -- if you asked him to do something proactive for his mental health, did you believe that he, in fact, acted upon that request or recommendation?

A    Yes.  I mean, of course, I can only recommend or advise that any client would seek out something that would move them in a positive direction mentally for their mental health.

Q    But do you have any information as you sit there today that Mr. Harvey did, in fact, do that, that he was receptive and --

A    Yes, at times.

Q    Do you still agree as you sit here today and after being cross-examined by Ms. Daswani that it was correct to not

put forth a 1013 for Mr. Harvey?

A    Can you repeat that question?

Q    Sure.  If you had to go back to July, would you have changed your mind and proceeded with a 1013?

A    No.

Q    Why not?

A    I did not feel that it was appropriate for the client to be 1013'd at the time.

Q    Did Mr. Harvey ever make any threats to Claire Harvey in your presence?

A    In my presence?

Q    Uh-huh.  Like in your therapeutic session, did he ever say I want to hurt her, but I -- other than I won't do it, but was he threatening to her?

A    Yes, at times.

Q    But you didn't feel that it was --

A    No.  Again, he would always back it up with he still said he would never move forward with that because he knows he would be at risk for losing Wells forever.  So I knew that that was enough to keep him from doing anything in my professional opinion and expertise.

MS. ZAMMIT:  Thank you very much.

THE WITNESS:  Of course.

THE COURT:  Anything, counsel?

MS. POTTER:  No, your Honor.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **MATTHEW THOMAS HARVEY,** | **CIVIL ACTION NO.** |
| Plaintiff, | |
| v. | **1:25-CV-04688-JPB** |
| **CLAIRE M. HARVEY, et al.,** | |
| Defendants. | |

# EXHIBIT A-3

## Selected Excerpts from the May 4, 2022 Final-Hearing Transcript

*Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's
Motion for Attorney's Fees and Reasonable Costs [Doc. 75]*

Matthew Thomas Harvey - Plaintiff, pro se

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA


CLAIRE MARSH HARVEY,

        Plaintiff,

                              Civil Action File
vs.                             No.:  20-10-6987

MATTHEW THOMAS HARVEY,

        Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~

       Divorce Case Resuming in the above-styled case before The HON. ANGELA Z. BROWN, Judge Presiding, commencing in Courtroom 6300, Superior Court of Cobb County, 70 Haynes Street, Marietta, Georgia, on the 4th day of May 2022.



APPEARANCES OF COUNSEL:

FOR THE PLAINTIFF:     STEPHANIE S. POTTER, Attorney

FOR THE DEFENDANT:    LEAH J. ZAMMIT, Attorney

THE GUARDIAN AD LITEM:  BRANDY DASWANI, Attorney



Michael W. Almand
Certified Court Reporter
B-604
70 Haynes Street
Marietta, GA 30090

I N D E X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Matthew Harvey | 3 | | 25 | |
| Brandy Daswani | | 66/76 | | |

| EXHIBIT | IDENTIFIED | DESCRIPTION |
|---|---|---|
| Defendant's 85 | Page 6 | Photographs |
| Defendant's 75, 76 | Page 17 | Student loan debt |
| Defendant's 78 | Page 17 | Student loan debt |
| Defendant's 44 | Page 19 | Resume' |
| GAL 4 | Page 44 | Photograph |
| GAL 5 | Page 44 | Photograph |
| GAL 6 | Page 59 | GAL recommendations |

2

Mother's therapist and Dr. Oppenheimer believe that she's stable and able to properly care for herself and Wells. Despite mother's mental health providers and Dr. Oppenheimer believing her to be stable, father has expressed concerns about her mental health that have no basis in fact from what I can tell.

He believes that mother is emotionally unstable, erratic, and dangerous to Wells, but this is based on his interpretation of their previous interactions.

He was open about his mental health struggles and he pursued therapy; however, in speaking to multiple therapists they were concerned about his anger and inability to control himself.

Father does not take recommendations as though he needs to make changes. His external focus on mother prevents him from recognizing issues as his own. The results of the psychological evaluation performed by Dr. Oppenheimer show that there are concerns that father could harm everyone, especially mother, maternal grandmother, Wells.

Other therapists have addressed concerns with me about their -- about him as well, not just Dr. Oppenheimer.

Several therapists addressed their concerns with me about his behaviors and their concerns. Father met

numerous factors in the violence assessment and -- from the therapists. Whether he has access to an AR-15 or not I'll let the Court determine.

That's what Dr. Oppenheimer found. That was in the self-report that he received from NG Counseling. Father is stating that he doesn't. I am there to provide what the information is and let the Court make that determination.

I believe that the Court will need to determine provisions to keep everyone involved safe. While no one can definitively say that he would hurt Wells, there is so much anger that it is in the realm of possibilities that he would hurt someone -- that he would hurt mom, Wells, the maternal grandmother and himself.

His over-identification with Wells is a very disturbing factor in the case. The OFW messages that he wrote to Wells read like suicide notes when looking through the lens of the psychological evaluation.

Why would he write those types of things to a child that can't even read. I am concerned about the OFW situation that they're asking for because those are the types of things that happened when he had it before, and he says it's not very effective.

According to Dr. Oppenheimer, his recent self-report in March of 2022 at MG Counseling Service is full of

51

contradictions, omissions, and false statements.  These actions make sense.  His father has cognitive distortion, which is the result of the psychological evaluation, and that affects his ability to see a situation as it actually is.

As far as Section (j), your Honor, each parent's involvement, or lack thereof, in the child's educational, social or extracurricular activity, we've sort of already addressed that previously, so I refer back to what I've already stated.

Section (k), each parent's employment schedule and related flexibility or limitations, if any, of a parent to care for a child:  Mother is a licensed occupational therapist with a flexible schedule and has the backup of her mother available to her if she needs help.

Father historically has an unstable employment history, but I did have in here that he maintains employment here today.

Section (l), the home, school, the community record and history of the child as well as any health or educational special needs of the child:

Wells is diagnosed with Autism Spectrum Disorder and global developmental delay.  He is currently in ADA, OT and speech therapy.  So those needs are currently being met by the therapist.

interest.

A.    She said, Mom was evasive and had to take the MMPI twice.  Moderately elevated in defensiveness.

Q.    Okay.

A.    As it relates to the questions that you just asked.

Q.    Thank you.  And Mr. Harvey was moderately elevated in defensiveness as well, correct?  They were all the same.

A.    Yes, I believe so, yes.

Q.    And Mr. Harvey didn't have to retake the MMPI.

A.    Not that I recall.

Q.    And I think you've said that Mr. Harvey's been very forthcoming with his therapist and his mental health issues. He hasn't hidden that he has issues to you.

A.    I can only answer up until July of 2021, as far as the information I have.  Any other information would be from Dr. Oppenheimer, because I have not had access to anything since July of 2021.

Q.    But Dr. Oppenheimer was not permitted to do a custody evaluation, correct?

A.    No.

Q.    Right.  So Dr. Oppenheimer's report is just a psychological evaluation, and it's your role --

A.    Correct.

Q.    -- to make recommendations, not determinations, but recommendations to the Court.

A.    Correct.  That's all I do is make recommendations.

Q.    And so the last communication you had with Mr. Harvey was July of 2021.

A.    I believe so, yes.

Q.    And you wouldn't -- you were not relying upon a psych evaluation for custody recommendation, were you?

A.    No, I was relying on a psychological evaluation in determination of mental health, yes.

Q.    But no personal interaction with Mr. Harvey.

A.    No.

Q.    And I think you were asked whether you were ever afraid of Mr. Harvey, and I think that your answer was not you, but you were concerned for others.  Is that a fair remembrance of your testimony?

A.    I'm concerned for those involved in this case, and -- but I am mostly concerned for Ms. Harvey, her mother -- Ms. Harvey and her mother, and potentially Wells, yes.

Q.    Is that something based on the therapeutic notes and/or Dr. Oppenheimer?

A.    Well --

Q.    It's not based on any action that you saw from Mr. Harvey.  He never threatened you.

A.    No, he did not.

Q.    Okay.  The only -- you were never -- there were never any pictures of any bruises or any evidence of any abuse

83

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**MATTHEW THOMAS HARVEY,**

Plaintiff,

v.

**CLAIRE M. HARVEY, et al.,**

Defendants.

**CIVIL ACTION NO.**

**1:25-CV-04688-JPB**

# EXHIBIT B

---

## January 22, 2022 "Murder/Suicide Text" Email and Attachment

*Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's
Motion for Attorney's Fees and Reasonable Costs [Doc. 75]*

Matthew Thomas Harvey - Plaintiff, pro se

2/3/22, 4:56 AM                                    Gmail - Murder/Suicide Text

 Gmail                                            **Matthew Harvey** ████████████

---

## Murder/Suicide Text
4 messages

**Matthew Harvey** ████████████                          Sat, Jan 22, 2022 at 10:42 PM
To: Kim Oppenheimer ████████████

Dr. Oppenheimer,

Please see attached text messages from early Sept. of 2019. The dialogue is from the day after Claire was held accountable in therapy for her bad behavior and words by Leslie Arrowsmith.

If you recall, the previous night, after the session, she physically assaulted me while I was driving with our son in the backseat and she walked home. If you'll notice, even though I did absolutely nothing wrong and shouldn't have had to apologize, I was being very cautious and careful not to upset her further. This was due not only to the physical abuse, but also because she had told me later that night when we were at home that if I left her she would kill me and then herself (page 10). I tried making light of it so as to try and get her to expressly admit what she had said in case I needed to get the police involved if she went off again. Pretty crazy how my mind completely blocked it out. That's also why I ultimately asked mom to come down and stay for a day or so. She was extremely ugly to mom too by the way.

████████████████████████████████████████
████████████████████████████████████

📄 **Pages from Text Messages - Murder_Suicide.pdf**
    173K

---

**Matthew Harvey** ████████████                          Mon, Jan 24, 2022 at 8:47 PM
████████████████████

Begin forwarded message:

> **From:** Matthew Harvey ████████████
> **Date:** January 22, 2022 at 10:42:34 PM EST
> **To:** Kim Oppenheimer ████████████
> ████████████████████
>
> **Subject: Murder/Suicide Text**

09/04/2019 18:57:12

**WIFE**    I'm turning in. I can nurse him later

09/04/2019 18:57:18

Do what is best for him

09/04/2019 18:57:50

I can tell he is waiting for you **HUSBAND**

09/04/2019 20:15:05

Seaman's chicken

09/04/2019 20:15:40

Myahhh (Peter griffin laugh).... seme
n

09/04/2019 20:16:17

Haha

09/04/2019 20:21:31

I never deep down thought ur comme
nt about killing me or yourself was a r    *
eal threat but like you said earlier, aft
er watching all these murder porn sh
ows.... I think we both were just freaki
ng out a bit

09/04/2019 20:21:41

Once again... South Park is right

09/04/2019 22:36:34

U mad?

09/04/2019 22:39:16

**WIFE**  This isn't solved overnight

09/04/2019 22:39:45

I think I'm allowed to have space if I ask in a respectful way

09/04/2019 22:40:43

Of course. I was going to try be sweet and say goodnight and say positive reinforcing things about our convo this evening    **HUSBAND**

09/04/2019 22:41:30

I guess I feel like you're being cold and distant while earlier you weren't as much

09/04/2019 22:41:38

Confusing is all

09/04/2019 22:41:45

Ok, good night. Love you

09/04/2019 22:42:16

Please don't call me cold

09/04/2019 22:42:20

I'm hurt

09/04/2019 22:42:34

Ok distant

**EXHIBIT "C"**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MATTHEW THOMAS HARVEY,

    Plaintiff,

v.

CLAIRE M. HARVEY, et al.,

    Defendants.

CIVIL ACTION NO.

1:25-CV-04688-JPB

# EXHIBIT C-1

## February 16, 2022 "List of Items" Email - Redacted Excerpt

*Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's*
*Motion for Attorney's Fees and Reasonable Costs [Doc. 75]*

Matthew Thomas Harvey - Plaintiff, pro se

## February 16, 2022 "List of Items" Email - Redacted Excerpt

| From: | Matthew Harvey <mharvey7744@gmail.com> |
|---|---|
| To: | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
| Bcc: | Karen Austin <kaustinmd@yahoo.com> |
| Date: | February 16, 2022, 11:41 a.m. EST |
| Subject: | List of Items |
| Gmail ID: | 17f0368aa6f6e355 |

Dr. Oppenheimer,

I wanted to share this concise list of things that I believe to be "not normal" behavior and/or proof of mental illness that I'll be including in the divorce filings.

[REDACTED - unrelated intimate, family, and third-party material]

Plaintiff told Defendant that she and Child "would be better off" if he committed suicide in Fall of 2020, while Defendant was actively undergoing treatment for Major Depressive Disorder (MDD), which is a disability recognized under the Americans with Disabilities Act.

*Redacted excerpt. The omitted portions are unrelated to the statement cited in Plaintiff's opposition.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

MATTHEW THOMAS HARVEY,

    Plaintiff,

v.

CLAIRE M. HARVEY, et al.,

    Defendants.

CIVIL ACTION NO.

1:25-CV-04688-JPB

# EXHIBIT C-2

## March 25-April 1, 2022 Email Correspondence and Audio Submission

*Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's
Motion for Attorney's Fees and Reasonable Costs [Doc. 75]*

Matthew Thomas Harvey - Plaintiff, pro se

## March 25-April 1, 2022 Email Correspondence and Audio Submission

*Repeated quoted thread text, standard signature blocks, and confidentiality notices are omitted; the substantive text of each identified Gmail message is reproduced.*

| | |
|---|---|
| **From:** | Matthew Harvey <mharvey7744@gmail.com> |
| **To:** | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
| **Bcc:** | Karen Austin <kaustinmd@yahoo.com> |
| **Date:** | March 25, 2022, 4:19 p.m. EDT |
| **Subject:** | Criminal Charges Update |
| **Gmail ID:** | 17fc2bba12b18239 |

Dr. Oppenheimer,

I'm not sure when the last I updated you, but DA office keeps telling Mr. Nash that they're "swamped" and busy with other cases. Supposedly I should be getting my ankle bracelet off soon. That should help with my sleep/anxiety not being deathly afraid of going back to jail all the time.

P.S. do you need the recording of claire admitting to telling me to kill myself or was my word sufficient? Also, will I be given a chance to refute her claims made against me? As people with her condition are notorious for manufacturing misinformation, I just want to make sure that you're receiving the full truth.

| | |
|---|---|
| **From:** | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
| **To:** | Matthew Harvey <mharvey7744@gmail.com> |
| **Date:** | March 25, 2022, 5:26 p.m. EDT |
| **Subject:** | Re: Criminal Charges Update |
| **Gmail ID:** | 17fc2f9e362d4d10 |

Hi Matthew,

You are welcome to send me anything you would like for me to review, but I would like to hear the recording you referenced. I am close to being able to start a written report of my findings. I will need a report retainer of $8000 to do so. Previously, you indicated you wanted me to write one. Is that still the case? Thanks,

Kim

| | |
|---|---|
| **From:** | Matthew Harvey <mharvey7744@gmail.com> |
| **To:** | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
| **Date:** | March 25, 2022, 5:32 p.m. EDT |
| **Subject:** | Re: Criminal Charges Update |

 17fc2fee807ce9c8

$8k total from me or split between us? I'd have to ask mom and dad since they'd be paying for it.

| From: | Matthew Harvey <mharvey7744@gmail.com> |
|---|---|
| To: | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
| Bcc: | Karen Austin <kaustinmd@yahoo.com> |
| Date: | March 25, 2022, 5:35 p.m. EDT |
| Subject: | Re: Criminal Charges Update |
| Gmail ID: | 17fc301baca52f04 |

Also, you have a retainer of $3k if I'm not mistaken. I'm just trying to understand. That's a lot of money.

Would you like the evidence that brandy modified my therapy notes too?

| From: | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
|---|---|
| To: | Matthew Harvey <mharvey7744@gmail.com> |
| Date: | March 25, 2022, 5:44 p.m. EDT |
| Subject: | Re: Criminal Charges Update |
| Gmail ID: | 17fc309fe3d83acd |

In reading the Order, each of you is responsible for your own fees. I know Claire does not want the expense of a written report, and frankly, I'm not sure that it is worth the expense. Please remember that I am conducting psychological evaluations which Brandy will use in formulating her conclusions. The options are (1) you pay the full cost of a written report which the Court may reapportion later; (2) I provide verbal feedback to the GAL; (3) Unless you are pro se, I provide verbal feedback to the GAL and both attorneys. Your initial retainer is being used for document review, cataloging documents, test scoring, etc.

Kim

| From: | Matthew Harvey <mharvey7744@gmail.com> |
|---|---|
| To: | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
| Bcc: | Karen Austin <kaustinmd@yahoo.com> |
| Date: | March 25, 2022, 6:42 p.m. EDT |
| Subject: | Re: Criminal Charges Update |
| Gmail ID: | 17fc33ec888168ab |

Dr. Oppenheimer,

You cancelled our appt in January. Are you saying that no additional appt is required? I'm confused as it was necessary then but not now?

| From: | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
|---|---|
| To: | Matthew Harvey <mharvey7744@gmail.com> |
| Date: | March 25, 2022, 6:46 p.m. EDT |
| Subject: | Re: Criminal Charges Update |
| Gmail ID: | 17fc34347bb8e121 |

Hi Matthew,

You underwent a violence assessment which is what I had planned to do at our next appointment. I need to review the documents in preparation for feedback. I may have some more questions or find that there is an area we didn't cover. If so, I will reach out.

Kim

| From: | Matthew Harvey <mharvey7744@gmail.com> |
|---|---|
| To: | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
| Bcc: | Leah Zammit <leah@hobsonlegal.com> |
| Date: | April 1, 2022, 2:52 a.m. EDT |
| Subject: | Audio of Claire Telling Me Kill Myself |
| Attachme nt: | admission kill myself.wav (audio file retained separately) |
| Gmail ID: | 17fe3e63c16136f4 |

Dr. Oppenheimer,

Firstly, let me apologize for my bad attitude in my last email. I've been missing him more than usual. I shouldn't have taken my frustrations out on you.

Also, a quick clarification since Brandy seems to be lying about the supervised visitation (3rd party), it was around October /November when it was first offered to me, but it was on the condition that I sign a release of my Ridgeview records to Brandy. Carrie told me it wasn't a good idea since she had already falsified/modified my therapy notes. The no strings attached visitation was offered in January.

Anyway, as promised, here is the audio clip from 12/5/20 in which we were at a friend's daughter's birthday party (outdoors at a park, watching Wells play on the jungle gym). We were very civil with one another, as was always the case before Brandy got involved. It can be hard to hear so I'm going to transcribe the

important part below.

M: Telling somebody they should…. telling somebody that you'd be better off if they were dead, to kill themselves.

C: Yes Matt, and that's a very cruel thing I've said to you. Very unkind.

*The WAV audio attachment is not embedded in this PDF. The email's contemporaneous transcription is reproduced above.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MATTHEW THOMAS HARVEY,

Plaintiff,

v.

CLAIRE M. HARVEY, et al.,

Defendants.

CIVIL ACTION NO.

1:25-CV-04688-JPB

# EXHIBIT C-3

## January 22, 2022 Appointment Correspondence and Claire-Karen Text Exchange

*Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's Motion for Attorney's Fees and Reasonable Costs [Doc. 75]*

Matthew Thomas Harvey - Plaintiff, pro se

## January 22, 2022 Appointment Correspondence and Claire-Karen Text Exchange

*Repeated quoted thread text and standard signature blocks are omitted; the substantive text of each identified Gmail message is reproduced.*

| From: | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
|---|---|
| To: | Matthew Harvey <mharvey7744@gmail.com> |
| Date: | January 22, 2022, 11:39 a.m. EST |
| Subject: | Appointment Tuesday |
| Gmail ID: | 17e82a8a35166188 |

Hi Matthew,

I hope you are doing well! You are on my calendar for Tuesday afternoon. I would like to postpone it until I see Claire a couple more times. Please confirm that you received this email. Thanks!

Kim

| From: | Matthew Harvey <mharvey7744@gmail.com> |
|---|---|
| To: | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
| Bcc: | Karen Austin <kaustinmd@yahoo.com>; Renee McDonald <pretoriafarms@gmail.com> |
| Date: | January 22, 2022, 12:48 p.m. EST |
| Subject: | Re: Appointment Tuesday |
| Attachment: | Screenshot 2022-01-22 at 10.59.57 AM.jpeg |
| Gmail ID: | 17e82e7bf60ee07a |

Yes ma'am. Thank you for letting me know.

I've attached a screenshot of texts between her and my mom this AM. While I remain guarded and skeptical as to her intentions, Claire seems to have had a change of heart. She is now concerned about focusing on co-parenting and what's best for Wells.

Have a great rest of your weekend.

Matt

| From: | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
|---|---|
| To: | Matthew Harvey <mharvey7744@gmail.com> |
| Date: | January 22, 2022, 1:04 p.m. EST |

| Subject: | Re: Appointment Tuesday |
|---|---|
| Gmail ID: | 17e82f6385e0e6a5 |

Thank you for the update.

## Attachment to January 22, 2022 Email



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MATTHEW THOMAS HARVEY,

Plaintiff,

v.

CLAIRE M. HARVEY, et al.,

Defendants.

CIVIL ACTION NO.

1:25-CV-04688-JPB

# EXHIBIT C-4

**April 18, 2022 Diagnoses Email Correspondence**

*Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's*
*Motion for Attorney's Fees and Reasonable Costs [Doc. 75]*

Matthew Thomas Harvey - Plaintiff, pro se

# April 18, 2022 Diagnoses Email Correspondence

*Repeated quoted thread text and standard signature blocks are omitted; the substantive text of each identified Gmail message is reproduced.*

| | |
|---|---|
| **From:** | Matthew Harvey <mharvey7744@gmail.com> |
| **To:** | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
| **Date:** | April 18, 2022, 3:52 p.m. EDT |
| **Subject:** | Diagnoses |
| **Gmail ID:** | 1803e3c2680e340a |

Dr. Oppenheimer,

As I feared, I wasn't given much, if any, information based on your oral report. My understanding is that neither of us were given any diagnoses by you? You don't believe I suffer from PTSD or am on the spectrum?

| | |
|---|---|
| **From:** | Kim Oppenheimer <ccsoppenheimer@gmail.com> |
| **To:** | Matthew Harvey <mharvey7744@gmail.com> |
| **Date:** | April 18, 2022, 5:00 p.m. EDT |
| **Subject:** | Re: Diagnoses |
| **Gmail ID:** | 1803e7ac6e46d56a |

Hi Matthew,

What I explained is that diagnoses are just short-hand terms for a specific set of behaviors. I find diagnoses to be more prejudicial than helpful in these types of evaluations. Hence, I did not assign either you or Claire a diagnosis.

Kim

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MATTHEW THOMAS HARVEY,

    Plaintiff,

v.

CLAIRE M. HARVEY, et al.,

    Defendants.

CIVIL ACTION NO.

1:25-CV-04688-JPB

# EXHIBIT D

## Professional Website Screenshot - "Clinical/Forensic Psychologist"

*Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's
Motion for Attorney's Fees and Reasonable Costs [Doc. 75]*

Matthew Thomas Harvey - Plaintiff, pro se



**Dr. Kim Oppenheimer, P.C.**
**Clinical/Forensic Psychologist**

**Ameris Center One**
**3490 Piedmont Rd., NE**
**Suite 1150**
**Atlanta, GA 30305**

| Home | About | My Approach | Treatments | Forensic Consulting Services | Articles | Contacts |

## FORENSIC CONSULTING SERVICES

With over fifteen years of experience conducting child custody and parental fitness evaluations, I provide case consultation to attorneys and their clients regarding the merits of their case. Frequently, I serve as an expert witness to metro Atlanta courts on issues such as child development, parental alienating behavior, resist/refuse dynamics, intimate partner violence, and relocation, among others. I provide Parenting Plan evaluations and can help you and your co-parent develop a Parenting Plan that is in the best interests of your children. Also, I conduct psychological evaluations ordered by the court to assist attorneys and guardians- ad-litem in their recommendations to the court. A court order is required to perform a psychological evaluation that will be used for forensic purposes.

# Mission

1. To provide a safe home(s) environment.
2. Positive communication between Co-Parents.
3. Positive communication between child/children and Co-Parents.
4. To reduce stress and create constructive changes in the homes.


Widget Didn't Load

# Vision



It is better to have two happy homes than one.
Try your best to have positive communication with
your Co-Parent.
To be able to achieve peace in both homes.
Make a positive difference in your child/children's
lives.

Back

# Contact Me

*Please send a message to my Office Manager regarding any
questions or to schedule your appointment. Thank you for taking
the next step.*

First name

Last name

Email

Phone

🌐 ⌄

Message

Submit



Directions to new location

Teresa Cotto
Office Manager

Widget
Didn't
Load

Forensic Consulting Services | Kim Oppenheimer

Ameris Center One
3490 Piedmont Rd., NE
Suite 1150
Atlanta, GA 30305
Office: 404-847-9560
Fax: 404-847-9537
info@drkimoppenheimerpc.com

Back

Schedule An Appointment

© 2035 by Modern Mindful Therapy. Powered and secured by Wix

Widget
Didn't
Load

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

MATTHEW THOMAS HARVEY,

    Plaintiff,

v.

CLAIRE M. HARVEY, et al.,

    Defendants.

CIVIL ACTION NO.

1:25-CV-04688-JPB

# EXHIBIT E

---

## July 12, 2021 Consent and Protective Order for Psychological Evaluation

*Plaintiff's Response in Opposition to Defendant Kim C. Oppenheimer's*
*Motion for Attorney's Fees and Reasonable Costs [Doc. 75]*

Matthew Thomas Harvey - Plaintiff, pro se

ID# 2021-0089592-CV
⚜ EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA

**20106987**

Jason D. Marbutt - 67
JUL 12, 2021 10:56 AM

Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

## IN THE SUPERIOR COURT OF COBB COUNTY
## STATE OF GEORGIA

CLAIRE MARSH HARVEY,
          Plaintiff,

vs.

MATTHEW THOMAS HARVEY,
          Defendant.

CIVIL ACTION FILE NUMBER
20-1-6987-67

### CONSENT AND PROTECTIVE ORDER FOR PSYCHOLOGICAL EVALUATION

Plaintiff, Claire Marsh Harvey, (hereinafter "Mother" and "Plaintiff") and the Defendant, Matthew Thomas Harvey, (hereinafter "Father" and "Defendant") have entered this Consent and Protective Order for Psychological Evaluation and after consideration and review IT IS HEREBY ORDERED AND ADJUDGED BY CONSENT AS FOLLOWS:

### 1. **PSYCHOLOGICAL EVALUATION**

The Guardian Ad Litem, Ms. Brandy Daswani, Esq., filed a motion that both parties undergo a Psychological Evaluation. The parties have agreed to use the services of Ms. Kim Oppenheimer, Ph.D. at Atlanta Psych Consultants, LLC. Each party shall be responsible for his/her own fees and costs for these evaluations. The Court shall have the power to reallocate Dr. Oppenheimer's fees between the parties on temporary or permanent basis at a later date as the Court deems appropriate. Each party shall be responsible for setting up his/her initial appointment with Dr. Oppenheimer, as soon as practicable. The parties shall cooperate fully with Dr. Oppenheimer throughout the evaluations, and neither party shall take any actions to delay the evaluations.

For the limited purpose of facilitating Dr. Oppenheimer's work, both parties waive any confidentiality or privilege that they may have as to any prior medical, alternative healthcare, nutritional healthcare, nutritional counseling, psychological, and psychiatric care that they have received, and Dr. Oppenheimer and/or her agents only shall have the right to contact any and all such mental health care providers as she deems appropriate. Dr. Oppenheimer shall be entitled to access all medical, psychological, and psychiatric records of the parties, and shall conduct such testing and utilize such other clinical tools as she shall deem necessary to do a full and complete evaluation. In the event a party refuses to allow Dr. Oppenheimer access to his or her medical,

psychological and/or psychiatric records, Dr. Oppenheimer shall so report to the Court and shall prepare the evaluation to the best of her ability without the cooperation of the party.

## 2. PROTECTIVE ORDER AND CONFIDENTIALITY

a.      Upon completion of the psychological evaluations, all evaluations, reports, etc.  shall be provided to the Guardian Ad Litem and marked "Confidential" and shall be distributed to and used by counsel for the parties only in connection with this action and, except as specifically set forth in the Order, shall not be provided, disclosed or made known to any person by the parties' attorneys except the parties, their respective Counsel's paralegals and secretarial employees, deposition and trial witnesses, experts, persons directly involved in the preparation of trial witnesses and experts, and other persons directly involved in the preparation or trial of this action.  Prior to disclosing such documents during deposition, at trial or to expert witnesses, non-expert witnesses or to other persons directly involved in the preparation or trial of this action, Counsel shall have such person review this Order and such person shall be advised of the obligation to honor the confidentiality designation and must agree to do so, and if such document is used during a deposition, must agree to do so on the record.  Counsel shall not provide any deponent, fact witness, or expert witness with copies of any documents or things identified as the psychological evaluation unless such persons have reviewed and agreed to be bound by this Order.  Deponents and fact witnesses shall be permitted to view a copy of the documents identified herein and must return their copy to the parties' respective Counsel after deposition, final hearing, settlement, or any appeal in this case.

b.      The parties shall only be permitted to review the document(s) mentioned herein with their respective attorney for the purposes of consultation and preparation for this lawsuit.  The parties shall not be given any copies of the document(s), and, except as specifically set forth in this Order, shall not show the document(s) to any person other than his/her Counsel, expert witnesses, litigation consultants or paralegal, secretarial employees of their respective Counsel, his/her therapist(s), or his/her medical providers.  Under the terms of this Order, the parties are also not permitted to discuss the contents of the document(s) to anyone other than their respective attorneys, therapist(s), medical providers, and those witnesses employed by their attorneys including expert witnesses.  Further, the document(s) shall not be used by the parties for any business, competitive, personal, private, or public purpose other than stated herein.

c.      The document(s) shall be provided to the Court by the Guardian Ad Litem.

d.      Subject to the applicable Rules of Evidence, the document(s) protected by this Order may be offered in evidence at trial or at any Court hearing subject to such protective measures as may be directed by this Court.

e.      This Order is subject to modification at any time upon further stipulation of the parties or pursuant to an order of this Court. The Court reserves the right to Order additional dissemination of the report(s) upon motion or as the interests of justice may require.

SO ORDERED this __12th__ day of __July__ 2021.

_____
Jason D. Marbutt
Judge, Superior Court Cobb County, Georgia


Consented to By:
Hobson & Hobson, P.C.

*Carrie M. Owens*

Carrie M. Owens
Attorneys for Defendant
Georgia Bar No. 185468
carrie@hobsonlegal.com

136 Fairground St. NE
Marietta, GA 30060
770-425-3373

Consented to By:
Kessler & Solomiany LLC

_____

Stefanie S. Potter
Attorneys for Plaintiff
Georgia Bar No. 503793
Spotter@KSFamilyLaw.com

101 Marietta Street, Suite 3500
Atlanta, GA 30303
404-688-8810


*Brandy Daswani*      *w/e/p by SSP*
_____
Brandy Daswani, GAL
Georgia Bar No. 205785
Brandy@DSFamilyLaw.net

2440 Sandy Plains Road
Building 27, Suite 100
Marietta, GA 30066
770-726-2648

## CERTIFICATE

This is to certify that I have this date served copies of the within and foregoing Order by sending through the Cobb County Mail System and/or e-mailing same using the PeachCourt Electronic Filing Portal:

Carrie M. Owens
carrie@hobsonlegal.com

Stefanie S. Potter
spotter@ksfamilylaw.com

Brandy Daswani
brandy@DSfamilylaw.net

This __12__ day of __July__, 2021.

**Amy Rushing**
Judicial Administrative Specialist for
Judge Jason D. Marbutt
Cobb County Superior Court

PRIORITY MAIL
FLAT RATE ENVELOPE
POSTAGE REQUIRED

RMLY TO SEAL

RITY®
L

nal destinations.

DATE

coverage.

als Service
GA 30303
ee Package Pickup,
ne QR code.



ED D

OM/PICKUP

AUG 06 20



APER
UCH

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuse may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023; All rights reserved.

**UNITED STATES POSTAL SERVICE®**    **Click-N-Ship®**

usps.com    9405 5301 0935 5429 8820 79 0111 2001 0003 0303

**P**    US POSTAGE
U.S. POSTAGE PAID
Click-N-Ship®

CLEARED DATE

1 lb 0 oz    Mailed from 28734    972573340954861

**PRIORITY MAIL®**

MATTHEW HARVEY    U.S. Marshals Service    Created 2026-08-03
501 N SLAPPEY BLVD RMB 1112    Atlanta, GA 30303    Flat Rate Envelope
ALBANY GA 31701-1409    **RDC 03**

**C039**

 U.S. DISTRICT COURT, NORTHERN DISTRICT
CLERK OF COURT
75 TED TURNER DR SW
ATLANTA GA 30303-3315

**USPS TRACKING #**



9405 5301 0935 5429 8820 79

