FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

AUG 24 2026

KEVIN P. WEIMER, Clerk
By: [signature] Deputy Clerk

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| MATTHEW THOMAS HARVEY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 1:25-cv-04688-JPB |
| v. | ) | |
| | ) | |
| CLAIRE M. HARVEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION AND MEMORANDUM TO ALTER OR AMEND JUDGMENT UNDER FEDERAL RULE OF CIVIL PROCEDURE 59(e)**

Plaintiff Matthew Thomas Harvey, proceeding pro se, respectfully moves under Federal Rule of Civil Procedure 59(e) and Local Rule 7.2(E) to alter or amend the July 24, 2026 Order [Doc. 73] and Judgment [Doc. 74]. This timely motion seeks correction of manifest legal error in a pleading-stage dismissal with prejudice entered before discovery and without a meaningful opportunity to cure defects first identified in the dismissal Order.

The requested relief is narrow. Plaintiff asks the Court to vacate the Judgment, reopen the action, and permit thirty days to file one focused Second Amended Complaint ("SAC"). Consistent with Rule 7(b) and Long v. Satz, 181 F.3d 1275, 1279 (11th Cir. 1999), Plaintiff attaches a detailed proffer setting forth the proposed SAC's substance. Ex. A. It narrows

defendants and remedies, identifies each alleged participant's role, separates judicial rulings from nonjudicial conduct, and omits requests requiring review or rejection of state-court judgments.

The proposed amendment would state the constitutional theory more precisely. Plaintiff proposes to allege that facially sex-neutral procedures were administered in his case through a sex-based framework treating the mother as presumptively protective and the father as presumptively dangerous and secondary; that an allegedly false ex parte temporary protective order ("TPO") converted that framework into immediate separation before individualized adjudication; that the deprivation became a self-reinforcing status quo; that his Christian beliefs were repeatedly reframed as instability, control, or danger; and that civil and criminal restraints escalated when he petitioned and resisted. See [Doc. 1, paras. 31, 37, 59, 75-76]; Ex. A.

The Order contains three errors material to amendment. First, it treated bribery as effectively necessary to plead joint action with a judge, though Dennis v. Sparks, 449 U.S. 24, 27-28 (1980), holds that private persons who willfully participate in joint activity with state officials act under color of state law. Second, it applied quasi-judicial immunity categorically rather than by function. Third, it found amendment futile despite sworn testimony, transcripts, contemporaneous communications,

firsthand witnesses, and a comparator proceeding showing how a more careful pleading could cure the perceived deficiencies.

Plaintiff does not offer the supporting records as newly discovered evidence; most predate judgment. They are offered only to demonstrate concrete curability and mistaken futility, not for the Court to weigh evidence, resolve credibility, or adjudicate the merits.

Alternatively, even if the Court declines to reopen the merits claims, the Judgment must be corrected because the portions dismissed under Rooker-Feldman were dismissed for lack of subject-matter jurisdiction and therefore cannot be dismissed with prejudice.

## I. RELEVANT PROCEDURAL HISTORY

Plaintiff filed a verified civil-rights complaint on August 19, 2025. [Doc. 1]. It alleged joint action, First Amendment retaliation, religious and sex-based discrimination, private chambers activity, civil-to-criminal crossover, and coordinated conduct involving the guardian ad litem ("GAL"), counsel, prosecutors, and a court-appointed psychologist. It also alleged that, after Plaintiff filed a pro se motion for reconsideration and new trial, he personally overheard prosecutor Jeffrey Gore say he was considering revoking Plaintiff's bond in response. [Doc. 1, paras. 75-76].

After the first round of dismissal motions, Plaintiff amended as of right under Rule 15(a)(1), filing the First Amended Complaint ("FAC") on January

5, 2026. [Doc. 44]. The FAC narrowed the action and attempted to avoid collateral review, but still alleged the ex parte TPO and Temporary Consent Order ("TCO"), private communications, a chambers meeting involving confidential health information, confinement and psychiatric coercion, indefinite loss of contact with his minor child, W.H., criminal enforcement, Daswani-Oppenheimer communications, and the April 2022 oral-feedback process. [Doc. 44, paras. 17-50].

Defendants renewed their motions to dismiss. [Docs. 46-49]. Plaintiff opposed them and argued that private defendants may act under color of law when they jointly participate with state officials in constitutional deprivations. [Doc. 53, pp. 13-17]. No answer was filed and discovery never opened. The Court entered a six-month discovery track on March 2, 2026, expressly stating that discovery was "not yet open." [Doc. 69, p. 1].

On July 24, 2026, the Court granted all four motions to dismiss. [Doc. 73]. It held most constitutional-process claims outside Rooker-Feldman, but dismissed portions of the FAC's Counts VII and VIII for lack of jurisdiction. Id. at 15. It then held Daswani and Oppenheimer immune, found the remaining private defendants were not state actors, and denied further amendment as futile. Id. at 15-21. The separate Judgment dismissed the entire action "with prejudice." [Doc. 74, p. 1].

## II. GOVERNING STANDARD

Rule 59(e) permits alteration of a judgment when the movant presents newly discovered evidence or relief is necessary to correct manifest errors of law or fact. Arthur v. King, 500 F.3d 1335, 1343 (11th Cir. 2007). It may not merely relitigate old arguments, but it is the proper vehicle to seek vacatur of a dismissal so a curative amendment may be filed. Czeremcha v. International Ass'n of Machinists & Aerospace Workers, 724 F.2d 1552, 1556 (11th Cir. 1984).

When Rule 59(e) is used to seek post-judgment amendment, the Eleventh Circuit applies Rule 15's liberal standard. Thomas v. Town of Davie, 847 F.2d 771, 773 (11th Cir. 1988); Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc., 376 F.3d 1065, 1077 (11th Cir. 2004); Sheffler v. Americold Realty Trust, No. 22-11789, slip op. at 5-7 (11th Cir. June 9, 2023) (unpublished). Leave should be denied only for a substantial reason such as undue delay, bad faith, repeated failure to cure, undue prejudice, or futility. Foman v. Davis, 371 U.S. 178, 182 (1962); Bryant v. Dupree, 252 F.3d 1161, 1163-64 (11th Cir. 2001).

For a pro se plaintiff, dismissal with prejudice is improper where a more carefully drafted complaint might state a claim and the plaintiff has not rejected amendment. Woldeab v. DeKalb County Board of Education, 885 F.3d 1289, 1291-92 (11th Cir. 2018). An amendment as of course does not by

itself establish "repeated failure to cure," particularly where the court later identifies a different defect. See Bryant, 252 F.3d at 1163-64; Sheffler, slip op. at 6-7.

## III. THE ORDER APPLIED A MANIFESTLY ERRONEOUS JOINT-ACTION STANDARD

### A. Dennis did not make bribery an element of every joint-action claim.

The Order correctly recognized that the nexus or joint-action test can convert private conduct into state action. [Doc. 73, pp. 17-18]. But it then stated: "For the 'joint action' theory of state action to work in this context, a Plaintiff would have to allege that 'an official act of the defendant judge was the product of a conspiracy involving bribery of the judge.'" Id. at 18-19 (quoting Dennis, 449 U.S. at 28). It dismissed because the FAC did not allege "anything like that." Id. at 19.

That reads the facts of Dennis as a universal pleading element. Dennis's governing rule is broader: "Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions." 449 U.S. at 27-28. The judge in Dennis allegedly accepted a bribe, but the Supreme Court did not hold that bribery is the exclusive means by which a private person may jointly participate with a judge. To the contrary, the Court emphasized that the judge's immunity did not alter the character of the private parties' joint conduct. Id. at 28-29.

Lugar likewise found state action where a private creditor jointly participated with state officials in a prejudgment seizure without any bribery allegation. Lugar v. Edmondson Oil Co., 457 U.S. 922, 941-42 (1982). The question is willful participation in challenged state action. Dennis, 449 U.S. at 27-28. Agreement may be plausibly inferred from particular communications and overt acts; direct proof is not a pleading prerequisite.

Plaintiff agrees that ordinary advocacy or prevailing in court is insufficient. The SAC instead would plead private meetings, use of confidential material, initiation of an unusual criminal investigation from the custody case, participation in criminal bond administration, coordinated pretrial dissemination of catastrophic psychological conclusions, discriminatory treatment, and alleged retaliation through state enforcement. Ex. A. Whether those facts prove agreement is a merits question; the absence of bribery is not dispositive.

**B. The sworn Rohan testimony describes more than private parties merely resorting to court.**

The Order characterized the allegation that the presiding judge sought criminal charges as made "[w]ithout much explanation." [Doc. 73, p. 4]. Detective Sean Rohan's sworn deposition supplies the detail. Rohan testified that Judge Jason Marbutt "did ask for an investigation" and "follow up." Ex. C, Rohan Dep. 10:20-25. The request came through Rohan's supervisor with

instructions to contact the Cobb County District Attorney's Office, a route Rohan called "not common." Id. at 11:5-19.

Rohan then met at the District Attorney's Office with Assistant District Attorney John Tulley ("Tulley"), Claire Harvey, and Potter. Id. at 15:1-6, 21:18-22:15. He testified that the allegations arose from the civil hearing, Claire's counsel from Kessler & Solomiany, LLC ("K&S") supplied the TCO and civil exhibits, he had no official hearing transcript, and he sought the warrant that afternoon or the next day. Id. at 16:6-17:23, 24:9-27:16.

Rohan testified this was probably the first time in roughly four and one-half years as a detective that he had been sent directly to the District Attorney's Office this way. Id. at 19:11-20:25. He was uncertain whether Marbutt contacted Sergeant Buehler directly or through Tulley, and the SAC will say so. Id. at 27:18-28:8. The core sequence is sworn: judicial request for investigation, unusual prosecutorial routing, participation by the adverse party and K&S counsel, civil materials, and a warrant sought the same afternoon or next day. That supports a concrete joint-action theory beyond mere resort to court.

## IV. THE IMMUNITY ANALYSIS WAS IMPROPERLY CATEGORICAL

### A. Absolute immunity turns on function, not title or general relationship to a case.

The Order acknowledged that quasi-judicial immunity applies only when an official acts within the scope of the protected function. [Doc. 73, p. 16] (citing Roland v. Phillips, 19 F.3d 552, 555 (11th Cir. 1994)). It nevertheless treated all alleged conduct by Daswani and Oppenheimer as immune because they interviewed Plaintiff and communicated with one another, the court, and other participants. Id. at 16-17.

Absolute immunity turns on "the nature of the function performed, not the identity of the actor who performed it." Forrester v. White, 484 U.S. 219, 229 (1988). Court appointment alone is insufficient. Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435-36 (1993). Protected officials may also perform investigative or administrative functions requiring a different analysis. Buckley v. Fitzsimmons, 509 U.S. 259, 269-76 (1993). Daswani's own reply framed the inquiry as whether conduct was "in relation to the judicial process" and "within the scope of [her] authority." [Doc. 58, pp. 2-6].

Plaintiff does not argue that harmful testimony itself loses witness immunity merely because it was false, biased, or damaging. Nor does he contend that every GAL interview or evaluative communication is actionable. The proposed SAC separates protected testimony and recommendation

functions from alleged criminal-process participation, acquisition and dissemination of confidential material outside authorized bounds, pre-testimonial coordination, and other acts that require a distinct functional analysis. Ex. A.

**B. The record supports a plausible inference that Daswani helped shape and preserve criminal bond conditions that operated as leverage in the divorce.**

The FAC expressly alleged that GPS monitoring was imposed at Daswani's insistence. [Doc. 44, para. 48]. The April 14, 2022 criminal bond transcript supplies concrete facts supporting that allegation. Criminal counsel told the court there was "no violation in the file," identified negative drug and alcohol tests, and described the $300 monthly GPS burden. Ex. D, Apr. 14 Tr. 5:1-24. The court asked whether the divorce remained pending and later specifically asked whether the GAL had been involved with the ankle monitor. Id. at 6:9-16, 8:9-13.

Counsel responded that Daswani "was one of the people that originally was put in here that she wanted to be a part of the bond order"; he then described her contact with the District Attorney's Office and her effort to modify the no-contact restriction so she could communicate with Plaintiff. Id. at 8:14-9:1. Judge McLaughlin observed that the consent bond had been presented to him without the usual proceeding, that he did not impose ankle monitors "that often" and was "stingy" about them, and that counsel had

reached a "consensus" concerning the bond amount, protected persons, and GPS monitoring. Id. at 9:2-10:1.

Those facts plausibly support more than passive receipt of protection. They support the proposed inference that Daswani used her access to the District Attorney's Office to help shape or materially influence the protected-person and no-contact package within which the unusual GPS condition was imposed. The transcript does not conclusively establish that she personally selected every term, but Rule 59(e) does not require Plaintiff to prove the proposed allegation now; it supplies a concrete, discovery-testable basis for amendment.

The court then acknowledged there had been no infractions but expressly retained GPS in part because "the divorce is still pending," stating that it would reconsider after the divorce ended and more time passed without violations. Id. at 10:1-18. Counsel answered that Plaintiff accepted the conditions only to obtain release from jail. Id. at 10:20-22. Thus, a costly criminal pretrial restraint was affirmatively tethered to the civil case despite compliant performance.

The proposed SAC would allege, upon information and belief, that the unresolved criminal charges and bond package operated together as coercive leverage. So long as the prosecution remained pending, Plaintiff bore GPS expense, geographic restrictions, protected-person and no-contact conditions,

reputational stigma, and the threat of reincarceration. Those burdens increased pressure to settle the divorce, stop resisting the prescribed custodial role, and bring the criminal matter to an end on terms acceptable to the prosecution. The April 14 transcript alone does not prove that purpose; considered with the communications and later bond threat described below, it makes the inference plausible and appropriate for discovery.

January 2022 correspondence strengthens that inference. Daswani wrote counsel, copying Plaintiff, that she had prepared an affidavit to modify the "protections afforded me through the state" and understood Plaintiff canceled the contact-modification hearing. Ex. J (Jan. 20-22, 2022 correspondence). Plaintiff's mother then said the attempted modification lacked Plaintiff's knowledge or consent, asked Daswani to recuse as biased, and explained that Plaintiff did not wish to communicate with her. Daswani responded that Plaintiff had "the ability to end this case by entering into an agreement," that her investigation would continue until finalization "whether he chooses to participate or not," and that modification would permit participation without "retribution through the state." Id.

The following morning, January 22, Claire contacted Plaintiff's mother proposing to "settle the whole thing out of court," discussing sale of the marital residence, and proposing to "re focus on co parenting and [W.H.]." Ex. J. Plaintiff forwarded a screenshot to Oppenheimer and initially described it

as a possible "change of heart." Id. Plaintiff does not claim timing alone proves agreement. Coupled with Daswani's prior-day statement that Plaintiff could "end this case by entering into an agreement," these are concrete circumstantial facts a SAC may plead concerning settlement pressure, motive, and possible coordination.

The resulting loop was not merely that Plaintiff refused cooperation. Daswani participated in criminal-bond administration, was made a protected person, sought modification to regain direct GAL access, and then Plaintiff's refusal—grounded in a contemporaneous demand that she recuse for bias—was invoked against him in the custody proceeding. Ex. E, Apr. 25, 2022 Tr. 23:1-25, 26:1-27:5. These facts support the proposed allegation that criminal restrictions were both influenced by and later exploited by civil participants; whether each act was a protected GAL function requires act-specific analysis.

The chronology also supports a concrete First Amendment retaliation theory. The verified complaint alleged that, shortly after Plaintiff's July 19, 2022 filing, he overheard prosecutor Gore say he was considering revoking Plaintiff's bond in response. [Doc. 1, paras. 75-76]. A November 3, 2022 email shows Plaintiff contemporaneously reporting that Potter and Daswani continued supplying a dangerousness narrative to the prosecutor and that he understood the bond threat as pressure to abandon the custody fight. Ex. K

(Nov. 3, 2022 contemporaneous email). The email corroborates timing, not independent proof; agreement remains an inference subject to discovery.

Plaintiff does not rely on Exhibit D as proof of a standalone speedy-trial claim. Its significance here is factual: the pending prosecution kept substantial liberty restraints in place, and the criminal court expressly maintained GPS in part because the divorce remained pending. That entanglement supports the proposed coercion, retaliation, and joint-action allegations.

**C. The July 20 confidentiality episode likewise requires a functional analysis.**

The Order accepted as pleaded that, immediately before the July 20, 2021 contempt hearing, Daswani supplied Plaintiff's confidential health and therapy records during a private meeting involving the judge and counsel. [Doc. 73, p. 3]; [Doc. 44, paras. 31-34]. The SAC would specify the source, authorization, circumstances of disclosure, alleged use to portray Plaintiff as dangerous, and the extraordinary liberty consequences that followed. Ex. A.

Plaintiff does not ask the Court on Rule 59(e) to determine criminal liability. The point is functional: alleged acquisition, dissemination, and strategic use of psychotherapy material beyond authorization potentially implicates confidentiality restrictions and cannot be deemed categorically immune merely because the actor held the title of GAL.

**D. Oppenheimer's pre-testimonial conduct likewise requires an act-specific analysis.**

The SAC will not impose liability merely because Plaintiff disagreed with Oppenheimer's opinion or testimony. It will allege pre-testimonial conduct: communications with Daswani, cancellation of Plaintiff's remaining session, a two-hour oral-feedback conference shortly before trial, dissemination of catastrophic homicide-suicide conclusions without a written report or disclosed diagnoses, and materially unequal treatment of testing and medical information. Ex. E.

Contemporaneous emails make the theory concrete. On March 25, 2022, Oppenheimer said a written report required an $8,000 retainer and that she was conducting evaluations "which Brandy will use in formulating her conclusions," offering verbal feedback as an alternative. Ex. G (contemporaneous March-April 2022 communications). On April 18, after oral feedback, she wrote that diagnoses were "more prejudicial than helpful" and assigned neither party one. Id.

The April 25 transcript confirms the feedback occurred less than two weeks before trial, only portions were recorded, and Plaintiff's counsel argued the late GAL recommendation appeared to rely heavily on Oppenheimer. Ex. E, Apr. 25 Tr. 4-15. Counsel sought a continuance and the GAL file; Potter

disclosed an ex parte safety communication from Daswani; the court denied both requests. Id. at 12-15.

The record also makes religious animus concrete. The verified complaint alleged that family witnesses were asked whether they shared Plaintiff's "biblical views on marriage" and that Plaintiff was questioned about female "submission" and whether women were inferior. [Doc. 1, paras. 37, 59]. Trial evidence again framed religious language through mania, psychosis, "Biblical submission," and "weaponizing the Bible." Ex. E; Ex. F, Apr. 26, 2022 Tr. 22-24. McDonald's affidavit confirms Daswani asked her and Plaintiff's grandmother about "biblical marriage" and whether the husband was the "head of the household," questioning she found unrelated to parenting or child safety. Ex. I, McDonald Aff. paras. 7-16. These facts support focused religion-based theories without making immunized testimony itself the tort.

## V. THE FUTILITY DETERMINATION WAS MANIFESTLY ERRONEOUS

### A. The FAC was filed before the Court identified the decisive defects.

The Order reasoned that Plaintiff had already amended once after defendants challenged state action. [Doc. 73, pp. 20-21]. But the FAC preceded the Court's bribery-type standard, its view that the criminal-investigation allegation lacked explanation, and its categorical treatment of

Daswani's and Oppenheimer's acts. The FAC's narrowing also compressed facts described in the verified original complaint. It was not a repeated failure after judicial identification of the defect.

Sheffler is procedurally close: the plaintiffs amended once as of right, the district court later dismissed under a standard they had been hard-pressed to predict, and a timely Rule 59(e) motion proposed curative allegations. The Eleventh Circuit applied Rule 15's liberal standard and vacated where there was no futility, undue delay, or prejudice. Sheffler, slip op. at 5-7. Here, futility rested on the mistaken Dennis premise and an incomplete view of the curative facts.

**B. The proposed amendment supplies a concrete constitutional narrative and defendant-specific cure.**

Exhibit A sets forth actors, dates, communications, overt acts, constitutional injuries, and remedies. The proposed narrative is a sequence rather than a collection of adverse rulings: an alleged sex-based paternal-danger/secondary-parent framework; ex parte TPO separation before adversarial custody adjudication; preservation of that deprivation through the TCO and contempt; the July 20 chambers process and confinement; civil-to-criminal crossover; psychological reinforcement of the danger narrative; and alleged retaliation as Plaintiff continued to petition and resist.

Sex discrimination would not be inferred merely from the final custody allocation. The verified complaint alleged that on December 5, 2020, Claire told Plaintiff that Potter had described every-other-weekend parenting as simply "standard" for fathers after divorce. [Doc. 1, para. 31]. Georgia law provides no presumption favoring either parent. O.C.G.A. section 19-9-3(a)(1). The SAC would use the statement as contemporaneous evidence and compare treatment of safety, aggression, mental-health information, parenting capacity, and compliance. It would not plead a statewide Monell custom.

The TPO allegations would likewise be reframed. The SAC would not ask this Court to invalidate the TPO or invoke a fraud exception to Rooker-Feldman. It would allege that Claire and Potter selected emergency ex parte procedures; police the preceding evening made no arrest or emergency finding; the petition contained statements Plaintiff alleges were materially false or misleading; and the resulting separation became leverage for the TCO and a manufactured status quo. [Doc. 44, paras. 17-25]. Alleged fabrication is the mechanism of independent constitutional injury, not a request for appellate review.

The proposed causes of action are focused: (1) procedural due process and familial association; (2) unreasonable seizure and liberty restraints; (3) First Amendment petitioning and speech retaliation; (4) religious

discrimination, Free Exercise, and religious-speech retaliation; (5) sex-based equal protection; (6) section 1983 conspiracy and joint action; (7) section 1985(2) obstruction of state-court justice with an equal-protection purpose; and (8) section 1985(3) equal-protection conspiracy based principally on religion and sex. Ex. A. The original verified complaint already pleaded section 1983 joint-action, retaliation, and equal-protection/religious-discrimination theories, and separately invoked section 1985. [Doc. 1, Counts I-III, X].

The proffer identifies defendants by phase. It does not allege that later participants joined the 2020 TPO decision, does not assign every act to every defendant, and distinguishes judicial rulings from the alleged state side of joint activity and Marbutt's narrowly alleged investigative act. Ex. A.

The amendment would also conform its remedies to the jurisdictional boundary the Court recognized. It would not ask this Court to vacate the divorce decree, determine custody, declare the TPO void, or rely on a fraud exception to Rooker-Feldman. It would seek damages for completed independent conduct and only permissible prospective relief. See Behr v. Campbell, 8 F.4th 1206, 1212-15 (11th Cir. 2021). It would omit Georgia RICO and statutory abusive-litigation claims, which are not presented for decision here.

**C. The sworn witness and unrelated comparator materials reinforce curability; they are not offered as newly discovered evidence.**

Plaintiff's aunt, Allison Renee McDonald, has executed a focused sworn affidavit. Ex. I, McDonald Aff. paras. 7-35. She attests that Daswani questioned her and Plaintiff's grandmother about "biblical marriage" and whether the husband was the "head of the household"; that Christianity predated the litigation; that she attended the July 20 proceeding and became aware of the private pre-hearing chambers meeting; that she heard the ensuing jail-versus-mental-health discussion and called a facility; and that she never observed conduct causing her to believe Plaintiff was dangerous to W.H. Id.

The McDonald affidavit is not offered as "newly discovered evidence" within Rule 59(e). The underlying events predate judgment. It is submitted to demonstrate that the proposed amendment is concrete, that identified firsthand witnesses exist for allegations the Court considered insufficiently pleaded, and that amendment therefore cannot be rejected as inherently speculative or incapable of cure.

Plaintiff also identified an unrelated Cherokee County proceeding involving the same GAL, a different family, and another K&S partner. In contemporaneous messages, Joshua Friedman—the nonparty husband whose conduct was scrutinized—reported that K&S entered the case through

partner Max E. Fishman approximately one week before Daswani moved to implement her recommendation, and that an in-chambers meeting followed in which the judge warned Hannah's counsel not to attack Daswani's credibility. Ex. H-2 (Jan. 4, 2026 messages). A motion filed March 12, 2026 then alleges more than thirty hours scrutinizing Friedman, repeated private communications with the father's partner, religious practices treated as concerns, pursuit of allegedly unlawfully obtained marital communications, and circulation of a spreadsheet of purported criminal charges alleged not to appear in the public record. Ex. H-1, Long v. Long, No. 24CVE0811, *Motion to Remove Guardian ad Litem* paras. 12-16, 37-44, 56-65 & pp. 12-16 (Cherokee Cnty. Super. Ct. Mar. 12, 2026).

Plaintiff does not offer Friedman's messages or Long's allegations as adjudicated facts, proof of an identical offense, or evidence of a statewide conspiracy. Their narrower relevance is that an unrelated family reported materially similar timing and methods involving the same GAL and a second K&S partner: private-chambers activity, alleged unsupported or fabricated evidence, selective investigation, privacy-boundary concerns, and religious focus. The named witness and filed record reinforce that the proposed amendment is concrete; discovery can test whether the similarities are coincidence or recurring conduct.

**D. There is no undue delay, bad faith, or prejudice.**

Plaintiff filed this motion promptly within Rule 59(e)'s non-extendable period. He is pro se, has multiple documented disabilities, was denied permission to file electronically, and is coordinating a paper filing under a compressed deadline. Ex. B (Plaintiff's declaration). He submits a detailed proffer now and requests thirty days after vacatur to convert it into a complete pleading. This is not tactical withholding; it avoids another rushed complaint before the Court decides whether judgment will be reopened.

Defendants would suffer no cognizable prejudice from one focused amendment. No answer has been filed, discovery never opened, and the Court's scheduling order contemplated a six-month discovery period that had not commenced. [Doc. 69, p. 1]. The proposed amendment arises from the same core events, clarifies the alleged constitutional mechanisms, and narrows rather than expands the remedial request. Any defendant may challenge the resulting pleading under Rule 12. The preference for resolving potentially curable claims on their merits therefore outweighs finality concerns at this early stage.

## VI. THE JUDGMENT CANNOT DISMISS JURISDICTIONAL MATTERS WITH PREJUDICE

The Order dismissed portions of the FAC's Counts VII and VIII under Rooker-Feldman because the Court lacked subject-matter jurisdiction to

declare state orders void or enjoin their enforcement. [Doc. 73, p. 15]. The separate Judgment nevertheless dismissed the entire action with prejudice. [Doc. 74, p. 1].

A dismissal for lack of subject-matter jurisdiction is not a judgment on the merits and must be without prejudice. Stalley ex rel. United States v. Orlando Regional Healthcare System, Inc., 524 F.3d 1229, 1232 (11th Cir. 2008); see also Jones v. The Lamar Company, LLC, No. 24-12949, slip op. at 12 (11th Cir. Mar. 2, 2026) (vacating a with-prejudice Rooker-Feldman dismissal and remanding for dismissal without prejudice). Thus, even if the Court declines to reopen the remaining claims, the Judgment must make every jurisdictional dismissal expressly without prejudice.

## VII. PLAINTIFF PRESERVES HIS OBJECTION TO THE DENIAL OF RECUSAL AND REQUESTS REASSIGNMENT IF THE ACTION IS REOPENED

The July 24 Order also denied Plaintiff's Motion for Recusal [Doc. 35]. Plaintiff preserves his objection without rearguing the full motion and does not contend that adverse rulings alone establish bias. The inquiry under 28 U.S.C. § 455(a) is whether impartiality might reasonably be questioned. If the Judgment is vacated, Plaintiff respectfully requests reassignment to a different Article III judge; alternatively, he preserves the issue for appeal. This limited request is not an independent basis for Rule 59(e) relief and does not displace the merits grounds above.

## VIII. REQUESTED RELIEF

For the foregoing reasons, Plaintiff respectfully requests that the Court:

1. grant this Motion under Rule 59(e);
2. vacate the July 24, 2026 Judgment [Doc. 74] and reopen this action;
3. alter or amend the July 24, 2026 Order [Doc. 73] to correct the joint-action, function-specific immunity, and futility errors identified above;
4. grant Plaintiff leave to file one focused Second Amended Complaint within thirty days after entry of the Court's order, consistent with the detailed proffer attached as Exhibit A;
5. alternatively, amend the Judgment to provide that all claims or remedies dismissed for lack of subject-matter jurisdiction are dismissed without prejudice and that the dismissal does not adjudicate unasserted state-law causes of action;
6. hold Defendant Oppenheimer's Motion for Attorney's Fees [Doc. 75] in abeyance until this motion and any resulting appeal are resolved; and
7. if the action is reopened, assign further proceedings to a different Article III judge; and
8. grant such other relief as is just and proper.

Respectfully submitted this 18th day of August, 2026.

*/s/ Matthew Thomas Harvey*

**Matthew Thomas Harvey**
Plaintiff, pro se

c/o 501 North Slappey Blvd. #1112
Albany, Georgia 31701
Mharvey7744@gmail.com
(912) 346-5299

## CERTIFICATE OF SERVICE

I certify that on August 18, 2026, a true and correct copy of the foregoing *Plaintiff's Motion and Memorandum to Alter or Amend Judgment Under Federal Rule of Civil Procedure 59(e)*, together with the supporting exhibits, was served by electronic mail upon all counsel of record addressed as follows:

- Noah Green, counsel for Claire M. Harvey — ngreen@henefeldgreen.com
- Christine L. Mast & Jamie McDowell, counsel for Kessler & Solomiany, LLC; Stefanie S. Potter; Molly Y. Teplitzky — cmast@hpylaw.com; jmcdowell@hpylaw.com
- Courtney B. Walker; Tia M. Brown, counsel for Kim C. Oppenheimer — cwalker@hallboothsmith.com; tbrown@hallboothsmith.com
- James R. Doyle, II, counsel for Brandy J. Daswani — james.doyle@lewisbrisbois.com

This 18th day of August, 2026.

*/s/ Matthew Thomas Harvey*
**Matthew Thomas Harvey**
Plaintiff, pro se

c/o 501 North Slappey Boulevard #1112
Albany, Georgia 31701
Mharvey7744@gmail.com
(912) 346-5299

# Exhibit A

Detailed Proffer of the Proposed Second Amended Complaint

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| MATTHEW THOMAS HARVEY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 1:25-cv-04688-JPB |
| v. | ) | |
| | ) | |
| CLAIRE M. HARVEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBIT A**

**DETAILED PROFFER OF THE PROPOSED SECOND AMENDED COMPLAINT**

Plaintiff submits this proffer to set forth, with particularity, the substance of the proposed Second Amended Complaint. See Long v. Satz, 181 F.3d 1275, 1279 (11th Cir. 1999). Plaintiff requests thirty days after vacatur to prepare and file the complete pleading in numbered-paragraph form. This proffer is not itself the proposed operative complaint and does not ask the Court to resolve disputed facts on the Rule 59(e) motion.

## I. NARROWED PARTIES AND REMEDIES

The proposed pleading would retain Matthew Thomas Harvey as the sole plaintiff. W.H. would not be named because Plaintiff, a nonlawyer parent, cannot litigate a minor's claims pro se. The pleading would name only

defendants for whom a defendant-specific factual and legal theory can be stated.

- Core private defendants: Claire M. Harvey; Stefanie S. Potter; Kessler & Solomiany, LLC; Brandy J. Daswani; and Kim C. Oppenheimer.
- Conditional defendant: Jason D. Marbutt, limited to the alleged nonjudicial act of requesting or initiating a criminal investigation, not his rulings or courtroom decisions.
- Conditional defendant: Molly Y. Teplitzky, limited to specific post-judgment enforcement or retaliation facts that can be pleaded without relying only on ordinary advocacy.
- Angela Z. Brown, Jeffrey M. Gore, and other judicial, prosecutorial, law-enforcement, or probation actors may be alleged as state participants supplying the state side of joint action without necessarily being named for damages where immunity applies.

The proposed pleading would not ask the federal court to vacate, modify, or enforce a custody decree, declare the divorce judgment or TPO void, determine parenting time, or rely on a fraud exception to Rooker-Feldman. It would seek damages for independent completed constitutional violations and only prospective relief that can be granted without reviewing and rejecting a state judgment. It would not assert Georgia RICO or statutory abusive-litigation claims.

## II. CORE FACTUAL NARRATIVE

### A. Sex-based framework, ex parte restraint, and manufactured status quo.

The pleading would allege that facially sex-neutral custody and family-violence procedures were administered in Plaintiff's case through a sex-based framework that treated the mother as presumptively protective and vulnerable and the father as presumptively dangerous, aggressive, and secondary. As contemporaneous evidence of that framework, the pleading would allege that Claire told Plaintiff on December 5, 2020 that Potter had described every-other-weekend parenting as simply "standard" for fathers after divorce, despite Georgia law providing no presumption favoring either parent.

The pleading would allege that Claire and Potter selected an ex parte emergency strategy before the November 2, 2020 police response; that officers made no arrest and initially received no allegation establishing an imminent emergency; and that Claire obtained an ex parte TPO the next day through materially false or misleading statements. State officers then removed Plaintiff from the home and immediately severed ordinary contact with W.H. before a completed adversarial determination of danger or parental unfitness.

It would allege that the TPO was used as leverage to obtain the Temporary Consent Order under threat of continued separation, after which

the TPO was dismissed. The resulting restrictions were then treated as an established status quo rather than a temporary deprivation requiring prompt justification. Contempt became the recurring enforcement mechanism when Plaintiff resisted, objected, sought equal parental treatment, or failed to follow the course demanded by Claire and counsel.

**B. The July 20, 2021 chambers and contempt sequence.**

The pleading would allege that immediately before the July 20 contempt hearing, Daswani, Potter, Marbutt, and Plaintiff's counsel met privately without Plaintiff; that confidential medical or therapy information was disclosed and characterized there; that Plaintiff lacked advance access and a meaningful opportunity to prepare a response; and that the hearing produced incarceration, psychiatric coercion, and indefinite cessation of all contact with W.H. The pleading would distinguish Marbutt's immune rulings from the private defendants' alleged participation in developing and supplying the off-record narrative. It would identify the source, authorization, disclosure, and alleged strategic use of the therapy material rather than relying on Daswani's title alone.

The SAC would further allege that the July 20-21 sequence included acts outside or in excess of lawful authority: an off-the-record pre-hearing chambers process from which Plaintiff himself was excluded; acquisition, disclosure, and strategic use of psychotherapy information under

circumstances Plaintiff alleges exceeded the GAL's authorized function; contempt enforcement intertwined with a jail-or-psychiatric-treatment ultimatum despite the absence of an independent medical determination requiring inpatient treatment; and an order completely and indefinitely suspending Plaintiff's then-authorized parenting time and contact with W.H. until further order. Plaintiff would characterize those alleged departures as ultra vires and procedurally unauthorized to the extent they exceeded the lawful authority of the participating actor or function. He would not ask this Court to declare the July 21 order void. Instead, the order and resulting separation would be pleaded as the culmination and evidence of the alleged constitutional injury and as the mechanism by which a temporary deprivation was converted into a durable custodial status quo that the participating defendants later invoked to justify continued restrictions.

**C. The judge-initiated criminal-investigation sequence.**

The pleading would quote Detective Sean Rohan's sworn testimony that Marbutt "did ask for an investigation" and follow-up. It would allege that the request reached Rohan through Sergeant Buehler and/or Assistant District Attorney John Tulley; that Rohan was sent directly to the District Attorney's Office through a route he described as uncommon; that he met with Tulley, Claire, and Potter; that Potter supplied the Temporary Consent Order and civil exhibits; that no official hearing transcript had been obtained;

and that the warrant was sought that afternoon or the next day. The pleading would expressly acknowledge Rohan's uncertainty as to the exact path of the communication while alleging the sequence his testimony establishes. See Ex. C.

**D. Criminal bond conditions, continued GPS surveillance, and settlement pressure.**

The pleading would allege that the criminal bond imposed GPS monitoring and protected-person/no-contact restrictions; that Daswani was made a protected person; and that the surrounding records support the inference that she helped shape or materially influence the package of conditions imposed. In January 2022, Daswani wrote that she had prepared an affidavit to modify the "protections afforded me through the state" so GAL communication could resume. Plaintiff would allege that he had instructed criminal counsel not to pursue that modification merely to restore access to Daswani because he believed she was biased and should recuse. His mother then informed Daswani that the effort lacked Plaintiff's knowledge or consent and expressly requested her recusal.

Daswani responded that Plaintiff had "the ability to end this case by entering into an agreement," that her investigation would continue until the case was finalized "whether he chooses to participate or not," and that the modification would permit participation without "retribution through the

state." The following morning, Claire contacted Plaintiff's mother proposing to "settle the whole thing out of court," discussing sale of the marital residence, and proposing to refocus on co-parenting W.H. The pleading would not allege that timing alone proves agreement, but would plead the communications as circumstantial evidence of settlement pressure, motive, and possible coordination. See Ex. J.

At the April 14, 2022 bond hearing, criminal counsel reported no bond violations, negative drug and alcohol tests, and a substantial monthly GPS expense. The court stated that it did not grant ankle monitors often and was "stingy" about doing so, acknowledged that counsel had brought it a proposed consent package identifying the protected persons and GPS condition, and nevertheless continued the monitor in part because the divorce remained pending. See Ex. D. The proposed SAC would allege that the pending charges, GPS expense, movement restrictions, no-contact provisions, stigma, and threat of reincarceration plausibly operated as coercive leverage to induce an unfavorable civil settlement, end Plaintiff's resistance to the prescribed custodial role, and resolve the criminal case on terms acceptable to the prosecution.

The pleading would further allege that, after Plaintiff filed his July 19, 2022 motion for reconsideration and new trial, he personally overheard prosecutor Gore tell criminal counsel that he was considering revoking

Plaintiff's bond in response. Plaintiff contemporaneously reported that Potter and Daswani continued supplying the prosecution with the dangerousness narrative and that he understood the threat as pressure to abandon the custody fight. See Ex. K. The SAC would distinguish direct evidence from inference and seek discovery concerning communications among the private defendants and state participants.

**E. The April 13, 2022 oral-feedback and trial-implementation sequence.**

The pleading would allege that Oppenheimer's oral feedback occurred on April 13, 2022, lasted roughly two hours, was only partly recorded, and came less than two weeks before trial. Oppenheimer would be alleged to have communicated catastrophic custody-contingent danger conclusions without a written report, diagnoses, or disclosed methodology permitting meaningful review. Her March 25 email stated that an $8,000 retainer was required for a written report and that Daswani would use the evaluations in formulating her conclusions. Her April 18 email stated that diagnoses were "more prejudicial than helpful." See Exs. E and G.

The pleading would allege that Potter and Daswani immediately adopted the conclusions; that Daswani communicated safety concerns to Brown outside Plaintiff's presence; that Potter asserted before testimony that Claire had left her home and city and was hiding with W.H. and her mother;

and that Brown denied a continuance and access to the GAL file. The pleading would rely on the April 25 transcript and contemporaneous communications to allege that the formal trial implemented a narrative developed and disseminated before meaningful adversarial testing. See Exs. E and G.

**F. Religious animus and pathologizing of Christian belief.**

Religious discrimination would be an organizing theme, not an aside. The pleading would allege that Daswani asked family witnesses whether they shared Plaintiff's "biblical views on marriage"; that Potter questioned Plaintiff about scripture, Biblical submission, whether women were inferior, and whether religious communications were threatening; and that Oppenheimer incorporated accounts treating scripture as mania, psychosis, Biblical submission, and "weaponizing the Bible." See Exs. E, F, and I.

The theory would not speculate about defendants' private theology. It would allege objectively observable conduct: sincerely held Christian beliefs and religiously framed speech were repeatedly converted into purported evidence of instability, dangerousness, coercive control, and parental unfitness, while secular or comparable conduct was treated differently. Those characterizations were then allegedly used to cause state-imposed custody, safety, psychological, and credibility consequences.

**G. Sex-based treatment of Plaintiff as a father.**

The pleading would allege intentional differential administration of facially neutral procedures, not merely that a mother prevailed over a father. It would identify the contemporaneous "standard for fathers" statement; the immediate ex parte conversion of paternal equality into separation; minimization of evidence concerning Claire's aggression, psychiatric history, defensive testing, delayed evaluation, threats, and noncompliance; and heightened treatment of Plaintiff's emotional, religious, and trauma-related responses as dangerous. Each comparator would identify the conduct, decisionmaker, materially different treatment, and resulting deprivation.

### H. Retaliation and financial coercion.

The pleading would identify separate retaliation episodes rather than a generalized campaign: protected pleadings, appeals, objections, and reports of misconduct; the responsible participant's knowledge; the later bond threat, probation report, contempt filing, fee request, abandonment process, or incarceration demand; and the temporal and causal link. Financial pressure would be described as economic and coercive leverage, not labeled criminal extortion absent facts satisfying a specific statute.

## III. UNRELATED COMPARATOR EVIDENCE

On information and belief, based on a filed motion in Long v. Long, No. 24CVE0811 (Cherokee County Superior Court), and direct communications with Joshua Friedman, the proposed pleading would identify a second,

unrelated proceeding involving Daswani, a different family, and another K&S partner. In January 4, 2026 messages, Friedman reported that K&S entered the case through Max E. Fishman approximately one week before Daswani sought implementation of her recommendation, and that an in-chambers meeting followed in which the judge warned Hannah's attorney not to attack Daswani's credibility. See Ex. H-2.

The filed March 12, 2026 motion alleges more than thirty hours scrutinizing Friedman, a nonparty stepfather; repeated private communications with the father's partner; selective investigation; religious practices treated as concerns despite no identified child harm; pursuit of allegedly unlawfully obtained marital communications; discouragement of cooperation with criminal authorities; and circulation of a spreadsheet of purported criminal charges alleged not to appear in the public record. See Ex. H-1.

The comparator would be pleaded as circumstantial evidence bearing on intent, method, absence of mistake, religious animus, and plausibility. The proposed complaint would expressly state that Friedman's messages and allegations in another litigant's motion are not judicial findings and do not by themselves prove Plaintiff's case or a statewide conspiracy.

## IV. PROPOSED COUNTS

### COUNT I - Procedural Due Process and Familial Association (42 U.S.C. § 1983; Fourteenth Amendment)

Against private defendants who allegedly jointly participated in creating, preserving, or intensifying the initial separation, the July 20 chambers process, alleged ultra vires or procedurally unauthorized acts, undisclosed use of medical information, confinement, denial of meaningful rebuttal, April 13 feedback process, and indefinite familial deprivation. The count would identify each defendant's act and the state action that followed.

### COUNT II - Unreasonable Seizure and Unconstitutional Liberty Restraints (42 U.S.C. § 1983; Fourth and Fourteenth Amendments)

Concerning removal from the home and property, confinement, the judge-requested criminal investigation, warrant process, arrest, GPS monitoring, and bond/no-contact restrictions. Marbutt would be named, if at all, only for the alleged investigative act. The count would be drafted not to imply invalidity of any conviction or plea and would omit any theory that cannot be reconciled with Heck or favorable-termination requirements.

### COUNT III - First Amendment Petitioning and Speech Retaliation (42 U.S.C. § 1983)

Pleading discrete causal episodes in which motions, objections, appeals, complaints, or other protected expression were followed by threatened bond revocation, probation intervention, fee or contempt escalation, abandonment

process, or incarceration demands. Each episode would identify the protected act, responsible participant's knowledge, adverse action, and causation.

**COUNT IV - Religious Discrimination, Free Exercise, and Religious-Speech Retaliation (42 U.S.C. § 1983; First and Fourteenth Amendments)**

Alleging that state and private joint participants intentionally treated Plaintiff's Christian beliefs and religious speech as pathology or danger and used that treatment to cause state-imposed deprivation. The count would rely on specific questions, communications, comparator evidence, and transcript passages rather than religious affiliation alone.

**COUNT V - Sex-Based Equal Protection Discrimination (42 U.S.C. § 1983; Fourteenth Amendment)**

Alleging intentional differential treatment of Plaintiff as a father and male litigant, supported by specific statements, comparators, chronology, and departures, and connecting that discrimination to emergency removal, parenting restrictions, credibility assessments, and enforcement consequences.

**COUNT VI - Conspiracy and Joint Action to Commit Counts I-V (42 U.S.C. § 1983)**

Alleging separate agreements or understandings by phase, the supporting communications and circumstances, overt acts, and resulting exercise of state power. This count would not treat state action as an

independent constitutional injury; it would supply the joint-participation basis for the substantive violations.

### COUNT VII - Conspiracy to Obstruct the Due Course of Justice in State Court (42 U.S.C. § 1985(2), State-Court Clause)

Alleging obstruction through private chambers processes, selective or false material, restrictions on meaningful challenge, criminal crossover, and pretrial coordination, together with an adequately pleaded equal-protection purpose based principally on religion and sex. The count would be omitted or narrowed if final research shows a particular defendant or act cannot satisfy the clause.

### COUNT VIII - Equal-Protection Conspiracy (42 U.S.C. § 1985(3))

Alleging a class-based discriminatory purpose based principally on religion and sex, agreement, overt acts, and resulting injury. Disability and neurodivergence would be supporting motive evidence rather than the sole class theory. The full pleading would address the attorney-conspiracy doctrine by identifying alleged acts outside ordinary representation and any independent personal or institutional interests.

## V. DEFENDANT-SPECIFIC ALLEGATIONS

- **Claire Harvey:** alleged false emergency allegations, participation in the Tulley-Rohan meeting, provision of factual narrative, January 22

settlement communication, adoption of the hiding and danger narrative, and later enforcement or retaliation acts.

- **Stefanie Potter and K&S:** alleged emergency strategy, private coordination with Daswani, participation in the prosecutor-detective meeting, provision of civil materials for criminal use, participation in or exploitation of bond restrictions, use of religious expression and the psychological narrative, and specific later enforcement episodes. Ordinary motions and courtroom advocacy alone would not be pleaded as state action.
- **Brandy Daswani:** alleged private coordination, use or mischaracterization of confidential material, acts allegedly exceeding the authorized GAL function, involvement in shaping or administering criminal bond protections, prosecutorial and defense-counsel communications, January 2022 agreement/recusal correspondence, safety communication to Brown, religious questioning, and other acts outside neutral investigation and reporting. Protected testimony and recommendations would be separated.
- **Kim Oppenheimer:** alleged pre-testimonial communications, cancellation of Plaintiff's remaining session, unequal methodology, April 13 dissemination process, safety communication, refusal to provide diagnoses or a written report without substantial additional

payment, and provision of the professional foundation used by other participants. Her testimony would be evidence of prior acts, not the sole actionable wrong.

- **Jason Marbutt:** only the alleged nonjudicial request for a criminal investigation, supported by Rohan's sworn testimony. Judicial rulings would be alleged only as state action or resulting injury, not as a damages basis against him.
- **Angela Brown, Jeffrey Gore, and other state officials:** principally state decisionmakers or enforcement participants alleged to have received, adopted, or implemented privately developed narratives. Unless a nonimmune act can be specifically supported, they need not be named for damages.

## VI. RELATION TO THE PRIOR PLEADINGS

The amendment would preserve the original verified complaint's factual detail and express religious and sex-discrimination theories while retaining the FAC's narrower jurisdictional framing. It would correct collective pleading, restore the Rohan chronology, divide protected from nonprotected functions, expressly plead the July 20-21 ultra vires/excess-of-authority theory without asking this Court to invalidate the resulting state order, identify the state officials on the other side of joint action, plead the January 2022 bond/recusal/settlement sequence, distinguish direct evidence

from inference, and remove requests that could be understood as asking the district court to review and reject state judgments.

Plaintiff respectfully requests thirty days after vacatur to convert this proffer into the complete Second Amended Complaint, with consecutively numbered paragraphs, a precise prayer for relief, and only those allegations that can be made consistently with Rule 11.

# Exhibit B

Declaration of Matthew Thomas Harvey

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| MATTHEW THOMAS HARVEY, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 1:25-cv-04688-JPB |
| v. | ) | |
| | ) | |
| CLAIRE M. HARVEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**EXHIBIT B**

**DECLARATION OF MATTHEW THOMAS HARVEY**

I, Matthew Thomas Harvey, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am the Plaintiff in this action and have personal knowledge of the matters stated in this declaration, except where I expressly identify information supplied by a record or another person.

2. I filed the First Amended Complaint before the Court issued any merits ruling identifying the precise defects later relied upon in Document 73. In trying to narrow the case and avoid asking the federal court to review a state judgment, I removed state defendants and compressed factual allegations that had appeared in my original verified complaint.

3. The sworn deposition excerpts attached as Exhibit C are true and correct excerpts from the Sean Rohan deposition package I received from the state proceeding. They record Rohan's testimony that Judge Marbutt asked for an investigation, that Rohan was sent to the District Attorney's Office through a route he described as uncommon, that Claire Harvey and Stefanie Potter participated in the meeting there, and that civil materials were supplied before the warrant application.

4. The April 14, 2022 transcript attached as Exhibit D is a true and correct copy of the transcript from my criminal bond hearing. I was present. It records the discussion of the pending divorce, the GPS monitor, the absence of infractions, the court's statement that it rarely imposed ankle monitors, and my attorney's statements concerning Brandy Daswani's involvement with the District Attorney and the criminal bond restrictions.

5. After the criminal bond conditions made Daswani a protected person, I told my criminal attorney, Melvin Nash, that I did not want to modify those restrictions merely so that I could resume communicating with Daswani. I took that position because I believed she was biased and should recuse. My mother later conveyed that position directly to Daswani.

6. On July 16, 2021, four days before the contempt hearing, Brandy Daswani spoke with my then-therapist, Shana Adkins, immediately before my therapy session. During that session, Adkins told me that she had told

Daswani that I was not a danger to myself or others. Adkins also told me that she questioned Daswani's impartiality and believed Daswani was biased toward Claire. I understood before the July 20 hearing, therefore, that Daswani had been told directly by my treating therapist that I was not dangerous and that the therapist herself questioned Daswani's impartiality.

7. On July 20, 2021, I was present at the Cobb County courthouse for the contempt hearing but was excluded from the private chambers meeting that occurred immediately before the hearing among Judge Marbutt, Daswani, Claire's counsel, and my counsel. After that meeting, my counsel told me that Daswani had portrayed me to Judge Marbutt as mentally unstable and dangerous. That portrayal was materially opposite to what Adkins had told me four days earlier she had communicated directly to Daswani. I did not knowingly consent to my confidential therapy information being disclosed or used in a private chambers meeting from which I was excluded. During the ensuing proceeding, I was confronted with the choice of incarceration or psychiatric treatment and was taken into custody. The resulting July 21, 2021 order provided that my visitation with W.H. would cease until further order of the court. No subsequent order restored my parenting time before the final hearing.

8. The excerpts attached as Exhibits E and F are true and correct excerpts from the April 25 and April 26, 2022 final divorce hearing transcripts. I was present for the proceedings reflected in those excerpts.

9. The emails and message excerpts reproduced in Exhibit G are true and correct excerpts from emails sent to or received by me through my Gmail account and from message exports maintained from my devices, together with the April 2022 screenshot supplied by my mother. They include Oppenheimer's statements concerning the $8,000 report retainer, Daswani's use of the evaluations, and diagnoses being more prejudicial than helpful, and communications bearing on the later assertion that Claire and W.H. had gone into hiding.

10. Joshua Friedman first contacted me independently in October 2025 after locating my public federal case while researching Brandy Daswani. I did not recruit him to invent a similar story. Exhibit H-1 is a true and correct copy of the first seventeen pages of the March 12, 2026 motion supplied to me concerning Long v. Long. Exhibit H-2 is a true and correct focused excerpt from my message export with Friedman, including his January 4, 2026 identification of Max E. Fishman and his description of the timing of K&S's entry and the in-chambers meeting.

11. I understand that the assertions in the Long filing and Friedman's messages are not judicial findings. I offer them as comparator material

showing that a focused amendment has identified witnesses and a concrete factual basis capable of investigation and discovery.

12. The January 20-22, 2022 communications reproduced in Exhibit J are true and correct focused excerpts from Gmail records, together with the screenshot my mother supplied and that I attached to my January 22 email to Oppenheimer. They accurately reflect Daswani's statements concerning modification of protections, ending the case by agreement, continued investigation, and "retribution through the state," my mother's recusal request, and Claire's settlement message the following morning.

13. The November 3, 2022 email reproduced in Exhibit K is a true and correct focused copy of an email I sent to Carrie Owens. It documents that I was contemporaneously reporting, years before filing this federal action, that Potter and Daswani were continuing to supply a dangerousness narrative to the prosecutor and that I understood a threatened bond revocation as pressure to give up on custody.

14. Shortly after I filed my July 19, 2022 motion for reconsideration and new trial, I personally overheard prosecutor Jeffrey Gore tell Mr. Nash that Gore was considering revoking my bond because of that filing. The statement was made loudly enough for me to hear during a discussion between Gore and Nash.

15. As of judgment, no defendant had answered and discovery had not opened. I had no opportunity through this federal case to obtain the private communications among the defendants and state participants that are central to the joint-action allegations.

16. I am presently outside the United States, proceeding without counsel, and the Court denied my requests for electronic filing. I have had to coordinate drafting, printing, physical filing, and service through family members while complying with Rule 59(e)'s fixed deadline.

17. I am not withholding a Second Amended Complaint for tactical advantage. I request thirty days after any order reopening the case so I can prepare a complete, defendant-specific pleading carefully, rather than file another rushed complaint before knowing whether the judgment will be vacated.

18. I understand that Rule 11 requires factual contentions to have evidentiary support or to be specifically identified as likely to have support after a reasonable opportunity for investigation or discovery. Any Second Amended Complaint will be limited accordingly.

19. The records attached to the Rule 59(e) motion generally existed before judgment. I do not characterize them as newly discovered evidence. I rely on them to show a concrete and nonfutile route to amendment and to correct the

Order's characterization of the allegations as ordinary litigation activity unsupported by specific facts.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 18, 2026.

**Matthew Thomas Harvey**
Plaintiff, pro se

c/o 501 North Slappey Boulevard #1112
Albany, Georgia 31701
Mharvey7744@gmail.com
(912) 346-5299

# Exhibit C

Excerpts from Sworn Deposition of Detective Sean Rohan

Planet **Depos**®
We Make It *Happen*™

# Transcript of Sean Rohan

**Date:** August 16, 2021
**Case:** Harvey -v- Harvey

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

CLAIRE MARSH HARVEY,

Petitioner,

v. CAFN: 20-1-06987-67

MATTHEW THOMAS HARVEY,

Respondent.

Deposition of SEAN ROHAN

Monday, August 16, 2021

10:04 a.m.

Job No.: 392652

Pages: 1 - 29

Reported by: Lori Roy, RPR, CCR

Deposition of SEAN ROHAN, held via in person.

Pursuant to agreement, before Lori Roy, Registered Professional Reporter, Certified Court Reporter.

A P P E A R A N C E S

ON BEHALF OF THE PETITIONER, CLAIRE MARSH HARVEY:

STEFANIE S. POTTER
KESSLER & SOLOMIANY LLC
101 MARIETTA STREET NW
SUITE 3500
ATLANTA, GA 30303
(404) 688-8810

ON BEHALF OF THE RESPONDENT, MATTHEW THOMAS HARVEY

CHRISTOPHER HOBSON
SARAH HOBSON
HOBSON & HOBSON, PC
136 Fairground Street NE
MARIETTA, GA 30060
(770) 425-3373

A P P E A R A N C E S  C O N T I N U E D

ON BEHALF OF THE WITNESS, SEAN ROHAN

DANIEL WHITE
HAYNIE, LITCHFIELD & WHITE, PC
222 WASHINGTON AVENUE
MARIETTA, GA 30060
(770) 422-8901

ALSO PRESENT:

John Tulley, District Attorney's Office
Claire Marsh Harvey, Petitioner

CONTENTS


| EXAMINATION OF SEAN ROHAN | | PAGE |
|---|---|---|
| By Mr. Hobson | | 7 |


EXHIBITS


| DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 1 | Warrant | 14 |
| | (Retained by counsel) | |

MR. HOBSON: My subpoena moves forward. There's no order on it. He needs to answer my questions.

MR. WHITE: Again, I've instructed him not to answer them. So, I mean, if you want to get the judge on the phone, we can talk about it, but I've told him not to answer if --

MR. HOBSON: Okay.

BY MR. HOBSON:

Q. Can you answer this question? What -- did Judge Marbutt ask you to take out the warrant against Mr. Harvey?

MR. WHITE: Objection.

BY MR. HOBSON:

Q. You can go ahead and answer.

THE WITNESS: I don't mind.

MR. WHITE: You can answer the question. I'll let you answer the question about whether Judge Marbutt asked you to take out the warrant.

THE WITNESS: No, sir, he did not directly ask me to do it, no. He did ask for an investigation.

BY MR. HOBSON:

Q. He asked for an investigation?

A. Follow up, yes.

Q. So did he reach out to you via phone?
A. No.
Q. Did he reach out to you via text?
A. No, sir.
Q. How did he reach out to you?
A. Contacted my -- somehow contacted my supervisor, and they asked me to follow up with the D.A.'s Office.
Q. Who's your supervisor?
A. Sergeant Matt Buehler.
Q. And what did he say to Matt Buehler?
A. I'm not sure about that.
He just asked me to follow up with the D.A.'s Office.
Q. Well, is that typical for a judge to ask the D.A. -- I guess your supervisor to follow up on an investigation?
A. Coming directly from the D.A.'s Office? Not common, no.
Q. Okay. So your supervisor's in the D.A.'s Office?
A. No, sir. He's the detective super- -- one of the detective sergeants.
Q. Who contacted him?
A. That I don't know. It just came from him.

He said, Hey, I need you to go over there and follow up with this.

Q. What did he say? Follow up with what?

A. A case over at the D.A.'s Office. So I met with Mr. Tulley.

Q. At the D.A.'s Office?

A. Uh-huh.

Q. And what did you get? What was provided to you at that time?

MR. WHITE: Objection.

That gets into matters of a pending criminal investigation.

MR. HOBSON: So counsel stated an objection on the record that he's not permitting his client to answer any questions related to a pending investigation.

Is there -- counsel, is there any case law or statute or anything saying that you have the authority, or he has the authority to submit that objection where there's no order prohibiting him on either motion to quash?

MR. WHITE: Well --

MR. HOBSON: Are you just doing it because you want to?

MR. WHITE: No, I'm not just doing it

because I want to.

For one, the motions to quash weren't pending at the time that we agreed for him to sit for the deposition. And since that time, just based on the cases that are cited in both the State's motions to quash and in opposing counsel's motion to quash, which we believe that those objections are appropriate, and so we would not have agreed to go forward with the deposition today if I hadn't been -- you know, if I had seen both of those at a time.

I know just generally -- I know that this is an -- that's an open records context and not a discovery, but when we have requested this type of information for open investigations under open records, and those types of documents aren't discoverable or are -- able to be produced for pending investigation, and it -- you know, and it goes to the -- just to the -- you know, just a common sense motion that, you know, that if a defendant is allowed to -- a potential defendant is allowed to have access to the methods and sources of investigations, then the evidence in the case could be compromised.

So at this point we -- you know, I'm

basing it on the -- both the objections made and the case law; and, you know, we've got Sears v. State, we've got Johnson v. State, all these things that are in here.

So that -- that's the direction I'm giving him this morning.

BY MR. HOBSON:

Q. All right. I'm going to hand you a copy of the warrant.

MR. HOBSON: This will be entered as Exhibit 1 for purposes of this deposition.

(Deposition Exhibit 1 was marked for identification and retained.)

BY MR. HOBSON:

Q. Do you recognize this?

A. Yeah.

Q. And this is the warrant that was -- Warrant No. 21W6369, warrant against Matthew Thomas Harvey; is that correct?

A. Yes, sir.

Q. And it states on here that on 6/21/2021 at 8:30 a.m. at 592 Bright Street, Marietta, Georgia, Mr. Harvey commits the offense of stalking aggravated; is that correct?

A. That's what it states, yes, sir.

Q. How did you learn about this?
A. This was through -- when I got called over to the D.A.'s Office and I met with Mr. Tulley and Ms. Harvey.
Q. Ms. Harvey was present?
A. Yes.
Q. Okay. When did you meet with them? What date was that?
A. I'd have to look back in my report. I'm not positive on the date.
THE WITNESS: Do you guys remember the date that was?
BY MR. HOBSON:
Q. If you don't know the report -- I'm asking you the questions. If you don't know -- so there is a report you said?
A. No, no, I haven't even typed it.
There's an initial report where she's made prior police reports with uniform patrol officers, and I'm just going to -- I'm using the same case number. So I'm going to be doing a supplemental follow up to that.
And I can email you that case number for the initial reports that were done, you know, over a couple of months at different -- different police

reports she took.
Q. So do you remember what day of the week it was?
A. I don't -- I don't remember. I have no idea.
Q. Do you remember how many days it was after the hearing?
A. Just a couple of days, I think.
Q. All right. And you said that Mr. Harvey, without the consent of Ms. Harvey, for the purpose of harassment and intimidation, committed aggravated stalking; is that correct?
A. Yes.
Q. How did you learn about that?
A. Through the interview with Mr. Tulley and Ms. Harvey.
Q. And you don't know what day that was?
A. I don't remember exactly.
Q. Do you understand that the hearing took place three days prior to you --
A. I knew it was a couple of days prior to our -- to our meeting.
Q. Okay. So how many days before you issued the warrant, or at least requested the warrant, did you meet at the D.A.'s Office?

A. It might have been the same -- it might have been that day, earlier in the day, and then that eve- -- that afternoon, I think I applied for the warrant. So it could be -- is it July 23rd? It's right around then.

Q. Did anyone ever tell you -- so you met with Mr. Tulley and the alleged victim? Is that what you're saying?

A. Correct.

Q. Did Mr. Tulley ever tell you how he found out about any of these allegations?

A. Yeah. There was a hearing, I guess a civil divorce hearing, and that's where they learned about some of these --

Q. So they learned at the hearing is what you knew?

A. Correct.

Q. And did they tell you how they learned of it?

A. Through when they were -- when Mr. Harvey was -- I don't -- when she was discussing the case with him, the divorce case, he -- he said some things. He admitted some things.

Q. Do you know how Mr. Tulley found out about it?

A. Sir?
Q. Do you know how Mr. Tulley found out about it?
A. Maybe through Judge Marbutt. I'm not positive.
Q. How did -- why would you think it was through Judge Marbutt?
A. He was hearing the case and -- and probably -- I don't know. I can't answer that. I have no idea.
Q. Okay. Did you get any indication that he heard about it through Judge Marbutt?
MR. WHITE: Objection. He's already said he has no idea.
BY MR. HOBSON:
Q. What was it -- was it relayed to you by Matt Buehler that Judge Marbutt wanted you to investigate Matthew Harvey?
A. From what I remember, he -- it was -- it was pretty short. He said -- I came in from lunch. He said, Hey --
Q. Who's "he"?
A. Matt Buehler.
Q. Okay.
A. He said, I need you to follow up with the

D.A.'s Office. Give John Tulley a call -- Mr. Tulley's over here -- and get with him.
And that was really it. As far as Sergeant Buehler, that was all I got from him.
Q. And what's his position again?
A. He's a detective sergeant. He's detective supervisor. One of the -- one of the sergeants of the detectives.
Q. Is he your direct supervisor?
A. Yes.
Q. Okay. How often does he tell you that you need to follow up with the D.A. about an investigation?
A. It's not often.
Q. Once a year?
A. No. Usually in cases, reports get, you know, taken, and then they get assigned to us for follow up, unless something happens live where we've got to go to a scene, but never -- that was probably my first time.
Q. First time that this has ever happened like that?
A. That I've gone to the D.A's. Office directly.
Q. Okay. How long have you been in -- how

long have you been in law enforcement?
A. About ten years, but I've been in detectives about four and a half years.
Q. Okay. So when -- the six years before that, would you have been in a position where --
A. I was uniform patrol answering calls.
Q. So it would have only been in these past four years that you would have had an opportunity --
A. To follow up, correct.
Q. And in the four years, you've never had that happen?
A. No, sir.
Q. Have you ever had or head of a judge referring a case for prosecution?
A. Not in my experience.
Q. Not in your experience?
Have you ever heard of anybody else within your department or anyone talk about it?
A. I mean, other than -- not -- not really. I'm drawing a blank here.
Q. Okay.
A. It could be perjury-type things in court, you know, like -- stuff like that. Other than that, no.

Q. Other than just perjury charges?
A. Correct.
Q. Okay. Is it true that Judge Marbutt told Detective Buehler that he needed someone to look into Matthew Harvey?
MR. WHITE: Objection, it's hearsay.
You can answer if you know.
THE WITNESS: That I don't -- I don't know the specifics on that.
BY MR. HOBSON:
Q. Did you ask the detective -- is it sergeant?
A. He's a sergeant, but he's over -- he's assigned to detectives, yes.
Q. Oh, he's assigned to detectives?
A. Yes.
Q. Did you -- did he give you any indication that Judge Marbutt told him to look into it?
A. No. Just basically it was real short. Call John Tulley. Here's his number.
Q. When you called Mr. Tulley, what was that conversation?
A. It was basically that they're having a meeting with Ms. Harvey and her attorney, and I just told them I would head over there and talk to

them.

Q. So that was the same day that you filed for the warrant?

A. I think so. I think it was that afternoon after I met with them is when I applied for the warrant.

Q. So --

A. It may have been the next -- it might have been the next day. I'm not a hundred percent positive.

Q. So you're --

A. All this I can find out back at work, but...

Q. Okay. So Mr. Tulley was there at the meeting?

A. Yes.

Q. Ms. Harvey was there?

A. Correct.

Q. And counsel for Ms. Harvey was there as well?

A. Yes.

Q. Okay. And -- hold on one second.

How long have you known Judge Marbutt?

A. I don't -- I don't know him well. I mean, I've known of him for at least four -- four years.

Q. So you knew him as -- when he was a prosecutor --
A. Yes.
Q. -- in the D.A's. Office?
Did you ever work with him?
A. He helped me on an elder abuse case once, just as far as I had a question about, you know, charging an elder case.
Q. Did you have any cases where you were the detective assigned to the case that he prosecuted?
A. I'm not -- I don't think so because I don't particularly work any elder cases. This was just a case where it was a theft of somebody over 65, and he asked me why I didn't charge an upper -- a higher offense for it, and that was really my only interaction with him.
Q. When you spoke with to him about that, did you increase the charge after you spoke with him?
A. I don't think so because he -- I don't think he was really assigned to that case for prosecution.
Q. Okay.
A. But it was just kind of -- he had heard about it and reached out to me, kind of like an educational thing.

Q. How did you know that there was an RFID placed or allegedly placed underneath the victim's car?

MR. WHITE: Objection. That's -- I've let him answer up to the point of, you know, how the investigation was initiated, but now we're getting into the substance of your investigation.

So I'm going to ask -- I'm going to instruct him not to answer about the substance of the investigation.

BY MR. HOBSON:

Q. All right. Leading up to the investigation, you quoted in here: If you ever think about hurting me -- hurting him or -- to hurt me, you better go ahead and dig a six foot pit.

And then he said something about his son.

How do you hear about that?

MR. WHITE: Objection. Same objection.

MR. HOBSON: I mean, this is about leading up to the investigation. This is what he put in the warrant.

BY MR. HOBSON:

Q. How did you know to quote something in the warrant?

MR. WHITE: You can answer.

THE WITNESS: Just through the interview, through the -- through the initial interview with Mr. Tulley and Ms. Harvey and her counsel.
BY MR. HOBSON:
Q. Did anyone show you the Temporary Consent Order you referenced in the warrant?
A. Yes, I saw that.
Q. Who showed you that?
A. It was again in that -- all the information came from that meeting.
Q. Did anyone show you the exhibits from the civil hearing?
A. I saw -- yes.
Q. Who showed you those?
A. Ms. Harvey's counsel who was present.
Q. Do you know if Ms. Tulley had that -- Mr. Tulley had those documents before the meeting?
A. I don't know that.
Q. Did anyone show you any transcript of the Harvey hearing that took place on July 20th?
A. Not official transcript, no, sir.
Q. Not an official?
Did they show you an unofficial one?
A. No, sir. I'm waiting on audio.
Q. Okay. So did you request the audio from

the hearing?
A. Yes.
Q. Did you do an open records request for that, or did you just ask for it?
A. I just asked for it.
Q. Okay. So just to get to the heart of it, it's your testimony that you were contacted by Sergeant Buehler, it sounds like on the 23rd, the same day that you met with them, correct?
A. Sounds right.
Q. All right. And that -- was that in the morningtime or you said lunchtime?
A. After lunch. I had just come in from lunch. Probably about one o'clock I think is when I met -- met with Mr. Tulley.
Q. Okay. And then did you go immediately after that to the meeting with -- oh, excuse me.
Did you go immediately from --
A. Oh, from the meeting to apply for the warrant?
Q. Yes.
A. Not immediately. I went back to my office and did some research and just read over some stuff and talked to Mr. Tulley a couple of times, and so it wasn't immediate, but I would say -- I guess it

looks like 3 o'clock, roughly.
Q. Okay. So --
A. I think I actually met with him on the 22nd, and then I applied for this on the 23rd. It looks like the next day, from what I remember.
Q. Okay. So Sergeant Buehler told you to reach out to this D.A., Mr. Tulley?
A. Uh-huh.
Q. Within a couple of hours, you were in a meeting with him?
A. Yeah, within an hour.
Q. Within an hour?
And then either that same day or the next day you filed the warrant?
A. Correct. It was in the afternoon for sure.
Q. Okay. So earlier you told me that it was your understanding that Judge Marbutt was the one that directed Mr. Buehler to investigate, correct?
A. I don't know if he directly -- Judge Marbutt to Sergeant Buehler. I don't know if -- it sounds like he might have contacted Mr. Tulley in between to contact Sergeant Buehler.
Q. But it's your understanding at a minimum that Judge Marbutt was directing -- either Judge --

A. Somebody.
Q. Somebody?
A. That's my understanding.
MR. HOBSON: Okay. Nothing further.
MR. WHITE: I don't have any questions.
MS. POTTER: I don't have any questions.
THE REPORTER: Did you want this transcribed?
MR. HOBSON: Yes, as soon as possible.
THE REPORTER: Ms. Potter, did you want a copy of the transcript?
MS. POTTER: No, that's okay.
(Off the record at 10:27 a.m.)

CERTIFICATE OF SHORTHAND REPORTER

I, Lori Roy, Registered Professional Reporter, Certified Shorthand Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my supervision; that reading and signing was not requested; and that I am neither counsel for or related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 17th day of August 2021.

LORI ROY, RPR, CCR

# Exhibit D

April 14, 2022 Criminal Bond / GPS-Monitor Hearing Transcript

IN THE MAGISTRATE COURT OF COBB COUNTY
STATE OF GEORGIA

STATE OF GEORGIA, )
)
PLAINTIFF, ) WARRANT NO.: 21-W-6369
)
vs. )
)
MATTHEW THOMAS HARVEY, )
)
DEFENDANT. )
)

* * *

Proceedings held before the Honorable Judge Michael McLaughlin, Magistrate Court of Cobb County, 32 Waddell Street, Marietta, Georgia 30090, on April 14, 2022 at 1:30 p.m. before Gloria A. Nelson, Certified Court Reporter.

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF

Mr. Gerald Moore, ADA
District Attoney's Office
Cobb Judicial Circuit
70 Haynes Street
Marietta, Georgia 30090
gerald.moore@cobbcounty.org
770-528-7976

ON BEHALF OF THE DEFENDANT

Mr. Melvin S, Nash II, Esq.
Law Office of Samuel Nash
204 Washington Avenue NE
Marietta, Georgia 30060
melvinsnash@gmail.com
770-422-0878

TRANSCRIPT LEGEND
[sic].............Written as spoken
[ph]..............Phonetically spelled
[dashes]..........Break in continuity
[ellipsis]........Trailing off

P R O C E E D I N G S

THE COURT: Let's go ahead and take up your matter, Mr. Nash. We're going to take up Mr. Harvey. Do you want this taken down by the court reporter?

MR. NASH: I do, Your Honor. I've given her my card.

THE COURT: All right.

MR. NASH: Your Honor, if it pleases the Court...

THE COURT: I'm just going to go ahead and formally announce it so that the court reporter has all of that.

MR. NASH: Say it again, Your Honor.

THE COURT REPORTER: Can you talk into that mic when you talk, Mr. Nash?

MR. NASH: Can I take -- I will talk into the microphone...

THE COURT: All right. I'll go ahead and formally announce the case. This will be the matter of the State of Georgia versus Matthew Thomas Harvey, 21-W-6369. It is on for a motion to modify bond. Mr. Harvey is here in the courtroom. He is represented by Mr. Nash, who is also here in the courtroom. The State is represented this afternoon by Mr. Moore.

All right. Go ahead, Mr. Nash.

MR. NASH: Thank you, Your Honor. Your Honor, Mr. Harvey was arrested on about October the 20th, 2021,

and he was charged with Aggravated Stalking and Terroristic Threats. The Aggravated Stalking consisted of him placing an AirTag on his spouse's vehicle who I've...

THE COURT REPORTER: Mr. Nash, can you talk into that mic, please?

MR. NASH: Can I talk louder?

THE COURT REPORTER: Into the mic?

MR. NASH: Okay. Do you mind if I sit down, Your Honor?

THE COURT: Sure, of course you can.

MR. NASH: So he -- he was accused of placing an AirTag on the vehicle which he owned -- co-owned with his wife and -- so that it gave locations, and that was allegedly a violation of a consent order that was done in -- I guess it was June 20 -- I guess that was done on June 21st, and then a consent order was previous to that.

In addition, there was some contemptuous language between -- text messages between Mr. Harvey and his wife, and he was concerned because of her mental state that she would harm the child to harm him. And so he sent her a text message that if she did something to the child that he would come after her and harm her as well. So he has been on bond since we obtained a bond in this case. I guess that was back in -- let's see. When was that?

THE COURT: October.

MR. NASH: October. October and -- of 2021. And I've looked through the file here. He's been on the ankle monitor and he's had conditions where he could not travel out-of-state. And he has lived with his aunt in Albany, Georgia, since, and -- so it's approximately 200 miles from Atlanta. So we're asking Your Honor to consider, since there is no violation in the file, he's tested negative for drugs -- I saw at least two drug tests in there where he tested negative for any drugs or alcohol.

And we're asking the Court to modify the conditions of the bond so that he may be allowed to not have to wear the ankle monitor. He's not employed currently, and it's a burden on him to have to spend this $300 a month to pay towards this in addition to having to provide support for his child. And so we're just trying to mark resources so he can get through this tough time. As Your Honor is fully aware, having previously done domestic cases, that they're very expensive to litigate as well as -- especially if you're one of the party -- party goers, so I would ask Your Honor to consider modifying the bond to allow him to, you know, not have to wear the ankle monitor.

In addition, his mother is a medical doctor and she

-- she resides in Franklin, North Carolina. She works for the Veterans Administration. She's a primary care physician, and she's present here in court today. He would like to be able to visit her, and Franklin, as Your Honor is probably well aware of, is just across the Georgia/North Carolina line. So we're asking also to modify the bond so that he may be allowed to visit his mother in North Carolina.

THE COURT: Is the divorce still pending?

MR. NASH: Yes, Your Honor.

THE COURT: Are there any orders in place on the divorce?

MR. NASH: Just the order that he have no contact with -- he can't have any contact with his ex-wife, and he hasn't seen his child in eight months.

THE COURT: All right. What's the position of the State?

MR. MOORE: Your Honor, the State is opposed. This is -- this is the chicken and egg situation. You know, the defendant is here because he allegedly violated a court order, and the Court felt it necessary to fit him with a GPS as a remedial measure to make sure that he would comply with the next judicial order, which was again being told for a second time to -- to stay away. And it would appear, at least as of now, that that

remedial measure has done exactly what it's supposed to do. By removing the remedial measure I think that we defeat the purpose of why it was put on in the first place. This is not a situation where the defendant has been out on bond for years and years and has a track record. We're talking about five months, Judge. That's not -- that's not burdensome, that's not over the top, especially in today's environment with COVID and everything else. I mean, I understand we've had cases before where the defendant has had, you know, a year and a half or two years with no violations, and that may be a different matter down the road, but we're not there yet, Judge, not by a long shot.

I also need to share with you that the victim in this case is strongly opposed to the removal of the ankle monitor, and wishes to be heard on that as well. I just think that, you know, the bond was granted, and a condition of the bond was an ankle monitor, and that's -- that's what is providing comfort and reassurance to both the Court and the victim that things will remain the way that they should. So once again, the State is opposed to Mr. Nash's motion, and ask that you leave the ankle monitor in place.

And -- and also, just one more thing. It's not lost -- shouldn't be lost on the Court, and it's certainly not

lost on the State that this is a surveillance issue and those, you know, tend to be a little more alarming. This isn't just, you know, a casual text or a -- you know, bumping into you at the supermarket. This is an alleged surveillance coupled with a terroristic threat, so that's it, Judge. That's where we're at, and I'd ask that you give the victim an opportunity to be heard in this matter. Thank you.

THE COURT: All right. Mr. Nash, it appears that there is a guardian in the divorce case. Has there been any mention in the divorce case or by the guardian regarding anything having to do with the ankle monitor?

MR. NASH: Well, the guardian is Brandy Daswamie (ph).

THE COURT: Uh-huh.

MR. NASH: And she was one of the people that originally was put in here that she wanted to be a part of the bond order. Now, I don't know who wanted her put in here, but somebody, either the -- she contacted the DA's -- and then, she contacted me and filed a motion. She wanted me to file a motion so that she could have contact with him and that fell through, and so now she still can't have any contact with him even though she's the guardian because of the bond condition that was placed in -- I mean, he didn't have it placed on her,

they had it placed on him.

THE COURT: One thing I notice is that this bond order is by consent because I saw my name to it and I really didn't remember, you know, having a get-together...

MR. NASH: You didn't. You didn't. John Persley (ph) and I brought this order over --

THE COURT: I understand.

MR. NASH: -- on maybe like a Thursday or Friday afternoon.

THE COURT: Because what I was going to say is that I don't grant ankle monitors that often. In fact, I might be stingy when -- when that occurs. But one thing I do do, however, is when I do -- when someone is trying to get out of jail in exchange for the ankle monitor because that's usually a quid pro quo because it kind of -- the argument is that it makes the State feel comfortable, it makes the Court feel comfortable and all that stuff. I usually give my little spiel that, usually it costs $350 a month, and don't expect to come back after a few months saying that this is a financial hardship unless you want to go back to jail because you're not going to use it as a crutch to get out of jail and then within a few months say it's a financial burden to get out. But I didn't get a chance to say that

because this was presented to me, and through two esteemed counsel somehow y'all reached the consensus that the bond amount should be what the bond amount is, that the protected parties should be who the protected parties are, and that, lastly, there should be an ankle monitor in place.

I -- I understand that there have not been any infractions under this consent bond order, which is a good thing. I do appreciate the fact, as you -- as you stated, that Mr. Harvey is now living in Albany, Georgia. But another consideration is the divorce is still pending. If the divorce -- when the divorce is over, after there has been a longer time period within which to say, Hey, it's now been X number of months and there still have been no infractions, I will consider that. But five months into this with a contentious divorce still going on, no, I'm not going to do that because the ankle monitor helped him get his freedom through the bond...

MR. NASH: He doesn't consent to anything, but to ride a horseback from the Square to get out of jail. I mean, that's basically...

THE COURT: I understand that. But if you're going to ride the horse, you've got to keep the horse. You can't sell him for glue, you know, so I'm going to go

ahead and deny the bond motion request.

MR. NASH: Thank you.

THE COURT: All right. Thank you.

(Hearing concluded at approximately 2:07 p.m.)

# C E R T I F I C A T E

STATE OF GEORGIA )

COUNTY OF COBB )

I hereby certify that the foregoing hearing was taken down, as stated in the caption; and the colloquies, questions and answers were reduced to typewriting under my direction; that the foregoing transcript is a true and correct record of the evidence given.

The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of GAN Court Reporting Services, Certified Court Reporters, and the signatures and original seal is attached thereto.

I further certify that I am not a relative or employee or attorney of any party, nor am I financially interested in the outcome of the action.

This, the 4th day of May 2022.

Gloria A. Nelson
Certified Court Reporter, #2612



# Exhibit E

Excerpts from April 25, 2022 Final Divorce Hearing Transcript

ID# 2022-0149298-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
20106987
Angela Brown - 66
NOV 18, 2022 09:42 AM
Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

| | |
|---|---|
| CLAIRE MARSH HARVEY, Plaintiff, vs. MATTHEW THOMAS HARVEY, Defendant. | CIVIL ACTION FILE NO.: 20-1-06987-66 |

CIVIL NONJURY PROCEEDINGS
April 25, 2022

Heard before Judge Angela Z. Brown
Cobb County Superior Court
Sixth Floor, Courtroom 6300
70 Haynes Street
Marietta, Georgia 30090

APPEARANCES OF COUNSEL:

On Behalf of Plaintiff:

Stefanie S. Potter, Esq.
Molly Teplitzky, Esq.

On Behalf of Defendant:

Leah J. Zammit, Esq.

Guardian ad Litem:

Brandy Daswani, Esq.

Deborah Fedorchak
Official Court Reporter
Cobb County Superior Court
70 Haynes Street
Marietta, Georgia 30090
Deborah.Fedorchak@cobbcounty.org

**INDEX TO EXAMINATIONS**


| Examination | Page |
|---|---|
| **KIMBERLY CRANE OPPENHEIMER, PH.D.** | |
| Direct Examination by Ms. Potter | 58 |
| Cross-Examination by Ms. Zammit | 97 |
| Examination by Ms. Daswani | 142 |
| Redirect Examination by Ms. Potter | 145 |
| Recross-Examination by Ms. Zammit | 146 |
| **MATTHEW HARVEY** | |
| Cross-Examination by Ms. Potter | 149 |


\- - -

PROCEEDINGS, April 25, 2022, commencing at 9:09 a.m.

THE COURT: Good morning. This is Claire Marsh Harvey versus Matthew Thomas Harvey, 20-106987. Let's have counsel for both sides put their appearance on the record, please, starting with the plaintiff.

MS. POTTER: Good morning, your Honor, Stefanie Potter and Molly Teplitzky for the plaintiff.

THE COURT: Good morning.

MS. ZAMMIT: Good morning, your Honor, Leah Zammit on behalf of the defendant, Mr. Harvey.

THE COURT: All right. Good morning, as well.

MS. DASWANI: Good morning, your Honor, Brandy Daswani, the guardian ad litem.

THE COURT: Good morning.

All right. We are here for a two-day trial. Got some preliminary things the Court wants to handle first. We've got Defendant's motion to continue and to release the guardian ad litem filed, then we'll deal -- after that, we'll deal with the defendant's motion in limine, and then we'll go from there.

So, counsel, let me hear with regards to the motion to continue.

MS. ZAMMIT: Thank you, your Honor. May I?

THE COURT: Yes, podium.

MS. ZAMMIT: Thank you, Judge. Hopefully, this

motion will be brief, but the importance cannot be stressed enough. This case is not a typical divorce case, as I'm sure the Court through its filings, as well as the fact that we're here for a two-day trial, probably is aware.

One of the most important issues in this case is the custody of the party's minor child, Wells. And early on in the case, a guardian ad litem was appointed, Ms. Daswani. And we were in front of Judge Marbutt. As the Court is also likely aware, Judge Marbutt was recused, and the circumstances surrounding that recusal, we believe, suggest that Ms. Daswani, the guardian ad litem, has been unable to completely and unbiasedly review this case in order to provide a recommendation. And it wasn't until we filed a motion for continuance that any recommendation was forthcoming at all.

We did receive the guardian's report around 4:00 o'clock in the afternoon on Friday, and it's a three-page report that contains within it commentary regarding reliance on the recommendations of Dr. Oppenheimer, who is the psychological evaluator in this case. And, your Honor, the Court -- we had a pretrial before your Honor via Zoom, and the Court required that Dr. Oppenheimer provide her oral recommendation on or before April 8th. Dr. Oppenheimer was not prepared to do it April 8th. She

hadn't finished reading everything she needed to read. And the parties and the guardian had time available April 13th at 5:00 p.m. And I was informed Ms. Daswani was in trial. I believe Ms. Potter was also -- in any event, we had two hours via Zoom, portions of which are recorded. The first two Zoom meetings are recorded. The third, I was not able to record. But, again, we didn't receive it until between 5:00 and 7:00 p.m. on the 13th. The content of the commentary does not elicit, we believe, a appropriate basis for any recommendation from the guardian.

So we have a delay in Dr. Oppenheimer's report. We have a delay in the receipt of the guardian's recommendation, which is based, it would appear, heavily on Dr. Oppenheimer's report, and there are significant inconsistencies. And, unfortunately, because of the lateness of both Dr. Oppenheimer's report and Ms. Daswani's recommendation, the defendant is significantly at a disadvantage. And I'm not sure if the Court -- and, again, we would like to review -- I don't know if the Court wants to hear the continuance and then decide on the file, but part of our motion for continuance is the ability to look at Ms. Daswani's, the guardian's, file, to understand the basis of these recommendations, to formulate a strategy to contradict

those recommendations based on whatever witnesses she, you know, utilized, whatever documents she utilized, whatever records she utilized. We don't know.

We have in the report, at this point in the investigation, I have had initial parent meetings. That's the recommendation. And then it's based on, it seems, texts and an inclusion of the parenting plan provided by Mom.

THE COURT: Let me ask you this: Did you call Ms. Daswani before this report and say, hey, who have you talked to, and I know you don't have the doctor's report, but where are you leaning?

MS. ZAMMIT: I have spoken to Ms. Daswani and mentioned seeing her file, and her -- and she can testify to this, but --

THE COURT: Not about her file but about what she's done.

MS. ZAMMIT: No, I did not hear what she has done. I did have a lengthy conversation with her when I took over the case back in mid March and got kind of her thoughts and findings and beliefs, enunciated some of my concerns regarding what transpired in chambers with Judge Marbutt. I think that Ms. Daswani recognizes that we believe that there's bias here. She's been unable to communicate with Mr. Harvey because of a, you know, bond

condition. So she's not been able to talk to him, visit him, go down to Albany to see where he's living. She has been unable to really further any interviews or assess Mr. Harvey's current stance and how he's doing, other than by virtue of Dr. Oppenheimer's report. And I put that in quotes because we don't believe that there were any actual recommendations made. And the basis of which Dr. Oppenheimer relied on some of her commentary are just plain wrong, and I don't know how much the Court wants to go into that in open court. We do have recordings. The Court can review them in chambers, but there's significant missteps to her analysis, for example.

THE COURT: Is that a cross-examination issue?

MS. ZAMMIT: Potentially, your Honor, but I don't know exactly the extent that the guardian has relied upon Dr. Oppenheimer's report. I don't know which portions of it she's relied upon. Dr. Oppenheimer has announced that she requires $8,000 for a written report that will take three months. You know, we're -- and the Court said no, we're not doing written, we're going to just do an oral because of the time constraints. And we understand that. Believe me, there is nothing that Mr. Harvey would rather have than the ability to see his child. He has been forbidden to do so since July 30th or -- I'm sorry -- the July hearing in front of Dr. -- Judge Marbutt.

This Court did permit supervised visitation as of April. I believe we were in front of the Court April 1st, your Honor. But in any event, this man would love to see his child. We are not trying to prolong this case for any purpose other than to be able to actually present the Court with an appropriate defense and counterclaim, and we can't do it until we have more information from the guardian. We believe we need to see the guardian's file to ascertain where she is coming up with her thoughts and purviews in this case and potentially have Dr. Oppenheimer either write a report or submit her deposition, because again the findings made were based on inaccurate information very easily gleaned from the reporting.

And I'm not sure how much to go into it. But, for example, it was her belief that Mr. Harvey was in possession of weaponry. That formed part of her recommendation. He's not and hasn't been. And so part of her analysis was based on his current possession of firearms, which is inaccurate. And that's just one of many examples of where her thought process, her recommendation is. It has no basis. And, again, that's just one area. And I don't want to go too much into others because we're required just to be an attorney only communication.

So Mr. Harvey is at a significant disadvantage through no fault of his own. He does what he's supposed to do when he's supposed to do it. He has not seen his child. And we just need to prepare the best possible case to show this Court why he should be allowed to see his child and what the custody issues really are, and we're just not there.

THE COURT: All right. And just tell me what efforts have you made to discuss -- to interview the guardian.

MS. ZAMMIT: I have spoken to the guardian on -- and I'm sorry -- I don't have the date. When I first got onto the case, I contacted Ms. Daswani. We spent quite a bit of time on the phone. And then we spoke prior to Dr. Oppenheimer's -- we spoke a couple of times to try and assess timing because Dr. Oppenheimer was unavailable. Dr. Oppenheimer, Ms. Daswani, and I have also spoke on the phone, and there were times when I -- I need to go to the judge. She's not ready. She's not prepared. I think we need to contact the Court. And then we decided that, no, she says she's going to be able to have her, you know, evaluation ready. And then it wasn't. And then it became April 13th. So it was delayed. Now, significantly? No. But every day counts.

THE COURT: Since April 13th, what efforts have you

had to interview the guardian -- have you made?

MS. ZAMMIT: Just one moment, your Honor. I'm sorry. I contacted the guardian at least once, perhaps two or three times with respect to her thoughts on potential resolution. So we did have some conversations that way, which I don't feel appropriate to go into, but -- and to discuss her thought process, but that was all.

THE COURT: Okay. Thank you so much, counsel.

MS. ZAMMIT: Thank you.

THE COURT: All right. Ms. Potter. And I'm sorry. Will you tell me the other attorney's name.

MS. TEPLITZKY: Molly Teplitzky.

THE COURT: How do I spell that?

MS. TEPLITZKY: T-e-p-l-i-t-z-k-y.

THE COURT: Okay. Thank you so much.

MS. TEPLITZKY: No problem. Thank you.

MS. POTTER: Good morning, your Honor.

THE COURT: Good morning.

MS. POTTER: So, honestly, I was very surprised to get the motion for continuance considering that most, if not all, of the issues that were alleged as grounds for continuance were specifically addressed by your Honor when we were in front of you on March 31st for our pretrial conference and ruled upon by your Honor.

The pretrial -- the order that was entered after that pretrial conference specifically says that either party may request a written report from Dr. Oppenheimer; however, the Court is not going to continue the trial based on the report not being ready. That was already specifically ruled upon. We already discussed this.

All the other issues that Ms. Zammit has brought up, respectfully, those are issues for cross-examination. If she thinks that Dr. Oppenheimer's findings are inaccurate or that Ms. Daswani's findings are inaccurate, put them on the stand, ask them some questions, show the evidence that you have to refute it. It's not grounds to continue a trial.

Also, in terms of the guardian's file, again, we were before your Honor on March 31st. We discussed at length Dr. Oppenheimer's written report. We didn't -- I didn't hear any request from Ms. Zammit for a written report or to see the guardian's file on that date. I've never seen a motion to see the guardian's file. And Ms. Zammit wants to make it sound like they've had this crunch for time, but I want to remind the Court that Ms. Zammit's firm, Hobson and Hobson, has been Mr. Harvey's counsel of record since June of 2021. They could have at any time filed a motion to ask for the guardian's file. I've never seen the motion until last

Thursday.

To me, this motion and the request to continue is a bad faith attempt by Mr. Harvey because he's unhappy with what Dr. Oppenheimer said. That's not grounds to continue a trial. And, yes, Ms. Zammit is correct. He should be the one who wants this trial to go forward. He's not seen his son since July of last year.

I do disagree with Ms. Zammit's classification that he's done everything he's supposed to do and nothing essentially is his fault. We discussed this also at length at the pretrial conference. In November of last year, Ms. Daswani made a recommendation that Mr. Harvey could have supervised visitation. My client agreed. She filled out all the paperwork, and Mr. Harvey hasn't done it. He still hasn't done it since we were in front of your Honor on March 31st. The only person preventing him from seeing his child is him. But with that said, like I said, it's even more reason why this trial should go forward.

And then most importantly -- and I know that the Court received some ex parte communication from the guardian last week -- this trial needs to go forward for safety reasons. It is the recommendation of the guardian that there are safety concerns for the child, my client, and her mother, if not others. Those recommendations are

based on the findings of Dr. Oppenheimer. Dr. Oppenheimer is here to testify today, and she can tell the Court the basis of those recommendations. But I will tell your Honor -- and I was there. I was present for it -- the feedback session from Dr. Oppenheimer. These concerns are real. This trial needs to go forward. It has been so bad that my client has been in hiding. She literally up and left her house, left the city, and has been in hiding with the child and her mother because she is in fear of Mr. Harvey. There needs to be a resolution to this case.

So for that reason, I ask that the Court deny Mr. Harvey's request to continue the trial and that we go forward today. And also, my client should -- he should have to pay my client's attorney's fees for even having to deal with this motion. This was already addressed on March 31st. Therefore, I ask that it be denied and that all attorney's fees incurred by my client be paid by Mr. Harvey relating to that motion.

THE COURT: All right. I'm going to deny the motion to continue. Counsel has -- I'm going to deny the motion to continue. I'm going to deny the motion to release the guardian ad litem's file.

The guardian ad litem file is an easier one. Both parties have had access to this guardian, to talk to her

concerning her investigation process, who she's talked to, what they have told her, and her feelings upon the matter. And I will take them in two steps: before the doctor's evaluation report coming out and after the doctor's evaluation report.

Beforehand, even though there have been issues with Dad talking to her, the attorney has been able to talk to her. The attorney can call her every single day. Obviously you're charging Dad for it, but the attorney can call her and say, okay, who have you talked to, what did they say, and then if the attorney had any -- has issues or wants -- wanted to then interview or investigate further, the attorney could call the teacher, call this person, the friend who -- I don't know -- I don't look at that until after trial -- well, after testimony -- and determine whether or not what the guardian says occurred is what the teacher said. And if it's different, bring the teacher in so the teacher can say I didn't tell her that.

I am protective of the guardian's files because you have access -- both parties have access to the guardian, and if in preparation for trial, you are able to talk to the guardian and prepare your trial witnesses and your trial cross-examination based upon what you think she would do. And this guardian knows this Court. If she

doesn't talk to you, I'm going to order her to talk to you because that is how you prepare for trial.

Now, let's talk about you are both -- both counsel are on the doctor's -- on the doctor's call where she gave you the report, and you were able to digest whether -- what her report was, what she's saying her basis is, and if you disagree with it, either side can bring the doctor here to testify. The doctor's going to be here. Defendant is saying that the doctor is going to be here, so the opportunity to cross-examine the doctor by Dad is available.

I do not find that there is a sufficient basis to continue the case. I don't find that Dad -- that there is a sufficient prejudice in preparing for trial to allow continuance of the case. I don't find that the guardian has not made herself available to talk to both counsel to investigate with regards to anything either side has wanted her to do. And so I am going to deny -- to deny that motion.

Now, with regards to Plaintiff -- Defendant having lawyer fees, attorney's fees to have to prepare for this, I'm going to deny that. In preparing for trial, things are going to come up before trial, and that is just one of the things that counsel would be doing anyway. And so I'm not going to order that.

that Ms. Daswani could not perform her duties because she could not speak directly to Mr. Harvey due to his bond conditions. What they are omitting from that is that Ms. Daswani agreed -- based on Mr. Harvey's counsel's suggestion, she agreed to amend the bond conditions so that she could speak to Mr. Harvey. Mr. Harvey had a hearing set in his criminal case on that motion, and he canceled it. He never agreed. He could have remedied that issue, which he's now using to try to move this trial or to disqualify Ms. Daswani. He could have remedied that. Again, it was in his control. The only reason he has not been able to speak to Ms. Daswani is because of himself.

Now, when Ms. Zammit was presenting this motion, you know, one of my arguments was going to be was this isn't a motion in limine; it's just a motion to recuse. And that's true. She argued that. And your Honor made a great point. If they are basing all of this alleged bias and issues with Ms. Daswani on conduct that allegedly happened in June or July, why are they filing a motion the Friday before trial? And also, again, when we were in front of your Honor on March 31st, I'm sure your Honor will recall that Ms. Zammit brought up that she believed the guardian was biased and wanted her removed. Your Honor said denied. I'm not going to remove the guardian.

This has already been argued over and over and over.

There is no statutory or case law to support a ruling that would allow the Court to exclude the testimony of the guardian. The guardian was appointed by consent in this case. She was appointed, and she's ordered to make recommendations in the best interest of the child. We can't go forward on a custody trial without the recommendations of the guardian. Mr. Harvey consented to the guardian. He also consented to Dr. Oppenheimer. And now he wants to challenge both of them as not being acceptable experts. Well, he already consented to them being experts. This is nothing but a motion to recuse that was not timely filed, has no factual basis and no legal basis.

Again, all of the issues that Ms. Zammit is bringing up where she claims that the methodology used was inappropriate or that the findings were inaccurate, her remedy is to cross-examine the witnesses.

So for those reasons, there's no basis in fact or law why the guardian should not be permitted to testify. The Uniform Superior Court Rules require that she be permitted to testify, as she was appointed by consent as the guardian ad litem. And there's been no finding of bias, and Ms. Zammit didn't file the motion correctly anyway on that issue.

Therefore, I request that the motion in limine be denied. And, again, I'm going to request that my client get attorney's fees for having to respond to this. This is a frivolous motion. There is no law supporting the relief requested. And, also, the relief requested is based on factual inaccuracies that would be -- you know, already have been or will be easily disproven by the evidence today.

MS. ZAMMIT: Your Honor, may I briefly respond?

THE COURT: Yes, absolutely.

MS. ZAMMIT: Thank you.

Your Honor, we would incorporate the law stated in our brief into the argument. But a motion in limine is a very well-known trial tool that alerts the Court to the possibility of evidence being inappropriate. And it's used widely. And it is appropriate. It's not a last-ditch effort. Everything was very well stated out that the motion in limine is absolutely appropriate when we're seeking a ruling on the admissibility of evidence.

And we are asking the Court to determine that the guardian's evidence is inadmissible based upon inappropriate and excessive -- she went outside the scope of her role significantly. And opposing counsel's right. We don't know what happened in that -- in that chamber, but we do have witnesses that will testify that they were

requested by the guardian to get Matt 1013'd. Very inappropriate and outside the scope of her purview. And anything flowing from that day forward should be considered inadmissible by this Court.

The Court can hear a custody case on its own. It doesn't need a guardian ad litem. We incorporate guardian ad litems very often, but that doesn't mean that the Court doesn't have the ability to determine a custody case without a guardian ad litem. We believe the Court can do so and we ask that it does.

Thank you.

THE COURT: All right. Thank you.

All right. The Court's going to deny the motion in limine. One, the defendant could have diverted any bias problem that the defendant is bringing up. The defendant could have agreed to change the bond to talk to -- to talk to the guardian. The defendant could have spoken to the guardian in depth concerning the guardian's basis for her recommendation. And, again, this ripple of bias and prejudice is argued that it started, you know, December 13th, 2021, with what happened with Judge Marbutt, and yet nothing is filed. So the Court takes that into account.

And I haven't been given any case law. I've read through the motions, the corresponding brief and the

respondent brief. I haven't been given any case law that shows that if I don't like what the guardian is saying, her testimony is inadmissible.

The second reason, which -- and I think this is the most important reason -- see, the Court's not bound by the guardian ad litem at all. She's an expert witness. She's a witness. It is this Court's solemn responsibility to determine what's in the best interest of these children, what's in the best interest of both of you with this marriage.

The Court only hears the recommendation of the guardian. Just because there's a guardian doesn't mean that the Court follows the guardian. And I think when counsel said many -- the Court could hear the case without the guardian and make a ruling. The Court could hear the guardian and determine I don't believe anything she said and the Court makes the final determination. This Court is impartial. And regardless of what has happened in other courts, it is this Court's responsibility to make sure that it hears the facts and it applies the law to those facts and makes a determination.

So I am going to deny it. I'm going to deny Mom's request for attorney's fees. Again, on the same basis, in preparation for trial, motions in limines come up.

MS. POTTER: Okay. It just -- I had mentioned before the issue of attorney's fees, and I talked to opposing counsel, and we're in agreement to reserve that issue if that's okay with your Honor, just in the interest of time.

THE COURT: Let's see where we are at the end of the -- at the end of the hearing. Okay.

MS. POTTER: I'm going to call Dr. Kim Oppenheimer.

THE COURT: Good afternoon, Doctor. I'm going to have you put your stuff down and have you raise your right hand to be sworn.

KIMBERLY CRANE OPPENHEIMER, PH.D.,

having been duly sworn, was examined and testified as follows:

THE COURT: All right. Thank you so much. If you will have a seat, the microphone is on. It's adjustable. Just make sure that you answer audibly because the court reporter's taking it down.

THE WITNESS: Yes, ma'am.

THE COURT: Your witness.

MS. POTTER: Good morning. Can you please swear the witness. Oh, sorry. Not paying attention.

DIRECT EXAMINATION

BY MS. POTTER:

Q Okay. Please state your name for the record.

A Kimberly Crane Oppenheimer.

Q And can you briefly give us a description of your background and education?

A Yeah, I'm a clinical psychologist. I've been licensed in the state of Georgia since 1986. My Ph.D. is from the University of South Carolina in psychology. I have a master's degree in psychology from Texas A&M and a bachelor's degree in psychology from Florida State.

I was a professor at the Medical College of Georgia when I graduated in 1985, and then I was an associate professor of psychology from 1989 to 1992.

I've been in private practice since then, starting part time while I was a professor and then went to full-time private practice. I perform child custody evaluations, criminal fitness evaluations, psychological evaluations, as well as having a general psychotherapy practice.

Q And how many cases have you been appointed to do a psychological evaluation in a divorce case?

A Would that include custody evaluation?

Q Yes, any kind of evaluation.

A I don't keep track of those. I would say somewhere north of a hundred and fifty.

Q And how many times approximately have you testified in court about those evaluations?

A I would say probably 25, 20 percent of the time. Most of the time, based on my feedback and especially if I

write a report, the cases settle.

Q And when did you -- your involvement in this case begin?

A I was appointed by Judge Marbutt July 12th, 2021.

Q And do you recall if that was -- that appointment was by consent of the parties?

A I don't recall.

Q And what specifically were you appointed to do in this case?

A A psychological evaluation.

Q How much time -- before I do that, can you describe to the Court what a psychological evaluation is?

A A psychological evaluation -- a forensic psychological evaluation involves multiple clinical interviews, psychological testing, collateral witness interviews, document review, and contacting other professional sources for information.

Q And as a result of your psychological evaluation, are you supposed to give feedback to the parties, and if so, for what purpose?

A Not to the parties but to the attorneys. And as a psychological evaluator, my role is fairly limited. I can talk about the parties' strengths and weaknesses, mental health challenges, personality characteristics, any current symptomology. But that's where it stops since I'm not doing a

parental fitness evaluation or custody eval.

Q How much time did you spend on your evaluation in this case?

A I'm not sure. The parties -- I believe I interviewed Mr. Harvey for about five hours, Ms. Harvey for about three and a half. They each completed about ten measures in a psychological battery. I did extensive document review. Mr. Harvey, in particular, had a lot of medical records.

Q Have you talked to collateral contacts for each party?

A I have.

Q And did you review evidence and documents from both of the parties?

A Yes.

Q Did you provide to counsel a list of the sources of information that you relied on prior to giving your oral feedback?

A I did.

Q And would that list comprise everything to the best of your knowledge that you used to complete your evaluation?

A Yes. I gave it to in draft form. So there may be something that is missing. But it was fairly complete at about 12 pages.

Q In conducting your evaluation, did you get any information directly from the guardian ad litem?

A No.

Q Did you talk to her and ask her to give you any information?

A I did. I called her sometime late fall -- I can't remember whether it was November or December timeframe -- because it's unusual in my experience not to have some information from the guardian, because any evaluation, whether it's a psychological evaluation, a parental fitness, or a custody eval starts with a referral question. What am I looking for? And so I had interviewed, I think, Ms. Harvey at that point one time and I think Mr. Harvey twice. And I reached out to Ms. Daswani, and she would not provide any information.

Q Did she give you any documents?

A I believe she sent over the order that Judge Marbutt wrote.

Q Would you say that you formed your opinion after your evaluation separate and independent from Ms. Daswani?

A Absolutely.

Q When, approximately, do you recall was the last time that you met with the parties?

A I met with Mr. Harvey in December, I believe early December, and Ms. Harvey, I believe it would have been in February.

Q And did you keep in touch with the parties after that

time up until the time that you did your feedback?

A No. The only contact I had -- I reached out to Mr. Harvey, since it had been a while since I had talked with him, for an update. And he sent me an email.

Q What did that email say?

A He said that he was living in Albany, I believe, with his grandmother, that the support was important for him. He said that he still was very concerned about Ms. Harvey's care of their son, Wells.

Q Would you say that email was sent in this month, in April?

A April 12th. And he also said that he was still employed with the same company that he had been.

Q And before we get into the details, can you -- and I know you did this on your -- the oral feedback session -- can you just give us a high level summary of the basic results of your evaluation?

A Mr. Harvey portrayed Ms. Harvey as being erratic, volatile, and greatly fears that she is capable of harming their son, Wells. Based on my interviews, based on my document review, everything that Mr. Harvey claimed about Ms. Harvey, there's extensive documentation that he is erratic. He can be unstable, angry, and loses his temper very quickly.

Q So, then, just to summarize -- let me know if this is correct -- would you say that the things that Mr. Harvey was

alleging about Ms. Harvey were true about Mr. Harvey himself?
A Correct.
MS. ZAMMIT: Your Honor, I'm going to object to leading.
MS. POTTER: I was summarizing her answer to ask if it was correct.
THE COURT: I'm going to overrule the objection. The answer will stand.
BY MS. POTTER:
Q Did you find Mr. Harvey's allegations -- let's start with the allegation that Ms. Harvey is a danger to Wells. Did you find that to be true?
A No, no evidence whatsoever.
Q Did you find Mr. Harvey's allegation that Ms. Harvey is mentally unstable to be true?
A No.
Q Did you find any basis, in fact, for those allegations?
A No.
Q Do you believe that Mr. Harvey is emotionally unstable?
A Yes.
Q Do you believe that he is erratic?
A Yes.
Q Do you believe that he is angry?

A Yes.

Q Do you believe -- do you have a concern, I should say, that Mr. Harvey may harm Ms. Harvey?

THE WITNESS: May I qualify that answer, your Honor?

THE COURT: If you answer the question first, then you can qualify.

THE WITNESS: Would you repeat the question, please?

MS. POTTER: Sure.

BY MS. POTTER:

Q Do you have a concern that Mr. Harvey may harm Ms. Harvey?

A Yes.

Q And if you want to explain your answer?

A Yes. Based on my document review, Mr. Harvey to his therapist, there's extensive documentation that he has threatened to hurt Ms. Harvey. And two therapists indicated that he was a danger to himself and others. Mr. Harvey did not make any direct threats to me about that, but there is extensive documentation about it.

Q And did you review Mr. Harvey's medical records?

A I did.

Q Did you review his mental health records?

A Yes.

Q Did you also review Ms. Harvey's medical records?

A Yes.

Q Did you review her mental health records?

A Yes.

Q Do you believe that Mr. Harvey suffers from cognitive disorganization?

A There are times when he has, yes.

Q Can you explain to the Court what that is?

A His reality testing is distorted. He does not think clearly.

Q How would you describe based on your evaluation Mr. Harvey's judgment?

A Poor.

Q Had it been reported to you during your evaluation that Mr. Harvey had a psychotic break?

A Yes.

Q Was that reported by a mental health professional?

A Yes.

Q Do you believe that Mr. Harvey has suffered from manic behavior?

A One of the therapists reported that, yes.

Q And that would be -- when you say one of the therapists, do you mean one of Mr. Harvey's therapists?

A Yes. It was the marital therapist, Leslie Arrowsmith.

Q Now, when you gave us your oral feedback, do you recall that you didn't tell us the name of the specific

provider who said certain things about Mr. Harvey?

A Yes.

Q And can you tell the Court why you did not want to give us that information?

A One, because Ms. Zammit was recording it, which is unusual in my experience. The other is that multiple therapists expressed concern for their safety.

Q And were those therapists expressing concern for their safety due to Mr. Harvey?

A Yes.

Q In your experience, have you ever had an attorney record an oral feedback session?

A No.

Q Were you -- did you have any notice -- prior to the time that we met on Zoom, did you have any notice prior to that that anybody would be recording?

A No.

Q Did you state concerns about the eval -- or the -- the feedback being recorded?

A I did.

Q Do you still have those concerns?

A That is why I did not name a therapist.

Q Would you describe Mr. Harvey as being anxious?

A Yes.

Q Would you describe him as being depressed?

A Yes.
Q Do you believe that he has a distorted reality?
A At times, yes.
Q Can you explain to the Court -- this is something that you mentioned to us -- what a global assessment of functioning is?
A When Mr. Harvey was admitted to Ridgeview's intensive outpatient program, the psychiatrist, the admitting psychiatrist, did a functional assessment of him. And in the old DSM system, which people still use because it's very efficient, they rank people. They give a diagnosis on Axis I, personality disorder on Axis II, health functioning on Axis III, on Axis IV has to do with any moderating factors, such as social support, strengths, and Axis V is a global assessment of functioning. And it's scaled zero to a hundred, with a hundred being, you know, somebody's in perfect mental health and zero that they are not functioning at all.
The admitting psychiatrist gave him a global assessment of functioning of 20, which indicates hospitalization and possible psychotic behavior.
Q And to be clear, that test was administered at Ridgeview in July 2021; is that right?
A Yes. It's a subjective assessment of the provider, so it's not a test per se.
Q Would a score of a 20 concern you?

A Yes.

Q Does Mr. Harvey -- did you find that he has anger issues?

A Yes.

Q Is he able to control himself?

A I would say yes.

Q Did you conclude in your evaluation that Mr. Harvey has issues with alcohol?

A Yes.

Q And what evidence did you have to support that?

A There were several therapists who talked about his drinking. The psychiatrist that he saw for quite a while, I believe starting in 2018, talked about his heavy consumption of alcohol. Mr. Harvey apparently told him that he had pancreatitis, alcohol-induced pancreatitis, in 2017. One of the therapists, Ms. Adkins, documented in her notes that he was having withdrawal symptoms from alcohol. Mr. Harvey himself talked about not having gone to bed sober in ten months, and that was -- I'd have to look it up, but that was during one of my interviews with him.

Q Did Mr. Harvey admit to blacking out from drinking too much?

A I don't recall.

Q Did you do your own testing on Mr. Harvey related to substance abuse?

A I did.

Q And what were the results of that?

A I gave a SASSI, which is a screening measure. He was moderately defensive on it. Anytime that an individual is defensive on their testing, their clinical scores are going to be suppressed. It indicated that he had a low probability of substance use disorder; however, on another measure, the personality assessment inventory, gave him a probable diagnosis of alcohol use disorder. And that is a more robust test than the SASSI.

Q Based on everything that you reviewed in your evaluation, has Mr. Harvey been suicidal?

A He reported -- and it's extensively documented in all of his medical records -- that he's had suicidal ideation but then since withdrawn and said that he wouldn't actually do it.

Q Can you explain what you -- what -- the definition of suicidal ideation?

A It is thoughts about wanting to die. Sometimes they're very active. I'm going to -- you know, I'm thinking of killing myself. That would be an active suicidal ideation. A passive suicidal ideation would be I wish I weren't here. I wish I wouldn't wake up. You know, I wish I were dead.

Q Was it multiple providers that reported Mr. Harvey had suicidal ideations?

A Yes.

Q Did you discover during your evaluation that Mr. Harvey had made threats to Ms. Harvey?

A Yes.

Q And what do you recall those threats to be?

A I believe they were text messages. They all centered around if something happened to their son that he would kill Ms. Harvey. And I think one that she would need to dig a 6-foot pit if Wells were harmed in any way.

Q Did you see any evidence during your evaluation that Mr. Harvey has been violent in the past?

A He choked Ms. Harvey.

Q Anything else?

A No, not that I recall.

Q We talked already, and you testified about Mr. Harvey -- my question about Mr. Harvey harming Ms. Harvey. Do you have concerns about Mr. Harvey harming Ms. Harvey's mother?

A I think it's possible.

Q And can you tell us why?

A Mr. Harvey seems laser focused on Ms. Harvey and her mother. He has a strong dislike for her. He is concerned that she is incapable of taking care of their son. And, again, if something happens to Wells, he has threatened harm.

Q Do you have -- is there anything that you saw in the evaluation or determined in the evaluation that would lead you

to believe that Mr. Harvey may harm Wells?

A The thing that concerns me -- he is overly identified with Wells. He has difficulty separating his identity from that of his son. And he has said multiple times that he would do anything to protect Wells. He truly believes that Ms. Harvey is a threat to their son. He believes, as recently as April the 12th, that she is still capable of harming him. And he has said he would take a bullet for him. He would do anything. Given that Mr. Harvey has difficulty separating himself from his son, given that if he does not have time with Wells, I'm concerned about his level of hopelessness and desperation. I'm speaking in probabilistic terms, but I would have to say that he might think Wells is better off if he couldn't have him.

Q Do you think that there is a likelihood that Mr. Harvey could harm Wells based on your testimony that you just gave?

A I can't answer likelihood. I can't say percentages.

Q Do you agree that it is a possibility?

A It's a possibility.

Q Do you believe that there are certain events that have triggered Mr. Harvey into acting in certain ways or exercising poor judgment that have happened throughout this case?

A Yes.

Q Do you believe that this trial could be one of those triggers?

A It's possible.

Q Have you -- did you review documents and hear about any examples of Mr. Harvey's poor judgment that has happened during this case?

A Yes.

Q Can you give me some examples?

A The AirTag that he put on Ms. Harvey's car. What he said -- and he admitted to me in an interview that it was poor judgment. He said that he thought if he could catch Ms. Harvey having an adulterous relationship with somebody that this divorce would come to a quick conclusion.

There are psychotherapy notes that indicate that he had been on a dating site and had gone out on a date prior to this and that he had also had an escort one evening.

Certainly his text that he would hurt Ms. Harvey, he would kill her if something happened to Wells, very poor judgment. His smoking pot and drinking before the July hearing was very poor judgment. And this is, I think, essentially what started the case. You know, he was belligerent, challenging with the officers who came to the house when Ms. Harvey went next door and someone called the police, and he called her a derogatory name in front of the officers.

Q How does Mr. Harvey's use of alcohol impact his

Mr. Harvey has been in any inpatient program since July of 2021?

A I didn't see any, no.

Q Following his time at Ridgeview, to your knowledge, has Mr. Harvey continued in therapy?

A Yes. I believe he has seen somebody near where he lives.

Q And did Mr. Harvey provide you with the names of his current providers?

A He did.

Q And were you able to speak to them?

A I was not.

Q Why not?

A I got the information on April the 12th, and we did feedback on April 13th.

Q So prior to April 12th, had Mr. Harvey not given you the names of his current providers?

A He had not.

Q Are you aware that following the receipt of your oral feedback to the attorneys that Ms. Harvey went into hiding with her mother and the child?

A I heard that today in the courtroom, and Ms. Daswani said that there was going to be a motion before judge and said that Ms. Harvey was in hiding.

Q And based on your evaluation, do you believe that

Ms. Harvey has sincere fear for her own safety?

A Yes.

Q Do you believe that she has sincere fear for the safety of the child?

A Yes.

Q Do you believe that she has sincere fear for the safety of her mother?

A I would assume so. She never specifically mentioned that.

Q And just to be clear, how seriously do you take the safety concerns in this case?

A I have to take them seriously. Again, it's a probabilistic statement. I can't give a percentage. Part of what psychologists do is risk mitigation. So worst-case scenario, it concerns me.

MS. POTTER: All right. I don't have any other questions at this time.

THE COURT: All right. Thank you.

Any cross?

MS. ZAMMIT: Absolutely.

CROSS-EXAMINATION

BY MS. ZAMMIT:

Q Dr. Oppenheimer, you didn't notify Mr. Harvey or my office that you were planning on testifying today, did you?

A No.

Q When did you make the decision to come to court to testify?
A I didn't make the decision. I received a subpoena to be here.
Q Okay. And were you paid your trial retainer fee with that subpoena? Did you get a check, as well?
A With the subpoena? No. Ms. Harvey paid me for my time today.
Q Okay. How much did she pay you?
A I'd have to ask my office manager. Half a day, I think it was seventeen fifty.
Q Okay. Did you not tell Mr. Harvey that in order for you to appear in court, you would require a retainer of $4,000 before you would appear?
A That is my time for a full day, yes.
Q When Mr. Harvey inquired, did you say that the 4,000 was for a full day or did you say you required 4,000 as a retainer to appear?
A It's in my informed consent, the full day. And I've since changed. I mean, I can't remember exactly when the informed consent was sent out. So at one point, the full day was 3500; half a day would have been seventeen fifty. It's currently 4,000 and 2,000. Ms. Harvey brought to our attention that it was a half day, and so I charged her the seventeen fifty.

A Not that I recall.
Q When was the first time your records indicate that Seroquel was prescribed for Ms. Harvey?
A I would have to go back and check. I believe it was from Dr. Naidu. Yes, July 16th, 2021. He added a hundred milligrams of Seroquel.
Q And you have no way of knowing -- or let me rephrase that. Do you have any way of knowing whether or not she was still taking Risperidone at the time she was taking the Seroquel?
A They probably would not have been given concurrently.
Q Probably would not have been, but do you know?
A Well, I'm not a psychiatrist. But they're two antipsychotics, so that would be pretty unusual. And the Seroquel was prescribed for sleep.
Q Okay. And a hundred milligrams for sleep?
A Yes.
Q And you're -- are you aware -- let me rephrase that. You said it was prescribed for sleep. Is that in the notes from Dr. Naidu?
A No. But a hundred milligrams, 50 milligrams is typically given for sleep. An antipsychotic dose is 400 to 600 milligrams.
Q You're not a psychiatrist; right?
A I am not a psychiatrist.

Q You don't know the drug effects pursuant to -- well, let me rephrase it. Do you know the dosages and protocols, I guess is the right word, associated with prescribing Seroquel at all?

A I have a general familiarity as a clinical psychologist and having had many patients on it, but I am not a psychiatrist.

Q Let me ask you this: Would you agree with me that Seroquel is approved by the FDA for schizophrenia, bipolar disorder, and again, psychotic types of diagnosis?

A Yes.

MS. POTTER: I'm going to object because she just said she --

THE COURT: Stand up and give the legal objection.

MS. POTTER: My objection is that she just stated she's not a psychiatrist. This is out of the scope of her appointment as an expert, as a psychologist.

THE COURT: Technically she hasn't been tendered as an expert, so I will overrule the objection.

MS. ZAMMIT: Thank you.

THE COURT: She has her on cross.

You may continue.

MS. POTTER: Your Honor, can I state one thing? We have a consent order appointing her as an expert.

MS. ZAMMIT: Your Honor, may I respond?

THE COURT: One second.

You may respond.

MS. ZAMMIT: Thank you.

The witness testified that Seroquel was prescribed for sleep. She made very specific determination, opinion, and I am cross-examining her on that comment. And I think that whether -- just asking if she knows, whether or not what Seroquel is prescribed for and what it is permitted to be prescribed for. So she made a -- Dr. Oppenheimer made a statement of fact that this medication was prescribed for this thing, and I'm asking why she believes that, where that comes from. I'm allowed to cross-examine her on her opinion.

THE COURT: Well, two separate things. As to -- since both parties have agreed and consent that she would be the expert for this -- let me make sure for the record. Both parties have agreed that she would be deemed an expert for purposes of this hearing; is that correct?

MS. POTTER: That's correct.

MS. ZAMMIT: I need to review the consent order, but I don't dispute what my colleague --

THE COURT: Okay. That being said, she can give an opinion. I'm going to overrule the objection because she does have her on cross. She's entitled to a thorough and

sifting cross. I'll give her some leeway.
You may answer the question.
MS. ZAMMIT: Let me try to remember what the question was, if I may.
BY MS. ZAMMIT:
Q Really it boils down to, Dr. Oppenheimer, do you have a note or a doctor commentary in what you reviewed that states that the Seroquel prescribed to Ms. Harvey was for sleep?
A I don't recall.
Q Okay. Is Risperidone -- and I'm sure I'm pronouncing it incorrectly. I apologize -- but to your knowledge, is that prescribed for sleep?
A It can be.
Q At what dosage; do you know?
A I don't know.
Q Okay. Do you have any reason to believe that it was prescribed to Ms. Harvey for sleep?
A I don't know.
Q Do you know if she was on the antipsychotic Risperidone from August 2016 through 2019?
A I didn't review those notes in that detail, no.
Q When we had our, I guess, Zoom meeting going over your recommendations and thoughts, did you indicate that Ms. Harvey was actually on 40 milligrams of Seroquel?
A No.

Q Did you indicate that she had been reducing her Seroquel?

A Yes.

Q What milligram, to your knowledge, is she on now, a hundred?

A I don't believe she's taking any right now.

Q Do you have any knowledge or information of medications that Ms. Harvey was on prior to becoming pregnant with Wells from Dr. Kaufman?

A I don't recall.

Q Do you have any recollection from your interviews with Ms. Harvey or Mr. Harvey that Mrs. Harvey was reducing her medications in order to effectuate a healthy pregnancy?

A That would make sense, but I don't recall.

Q Do you have any knowledge of what occurs when someone withdraws or stops taking Risperidone?

A No.

Q Do you have a general understanding or awareness of what occurs when someone stops taking prescribed antipsychotic medications? Is there kind of a general set of effects that happens, or does it just depend on the medication?

A Yeah, I'm not qualified to answer that.

Q Okay. Who's Mr. Johnson?

A He was the coparenting therapist.

Q And Ms. Arrowsmith is just a regular counselor?

She's not a coparenting therapist, as well, is she, or is she?

A In this capacity, I don't know if she does coparenting, but at least in the capacity she saw the Harveys, it was for marital therapy.

Q All right. So she saw both Mr. and Mrs. Harvey for marital therapy?

A To the best of my knowledge, yes.

Q And those were the records that you reviewed?

A Yes.

Q Okay. And then at some point, did she just treat Mrs. Harvey?

A Yes.

Q Do you know when that occurred, when that transitioned from marriage counseling to solo counseling with Mrs. Harvey occurred?

A I believe it was -- may I go back to my interview with her?

Q Sure.

A Because I think I asked that. She saw -- she saw them in 2021 for a couple of sessions.

Q Together?

A Yes.

Q Okay. I thought you said that Ms. Harvey was seeing Ms. Arrowsmith from August 2019 forward. So is it 2021 for a couple of sessions?

A I don't think so. Again, I wasn't really focused on the dates. Let's see. I did marriage counseling -- she saw them for a couple times. She did marriage counseling. And then at end of 2019, she worked with them as a couple. And then she saw them in 2021 for a couple of sessions.

Q Now, is Dr. Naidu the only prescription provider for Ms. Harvey?

A To the best of my knowledge, yes.

Q Did you review any of her medical records outside of Dr. Kaufman, Dr. Naidu, Ms. Arrowsmith, or Mr. Johnson?

A No.

Q When we were on the Zoom discussion or Zoom meeting on April 13th, do you recall saying that Mr. Harvey would never ever harm Wells? Never ever harm Wells? I know you potentially qualified that later, but do you recall saying that he would never harm Wells?

A I did qualify it. Yes, I did say something to that effect.

Q And I understand that you qualified it, but you did indicate that he would never harm Wells?

A Yes.

Q And would you agree with me that he has never harmed Wells?

A To the best of my knowledge, that is correct.

Q Well, has Ms. Harvey suggested he's physically harmed

Wells?

A No.

Q Okay. Did Mr. Harvey say anything to suggest he's physically harmed Wells?

A No.

Q In any of the interviews you conducted with any of the therapists or any of the family members, was there ever any suggestion that Mr. Harvey physically harmed his child?

A No.

Q Now, you indicate that potentially he would harm Wells. And I don't want to put words in your mouth. You said -- what would be the circumstance again that you indicate he could potentially harm Wells?

A My concern stems more that he is infused -- he is fused and meshed with Wells and can't separate his own identify from that of his child. And if he truly believes that life is not living without the child, that from a clinician standpoint concerns me.

Q When you made the determination that Mr. Harvey was -- saw himself as his child -- I'm not sure the layman way to phrase that -- but that they were -- he had a hard time distinguishing himself --

A Yes.

Q -- from his child? When did you make that determination?

respect to defensiveness?

A Correct.

Q And did you not tell us that that wasn't the only test that Ms. Harvey was defensive or not completely forthcoming with?

A Correct. She was highly defensive on all of the testing.

Q By highly defensive, for laymen, does that mean greater propensity for trying to conceal information?

A Not necessarily conceal but trying to present herself in the best possible light as being free from shortcomings to which most people will admit.

Q And Mr. Harvey, was he -- other than the alcohol screen, the SASSI, was he forthcoming and honest in his presentations and testing with you?

A He was also somewhat defensive.

Q Somewhat or -- somewhat defensive but not highly?

A It depended on the test. She was a bit more defensive than he was. So he was somewhat defensive on his MMPI-2.

Q Is that the multi -- Minnesota Multiphasic Inventory?

A Yes. Yes. But he also had clinical scales that were significantly elevated. And, again, as the defensiveness rises, the clinical scales are suppressed. So they are very high considering that his profile was somewhat defensive.

Q What does that mean for -- for again -- for lay people? That means -- you said that it was odd that it was so high considering -- meaning, he presented honestly?

A No.

Q The other way?

A He was -- he was defensive. Yet he had clinical elevations on three scales: depression scale, the scale that measures histrionic behavior, and the scale that measures suspiciousness.

Q Okay. How about Ms. Harvey? Isn't it true that she had to take the MMPI twice?

A Yes. The first time she omitted -- I believe it was 17 items, a lot of which loaded on the scale that measures bipolar disorder, specifically the manic phase of it. And even though it was scorable, I had her redo it.

So her second administration, she was somewhat defensive. She presented herself in a highly socially desirable manner. She has a very strong need for others to see her in a positive light. Her profile was within normal limits, again not reading a whole lot into that.

Q Why, because of the defensiveness?

A Yes. Yeah, because even -- even if -- typically when somebody scores in the clinical range on defensiveness, as a clinician think about raising the profile five to ten points, well, hers still would not have been clinically significant.

So if I raised Mr. Harvey's five to ten points, it is extremely clinically significant.

And basically what her profile says is that she is outgoing and sociable, strong need to be around other people. She's gregarious and enjoys attention. And that was consistent in all of the measures for her.

THE COURT: All right. This is good place to take a ten-minute break.

(Recess from 2:47 p.m. to 2:56 p.m.)

THE COURT: Counsel, you can continue.

BY MS. ZAMMIT:

Q All right. I think we had spoken about some of the testing, the defensive responses from both parties?

A Yes.

Q Is the SASSI -- I think you said that there was -- there were more robust tests than SASSI; is that accurate?

A The PAI and the MMPI-2 are more robust.

Q I'm sorry. What does PAI stand for?

A Personality Assessment Inventory.

Q And did you conduct the PAIs of both Mr. and Mrs. Harvey, or did you look at records of the PAI?

A No. All the testing was done in my office.

Q Did you do a PAI?

A Yes.

Q Okay. And the MMPI-2 for both; correct?

A Yes.
Q What other testing did you administer?
A So I administered a parent questionnaire, which is basically demographic information, concerns that they have about their coparent; Parenting History Survey, which taps areas of what their relationship was like prior to separation; any allegations that have occurred, alcohol usage, therapy; parenting, how much time they spend parenting; any concerns about the other's behavior in terms of parenting.

I gave a Quickview Social History, which is a paper and pencil measure that taps some of the same domains as in the Parenting History Survey. I gave the multi -- Minnesota Multiphasic Personality Inventory to both; the Personality Assessment Inventory, the PAI, to both; the Psychopathic Personality Inventory, looking for psychopathy to both; the Millon Clinical Multiaxial Inventory, the MCMI-IV, which is a measure of personality characteristics, styles, can and will assess personality disorders, as well as clinical symptomology; an Anger Disorders Scale; the SASSI; and a Trauma Symptom Inventory. And for Mr. Harvey, I added a Beck Depression Inventory to get a read on his level of depression at the time of testing.
Q And -- I'm sorry -- a psycho --
A Psychopathic Personality Inventory.
Q Thank you.

A PPI-R.

Q Perfect. Thank you. And what -- were you concerned by the results of either Mr. or Mrs. Harvey's results from that test?

A No.

Q Were you concerned with the results of either Mr. or Mrs. Harvey from the MCM -- I'm trying to read my own writing, and it's not working very well. So I apologize -- MCM -- is it one four?

A Yes, IV. Yeah, four. I think that they were fairly similar and also very accurate.

Q Anything that gave you concerns?

A Let me look quickly at his. Not -- not with hers. I mean, she's exuberant, cheerful, kind of can be larger than life, high need for attention, high need for approval, optimistic, also meticulous, compulsive. Some people may find her draining, and if she doesn't get the approval that she needs, she can become depressed. I mean, I wasn't really very concerned about that.

Q And his was similar? You weren't very concerned?

A He also produced a socially desirable protocol. He also has some compulsive tendencies, views himself as efficient, disciplined, meticulous. He can be perfectionistic, which interferes with getting tasks completed. He can be rigid, stubborn, opinionated. Failure to gain approval --

similarity there -- leads to emptiness and rejection. He is very alert to signs of hostility and rejection. And a few of his relationships are long-lasting, even though he has an intense need for them.

Q Let me go back to one thing that you said. You said that he easily -- and I know I'm incorrectly paraphrasing, so please correct me -- something to the effect that he is very overly sensitive to hostility. Is that --

A He's overly sensitive to rejection.

Q Okay. So there was something about hostility that --

A He's alert to signs of hostility.

Q Alert.

A And that's consistent with his MMPI-2, scored in the clinical range on the paranoia scale. That scale is passing feelings of persecution, suspiciousness, rigidity, externalization of blame.

Q And I think -- just want to go back a little bit and with respect to the threats of violence against Mrs. Harvey, I know we spoke about the text messages and we spoke about the choking behavior. Did Mr. Harvey explain to you that he did not choke Mrs. Harvey?

A Let me look. As I recall, he admitted to grabbing her arms, and he admitted to restraining her. So on two occasions.

Q And did he explain when he was making those

admissions that it was in response to behavior from Mrs. Harvey with respect to the plates and the knives?

A That is what he said, yes.

Q Now, do you recall when we had our Zoom meeting that you stated that you cannot talk about the inference that this has on parenting?

A Correct.

Q Okay. And by this, do you mean your evaluation?

A Yes, because I was ordered to do a psychological evaluation instead of a parental fitness evaluation. So the impact of what I'm saying on their parenting and recommendations regarding custody and any stipulations on parenting time, that goes to Ms. Daswani's role.

Q Right. So you would agree that your evaluation is not -- has no inference on parenting?

A Psychological evaluation, as I explained earlier, talks about strengths, weaknesses, symptomology. So any inferences are up to the guardian and the Court.

Q Let's talk about Ms. Harvey's, quote/unquote, bipolar. I think we spoke about that again at length at our Zoom meeting. And my recollection was that you stated that two doctors had diagnosed her with bipolar and then changed their mind and that one had diagnosed her, but that person was wrong. Am I accurate in that recollection?

A Yes. Ms. Arrowsmith diagnosed her as bipolar, and

when Ms. Harvey saw that on her superbill, the ICD code, she went to Dr. Naidu and -- her psychiatrist, and he did not think she was bipolar. And I had assessed her for bipolar, and I do not think she's bipolar.

Q Did you talk about the fact that Ms. Harvey has difficulty sleeping at night?

A Yes.

Q That she paces?

A Yes.

Q Has obsessive thought processes?

A Yes.

Q What else does she obsess -- what does she obsess about?

A I don't know. She just said she had trouble sleeping.

Q Okay. You used the word obsess, that she had obsessive thoughts. Did you delve into what those thoughts were, what they were in regards to?

A No. I believe that -- that was in one of the medical records, but, no, I didn't delve into that.

Q Let's talk about some -- again, during our Zoom conference, you made some reference to Biblical scripture, that Matt would communicate with Ms. Harvey via scripture, and my impression was that you thought that that was a negative way of communication. Am I correct in that judgment?

A No. The -- both Mr. Johnson and Ms. Arrowsmith talked about how he would quote scripture. And Ms. Arrowsmith, in particular, said that it made no sense, that that's when she thought he was either manic or having psychotic break or both. And both of them talked about Biblical submission. So I did not really get into that with him.

Q When you said both of them spoke about Biblical submission, you mean that Ms. Harvey and Mr. Harvey had the same -- I was going to say thought process, but that may not be the right phrase -- the same belief system with respect to female submission?

A The therapist talked about that in relation to Mr. Harvey weaponizing the Bible and scripture as a way to hurt her, calling her an adulterous, a sinner, Satan. It was not in the context of we believe this.

Q According to Ms. Arrowsmith or Mr. --

A And Mr. -- and Mr. Johnson, who identified himself as a Christian counselor.

Q Mr. Johnson. But not Ms. Arrowsmith?

A No. Mr. Johnson self-reported that. I didn't ask him about that.

Q Let's go -- move forward a little bit in time. Mr. Harvey's last therapeutic assessments, if you will, Ridgeview and the one in March, NG -- MG?

A Something like that.

Q Something like that. Okay. Ridgeview occurred when?
A July 2021.
Q And you agree with me that they did a Global Assessment of Functioning?
A Yes.
Q And you agree with me that you incorporated the results of that testing into some of your opinion?
A Well, that was a clinical assessment. They didn't do any psychological testing.
Q Okay. Is the clinical assessment called the Global Assessment of Functioning?
A That is one of the dimensions that they assessed, along with four others. That's pretty typical in terms of an evaluation for admission to an inpatient program.
Q Okay. But that was the one where you said he scored 20?
A Yes.
Q Okay. So you incorporated the results of that testing in your -- in formulating your opinion or in your -- conducting your evaluation?
A So it's not testing. It's a subjective assessment that the psychiatrist did, and what that says is that he was functioning very poorly at that time. And because he denied any active suicidality or homicidality is why he went to a PHP program as opposed to an inpatient admission.

Q Do me a favor -- we'll talk about that. I promise. But I just want to focus on this initial testing, because you brought it up in our Zoom call and you brought it up today before the Court. I understood it to be that he only scored 20 out of -- between one and a hundred, and that suggested certain psychosis or behavior problems, and you incorporated that into your evaluation?

A Yes. I guess the point I'm trying to make is that it's not a test. Okay. So that's an incorrect -- I mean, testing means something very specific to a psychologist. So I'm not trying to be argumentative; I'm just trying to explain that this was the psychiatrist's opinion that he was functioning poorly. And this -- in July of 2021, yes, he was functioning very poorly.

Q How do you know a psychiatrist did this and not an intake counselor at Ridgeview? Is there a doctor's name?

A Yes, Dr. Weichbrodt, Gary Weichbrodt. He's a psychiatrist.

Q And are you -- you alluded to it, but you didn't really go too much into it that -- what is DSM-5?

A That is the Diagnostic and Statistical Manual that psychiatrists and psychologists use for diagnoses.

Q Is that the current version?

A Yes.

Q And you are aware, are you not, that the Global

Assessment of Functioning assessment is not to be used; are you not, in DSM-5?

A It is not used in DSM-5.

Q Because of reliability; correct?

A Yes.

Q You spoke, I think, as well about -- so that was Ridgeview. So he was admitted initially for inpatient; is that your understanding?

A I think he was admitted directly to intensive outpatient, IOP program.

Q After Dr. -- I'm not going to try to pronounce his last name -- Gary from Ridgeview assessed him, met with him, did an intake?

A Correct.

Q So instead of putting him in inpatient, they put him in an outpatient -- an intense outpatient treatment. And as far as you understand, is that like a full day?

A Yes.

Q And after a week, he was released from that program? Five days?

A He was stepped down to a partial program.

Q Okay. And how long did it take between he was in intensive outpatient to a partial?

A I believe a week.

Q Do you have notes that show that he was only being

specifically to compliment Mr. Harvey on the fact that he has been so proactive with his mental health, seeing counselors, therapists, that type of thing?

A Yes.

Q Since we had our Zoom call, has Mr. Harvey reached out to you?

A I requested an update.

Q After our Zoom call?

A No. I'm sorry. I'm sorry. That was before the Zoom call. Yes, he called my office. I believe it was Wednesday.

Q Did you speak with him?

A I did not.

Q Did he leave a message?

A He spoke with my assistant.

MS. ZAMMIT: I think I'm finished, your Honor.

THE COURT: Ms. Daswani, any cross?

MS. DASWANI: Yes, your Honor, very quickly.

THE COURT: Come around to the podium.

EXAMINATION

BY MS. DASWANI:

Q Thank you for being here today, Ms. Oppenheimer.

A You're welcome.

Q As you stated earlier, it's very typical for a guardian ad litem and a psychologist coming in to do psychological evaluations for us to have a conversation at the

beginning?

A Correct.

Q In this case, that did not happen, and what is your understanding of why that didn't happen?

A You were very concerned about sharing any information that could influence my evaluation one way or the other.

Q And the first time we had any substantive discussions about the results of the evaluations was when it went out to everyone?

A Yes. We -- yes. As I recall, we talked a couple of days before about how best to disseminate the results, but we did not talk about them.

Q And the reason that we discussed how best to disseminate the results, did you alert me as to safety concerns once the results were going to be posted?

A Yes.

Q And as the guardian ad litem, you wanted me to be aware of the safety concerns. Would that be a fair statement?

A Yes, ma'am.

Q When you reviewed the medical psychological records for the parties, when it came to Mr. Harvey's records, did you ever see that previous therapists had requested that he be inpatient, go to an inpatient facility?

A I don't -- I don't recall that. I know that Dr. Lin, the psychiatrist at Wellstar, wanted him to get a therapist and

a marital therapist, and he was resistant to that, but I don't recall anything having to do with inpatient treatment.

Q And do you have any of Dr. Lin's records here with you today?

A I have my summary of them.

Q Because the only two people that have copies of those records is you and I that's in the courtroom today; correct?

A I don't know that. I do have his records at home. I have a summary of them here.

Q Would it be fair to say there's been recommendations given to Mr. Harvey by therapists and psychiatrists that he didn't necessarily follow?

A Yes.

Q And were you concerned about the safety of -- you had deemed earlier there was a girls' club?

A Yes.

Q And who does that girls' club consist of again?

A Female professionals on this case.

Q So that includes myself, you, Ms. Potter, potentially Ms. Zammit, as well?

A I think at the time he made that statement I was excluded from that. I don't think I was included in the girls' club.

Q Did you have concern for the safeties of the women professionals in this case?

A I do know that there have been protective orders issued.

MS. DASWANI: That's all the questions I have, your Honor. Thank you.

THE COURT: Thank you.

Any redirect?

REDIRECT EXAMINATION

BY MS. POTTER:

Q We were talking or you testified about the defensiveness on the various testing that you did. Would you say that even with the defensiveness that Ms. Harvey had on a certain test, were you able to accurately assess her?

A Yes.

Q And is it common for people in the middle of a

custody dispute to be defensive on those types of tests?

A Yes.

Q Now, Ms. Zammit asked you if you had stated that Mr. Harvey would never harm Wells. Then she said I know that you put a qualification on that. And I just want to make it clear: Do you believe that qualification is important?

A Yes.

Q And, again, what was the qualification?

A If he loses custody of Wells, I'm concerned that his desperation will take over.

Q And then Ms. Zammit asked you some questions about

Mrs. Harvey's father allegedly attempting suicide. Do you have any reason to believe based on your evaluation that Ms. Harvey is suicidal?

A No.

Q Would the fact that her father committed suicide, if that was true, would that change your opinion?

A No.

MS. POTTER: Thank you.

THE COURT: All right. Any re --

MS. ZAMMIT: Recross?

THE COURT: Recross.

MS. ZAMMIT: Just briefly.

RECROSS-EXAMINATION

BY MS. ZAMMIT:

Q You mentioned the girls' club, as in Ms. Daswani brought that up. Were there any threats ever made by Mr. Harvey to any member of the girls' club?

A I don't know.

Q Did he make any threats or voice any threats to you about the girls' club?

A No. He felt that the girls, the females in this case, were biased against him.

Q Okay. And he shared that with you?

A He shared that with me, yes.

Q Okay. But I thought you said in your direct

testimony that you felt that that required a safety plan or some type of protective measure on the female attorneys or female professionals in this case?

A I don't recall saying that.

Q Well, when asked direct questions about do you feel that anyone's in danger or that there's been any concern of violence other than to Mrs. Harvey or her mother, you referred to the girls' club. So I'm trying to ascertain for the Court if there was ever any threat made by Mr. Harvey or this is just a expression of his concern over the bias in this case?

A There was never any direct threat made to me.

Q And is it your belief or are you aware that Mrs. Harvey believes that her mom was narcissistic and she's concerned about her healing from that?

A I know that Mr. Harvey expressed concerns about that and referenced a book that Ms. Harvey bought, read. And he made a statement about his concern that Wells was an extension of both of them, indicating that Ms. Harvey and her mother were overly identified and meshed with Wells. But Ms. Harvey did not use that term. She talked about they had differences in the past and that they have resolved those.

Q Did you ask her about the book? Did you ask her about --

A No.

MS. ZAMMIT: Okay. Nothing further. Thank you.

THE COURT: Ms. Daswani, anything?

MS. DASWANI: Nothing further, your Honor. Thank you.

THE COURT: All right. May this witness be excused?

MS. POTTER: Yes, your Honor.

MS. ZAMMIT: Yes.

THE COURT: All right. Doctor, thank you. You are excused.

Call your next witness.

MS. POTTER: Call Brandy Daswani.

THE COURT: What I usually do is I have the guardian testify at the very end --

MS. POTTER: Okay.

THE COURT: -- so that if there are any other witnesses that are brought, it may change.

MS. POTTER: Okay. Then I will call -- I will call Mr. Matt Harvey to the stand.

THE COURT: All right. Mr. Harvey, if you'll come around. You're going to come up right where the bailiff is. And if you'll raise your right hand, we're going to swear you.

MATTHEW HARVEY,

having been duly sworn, was examined and testified as follows:

THE COURT: All right. Thank you. You may have a seat. I was going to say good morning, but we have good

afternoon now. Same thing that I told the other witnesses, the microphone is adjustable for you. She has you on cross. So listen to the questions, answer the questions, and then if you need to explain, you can do so.

THE WITNESS: Yes, ma'am.

THE COURT: And answer out loud for the court reporter.

THE WITNESS: Yes, ma'am.

THE COURT: All right. Your witness.

CROSS-EXAMINATION

BY MS. POTTER:

Q Good afternoon, Mr. Harvey.

A Good afternoon.

Q I have two binders in front of you. I'm going to ask you to refer to an exhibit. It will just be the tab in the appropriate binder.

A Uh-huh.

Q If you can turn to tab 7, can you identify this document?

THE COURT: For the record, you say tab 7. What exhibit are you referring to?

MS. POTTER: 7, P-7.

THE COURT: Go ahead.

THE WITNESS: Sorry. Repeat the question.

BY MS. POTTER:

Q Sure. Can you identify the document that's marked as Exhibit P-7?

A I recognize it, yes.

Q Are these text messages that -- between you and Ms. Harvey?

A It would appear so.

Q And you recognize that your text messages are the ones on the left-hand side that are in gray?

A Yes, ma'am.

THE COURT: Sorry. Let me interrupt. Because you are looking down, would you just put -- scoot the microphone closer to you so that you can still -- you can still do what you're doing, but at least we -- the court reporter's having some problems getting the answer.

THE WITNESS: Okay. Sorry.

THE COURT: That's okay. Thank you.

THE WITNESS: Yes, ma'am.

BY MS. POTTER:

Q In these text messages, would you agree that you were using scripture to communicate with Ms. Harvey?

A I don't -- I mean, it was a form of communication, and then, yes, I was using scripture.

Q Is that something that you have commonly done?

A It's something that she and I, as well as members of

my family do, commonly.

Q Have you since the filing of this divorce case sent scripture to Ms. Harvey in threatening ways?

A I don't think so.

Q Has Ms. Harvey said to you that she believed your communications to her are threatening?

A Yeah, everything to her has been threatening, so. That's the way she perceives things, yes.

Q So to answer the question, would you say that you are aware that sending scripture to Ms. Harvey is threatening to her?

A I am aware that scripture is now threatening, perceived as a threat to her after the separation and the divorce starts, yes.

Q And in this text message, you said at the bottom: You just don't like the word no and do not want to submit to me or to God?

A That's what I said, yes.

Q And then if you go to the third page, you stated: Satan has gotten ahold of you?

A Uh-huh, yep.

Q And then if you go to the next page, you continue to state scripture to Ms. Harvey?

A I'm sorry. Which page?

Q It's the fourth page in.

A It would appear so, yes.

Q Was this in response to Ms. Harvey telling you that she wanted to be separated?

A So this was the day that -- the beginning of the exhibit, that was -- I sent her that scripture because I realized that she was going over to her friend's house to call you, Ms. Potter, and to initiate the divorce even though I had asked for the separation of Friday prior to this Monday, I believe. To answer your question, it was just in response to her going against our principles and beliefs as Christians.

Q Do you believe that part of those principles and beliefs are that she's required to submit to you?

A Not in the way that you mean it or intend to make it seem.

Q Can you tell me what it does mean to you?

A What it means -- the Bible's God's word, and it's very clear that it does not mean that, you know, the wife is to do whatever the husband says or to be -- you know, submit like inferior in any way. It just means simply that I submit to God, and in response, I take responsibility for the family and the household. It's all on my shoulders. It's my responsibility. So the buck stops with me. And really it's a good thing, at least for the wife, that she's not -- she doesn't have to be held responsible if I -- if that makes any sense.

Q Can you repeat that. I didn't hear what you said.
A I didn't want to go off on a tangent or side note about -- you know, about the subject.
Q Are you done with your answer?
A I think so.
Q So when you're talking about the submission, does that mean that it's your belief that during the marriage Ms. Harvey -- you had the final say, and Ms. Harvey had to comply with whatever you -- whatever decision you made?
A No, ma'am.
Q Then can you explain what you meant by that?
A Again, I don't know what you mean by what I mean by what.
Q When you stated the idea of the husband is the head of the household and I have the final say?
A That's what God said. I didn't say it.
Q I'm asking you what you believe that means?
A She can do whatever she wants. I mean, obviously we're getting a divorce. Like, I can't force her to do anything. There were many times where she went against my wishes and did whatever it was anyway, so -- and we were still married, so.
Q Is it fair to say that made you angry?
A No. It made me feel disappointed and upset that she cared more about her own selfish desires than the needs of the

# Exhibit F

Excerpts from April 26, 2022 Final Divorce Hearing Transcript

ID# 2022-0149299-CV
EFILED IN OFFICE
CLERK OF SUPERIOR COURT
COBB COUNTY, GEORGIA
20106987
Angela Brown - 66
NOV 18, 2022 09:43 AM
Connie Taylor, Clerk of Superior Court
Cobb County, Georgia

IN THE SUPERIOR COURT OF COBB COUNTY
STATE OF GEORGIA

| | |
|---|---|
| CLAIRE MARSH HARVEY, Plaintiff, vs. MATTHEW THOMAS HARVEY, Defendant. | CIVIL ACTION FILE NO.: 20-1-06987-66 |

CIVIL NONJURY PROCEEDINGS
April 26, 2022

Heard before Judge Angela Z. Brown
Cobb County Superior Court
Sixth Floor, Courtroom 6300
70 Haynes Street
Marietta, Georgia 30090

APPEARANCES OF COUNSEL:

On Behalf of Plaintiff:

Stefanie S. Potter, Esq.
Molly Teplitzky, Esq.

On Behalf of Defendant:

Leah J. Zammit, Esq.

Guardian ad Litem:

Brandy Daswani, Esq.

Deborah Fedorchak
Official Court Reporter
Cobb County Superior Court
70 Haynes Street
Marietta, Georgia 30090
Deborah.Fedorchak@cobbcounty.org

## INDEX TO EXAMINATIONS


| Examination | Page |
|---|---|
| **MATTHEW HARVEY** | |
| Cross-Examination by Ms. Potter (continued) | 4 |
| **CLAIRE HARVEY** | |
| Direct Examination by Ms. Potter | 20 |
| Cross-Examination by Ms. Zammit | 55 |


- - -

## INDEX TO EXAMINATIONS


| Examination | Page |
| --- | --- |
| **RENEE MCDONALD** | |
| Direct Examination by Ms. Zammit | 126 |
| Cross-Examination by Ms. Potter | 135 |
| **SHANA ADKINS** | |
| Direct Examination by Ms. Zammit | 139 |
| Cross-Examination by Ms. Potter | 141 |
| Examination by Ms. Daswani | 143 |
| Redirect Examination by Ms. Zammit | 164 |
| **KAREN HARVEY AUSTIN** | |
| Direct Examination by Ms. Zammit | 170 |
| Cross-Examination by Ms. Potter | 176 |
| Examination by Ms. Daswani | 182 |
| Redirect Examination by Ms. Zammit | 192 |
| **MATTHEW HARVEY** | |
| Direct Examination by Ms. Zammit | 196 |


- - -

PROCEEDINGS, April 26, 2022, commencing at 9:09 a.m.

THE COURT: Let's go back on the Harvey v. Harvey matter. Thank you, both counsel and both parties. I apologize for that.

I believe Mr. Harvey was on the stand.

MS. POTTER: Correct.

THE COURT: Mr. Harvey, you may come and walk around.

I'm going to remind you you're still under oath.

MS. POTTER: Good morning, Mr. Harvey.

THE WITNESS: Good morning.

MS. POTTER: Good morning, your Honor.

THE WITNESS: Good morning.

CROSS-EXAMINATION (CONTINUED)

BY MS. POTTER:

Q So, Mr. Harvey, you testified yesterday, I believe, and your attorney also mentioned, you believe that the guardian has misrepresented Shana Adkins' records; is that correct?

A I'm not sure exactly what the mixup is. I just know what I've been told by Shana throughout the time that I was utilizing her as a therapist, and it doesn't match what -- the therapy notes that I've seen and received.

Q Your testimony is that the guardian misinterpreted something that Ms. Adkins had written down in her notes?

A Ms. Adkins told me --

Q I don't want you to testify to anything that she told you.
A Okay. Sorry. Can you repeat the question?
Q Sure. My question was: Is it your testimony that you believe the guardian misrepresented something that was in Ms. Adkins' notes?
A I believe that the notes were altered.
Q By the guardian?
A No, by Ms. Amy Barker, who is the co-owner of Roots Wellness Center.
Q You have not personally reviewed Ms. Adkins' records; correct?
A Incorrect.
Q When did you review them?
A I received them, I believe, November or December of 2021.
Q That was after your deposition?
A That's correct.
Q Can you open the binder to Plaintiff's Exhibit 35, please.
A Okay.
Q Do you recall sending this message to Ms. Harvey?
A I don't remember sending it, but, I mean, I don't deny that I did.
Q And you stated in this message: I know you gals are

all colluding. Brandy is far from unbiased, and the unethical nature of this procedure will be brought to light. And then you stated: I suggest you turn to the Lord and repent. His wrath and judgment, although not always immediate, will come to pass, and His justice on the unrighteous will be overwhelming and devastating.

A That's accurate.

Q Is that something that you said to Ms. Harvey and also directed at the gals?

A I mean, it's just what I believe. All of us will be judged one day.

Q And when you said the gals, you meant the professional women involved in this case?

A Referring to you and Ms. Daswani.

Q Would you say that -- or have you stated that some of your parenting strengths are that you're logical and rational?

A I have. And Claire said the same thing at the July hearing.

Q Ms. Harvey stated that you were logical and rational?

A Yes, ma'am.

Q You still believe today that you are logical and rational?

A When I'm not under duress and my son's life is on the line, absolutely. When I'm not in a fight or flight, PTSD type of, you know, response, absolutely.

Q Are you in that type of response right now?
A I'm trying not to be.
Q Does that mean that you are?
A Not currently.
Q You would agree that you have allowed your love for your son to get to your emotions; right?
A That's fair and accurate.
Q And that has clouded your judgment?
A My love for my son and the abuse and trauma I endured in the marriage and her behavior since the separation has caused whether -- whether real or, you know, imagined, the way I perceive, it's perceived fear, and, I mean, it's very real to me. And so, yeah, in that sense, it has clouded my judgment.
Q You don't think that Ms. Harvey has any strengths as a parent, do you?
A That's not true.
Q Well, you testified in your deposition that you couldn't really think of anything positive to say about her; do you recall that?
A I do. I mean, I was on the spot. I did say she had -- I said she was, you know, vivacious and had a lot of energy. And I've actually thought about it some since. And, you know, she's a good cook. You know, when we -- she's pretty funny or can be pretty funny. She's smart, I mean, as far as parenting. I mean, I just -- what I said was that there wasn't

MS. ZAMMIT: Your Honor, is it possible to take a five-minute comfort break?

THE COURT: Yes, absolutely.

MS. ZAMMIT: Maybe this is inappropriate, but is the Court intending on doing any drug and alcohol screens of the parties, or is Mr. Harvey free to utilize the restroom?

THE COURT: I'm not asking for any.

MS. ZAMMIT: Thank you, Judge.

THE DEFENDANT: Thank you.

(Recess from 9:39 a.m. to 9:45 a.m.)

THE COURT: Ms. Harvey, you can come back to the stand. Raise your right hand and be sworn.

CLAIRE HARVEY,

having been duly sworn, was examined and testified as follows:

THE COURT: Thank you. You can have a seat. As you heard, the microphone is adjustable. Make sure that you answer any questions audibly. The court reporter's taking everything down.

Counsel, your witness.

DIRECT EXAMINATION

BY MS. POTTER:

Q Good morning.
A Good morning.
Q State your name for the record.

A Claire Harvey.
Q Where are you employed?
A I work for a company called naviHealth.
Q And what is your job title?
A I'm a skilled inpatient care coordinator, but I'm an occupational therapist by trade.
Q And where do you work locationwise?
A I work in my bedroom. I have a home office there. And then three times a week I go onsite to three different local skilled nursing facilities to speak to our -- our patients. Yeah, sorry.
Q Explain to me what happened on the evening of November 2nd of 2020, briefly.
A Matt and I had been arguing a lot recently, and I told him that I was going to file for divorce. And he was across the room from me, and he got up, and he lunged towards me to try to get my phone. And he pushed me down to the ground, and he took my phone. And then I had my work phone, also. So he went into the back patio. And then I took my work phone and ran to my neighbor's house with no shoes on and called friends to look at Wells's monitor because he was asleep. And then I called the police.
Q Were you fearful of Mr. Harvey on that day?
A Yes.
Q Has Mr. Harvey -- had Mr. Harvey previously been

physically abusive to you?

A Yes. He had strangled me more than once in our marriage.

Q You heard testimony and the argument of counsel stating that Mr. Harvey restrained you; is that accurate?

A No.

Q Had Mr. Harvey previously, before November 2nd, 2020, been verbally abusive to you?

A Yes.

Q Has Mr. -- explain to me Mr. Harvey's use of scripture towards you.

A He would often kind of pick and choose scripture to send to me or talk to me. When we were talking about divorce, he said God hated divorce. God hated divorce, you know, more than anything and that we would never be truly divorced in the eyes of God.

He would tell me that I was not performing my wifely duties when I declined to have sex with him. He would tell me that I was withholding from him, and he would get very upset and remind me that I wasn't supposed to deny him physically. I was supposed to have sex with him when he wanted.

He would tell me that we really don't deserve anything, so anything that we have is a gift and that anything that I, like, wanted, like, home decor or, like, going out, he said I was just materialistic and narcissistic like my mother

and I was going to end up like her, alone.

Q You heard the argument from Mr. Harvey that you had agreed with him on the roles in the marriage based on your Christian faith. Do you agree with him that that is an accurate interpretation?

A I believe we had a mutual understanding, but I believe at that time we didn't fully understand what the scripture meant by that. It talks a lot about in the Bible that you submit to your husband who is also worthy of submission in the sense that he's guiding and trusting -- I can trust him. And when I first met Matt, I did trust him. I did believe that he had our best interest at mind. And as things -- as life got harder, you know, we had two miscarriages and we had a fire and I had vertigo, and life happened, and I feel like that I adapted and Matt never kind of bounced back from that. So he kept just getting more controlling. So he's kind of deviated from that.

So to go back to your question, we had an understanding that he was, you know, the leader, but at that point, he was a leader. I trusted him. Like, he made great decisions. But towards the end of our marriage, I started to doubt his decisions and think that he wasn't acting in our best interest. So me not being able to say anything or do anything and he had all the decision-making power was -- was scary.

Q Do you believe that he used that understanding that

the two of you had in an attempt to control you?

A Yes. Matt reminded me often that he was the 51 percent, that he was the tiebreaker, and that he could say no to me and I couldn't ask why or an explanation.

Q And is that what you intended when you entered into this understanding at the beginning of your marriage?

MS. ZAMMIT: Your Honor, I'm going to object to leading. It's been going on for quite a while. And I appreciate the desire not to object inappropriately or too often, but if counsel would refrain from leading questions on direct, I would appreciate it.

THE COURT: All right. I am going to overrule that objection this particular -- while she has been leading, but this particular question calls for a yes or no answer. So I'll overrule it as to this particular question.

You may answer the question.

THE WITNESS: Can you repeat the question?

MS. POTTER: Sure.

BY MS. POTTER:

Q The question was: Do you believe that Mr. Harvey used the understanding that the two of you had at the beginning of the marriage to control you?

A Yes.

Q Did you feel threatened by Mr. Harvey during the

# Exhibit G

Contemporaneous Oppenheimer Emails and Other Communications

# CONTEMPORANEOUS OPPENHEIMER EMAILS AND OTHER COMMUNICATIONS

*Focused excerpts reproduced from Plaintiff's Gmail account and message exports. They are offered to demonstrate a concrete basis for amendment, not for adjudication of disputed facts on the Rule 59(e) motion.*

**G-1. March 25, 2022 email concerning written report and dissemination**

Date: March 25, 2022, 5:27 p.m. EDT
From: Kim Oppenheimer, Ph.D. <ccsoppenheimer@gmail.com>
To: Matthew Harvey <mharvey7744@gmail.com>
Subject: Re: Criminal Charges Update

Hi Matthew,

You are welcome to send me anything you would like for me to review, but I would like to hear the recording you referenced. I am close to being able to start a written report of my findings. I will need a report retainer of $8000 to do so. Previously, you indicated you wanted me to write one. Is that still the case? Thanks,

Kim

Date: March 25, 2022, 5:44 p.m. EDT
From: Kim Oppenheimer, Ph.D. <ccsoppenheimer@gmail.com>
To: Matthew Harvey <mharvey7744@gmail.com>
Subject: Re: Criminal Charges Update

In reading the Order, each of you is responsible for your own fees. I know Claire does not want the expense of a written report, and frankly, I'm not sure that it is worth the expense. Please remember that I am conducting psychological evaluations which Brandy will use in formulating her conclusions. The options are (1) you pay the full cost of a written report which the Court may reapportion later; (2) I provide verbal feedback to the GAL; (3) Unless you are pro se, I provide verbal feedback to the GAL and both attorneys. Your initial retainer is being used for document review, cataloging documents, test scoring, etc.

Kim Oppenheimer, Ph.D.

**G-2. April 18, 2022 email concerning diagnoses**

Date: April 18, 2022, 5:00 p.m. EDT
From: Kim Oppenheimer, Ph.D. <ccsoppenheimer@gmail.com>
To: Matthew Harvey <mharvey7744@gmail.com>
Subject: Re: Diagnoses

Hi Matthew,

What I explained is that diagnoses are just short-hand terms for a specific set of behaviors. I find diagnoses to be more prejudicial than helpful in these types of evaluations. Hence, I did not assign either you or Claire a diagnosis.

Kim

**G-4. Later 2022 message-export excerpts concerning the planned April 18 visit**

August 4, 2022, 9:44 p.m. - Karen Harvey Austin: We were supposed to visit the 18th but left nanny's late. That was 1 week before court

August 4, 2022, 9:44 p.m. - Karen Harvey Austin: They were not in hiding

August 4, 2022, 9:47 p.m. - Karen Harvey Austin: We were going to the house on our way back and had to cancel on her that day the 18th

August 4, 2022, 9:48 p.m. - Karen Harvey Austin: I canceled after we left Nanny's that morning

August 4, 2022, 9:51 p.m. - Karen Harvey Austin: They were at the house

October 21, 2022, 7:12 p.m. - Karen Harvey Austin: They were home on April 18 because we were supposed to stop in the way back from Albany and left too late to do it

Source note: Gmail and message-export timestamps are displayed in Eastern Time. Typographical errors in the original communications are preserved.

**G-3. April 18 and April 26, 2022 messages between Karen Harvey Austin and Claire Harvey**



# Exhibit H-1

Long v. Long Motion to Remove Guardian ad Litem (filed March 12, 2026)

Superior Court of Cherokee County
**E-Filed**
24CVE0811
3/12/2026 3:59 PM TB
Patty Baker, Clerk
Civil Division

IN THE SUPERIOR COURT OF CHEROKEE COUNTY
STATE OF GEORGIA

| | |
|---|---|
| HANNAH LONG,<br>PETITIONER,<br><br>v.<br><br>JARROD LONG,<br>RESPONDENT. | CIVIL ACTION FILE NUMBER<br><br>24CVE0811 |

**MOTION TO REMOVE GUARDIAN AD LITEM FOR BIAS, SELECTIVE INVESTIGATION AND FAILURE TO REPORT MATERIAL INFORMATION**

COMES NOW Petitioner HANNAH LONG, by and through undersigned counsel, and pursuant to Uniform Superior Court Rule 24.9, O.C.G.A. § 15-11-104, and O.C.G.A. § 9-11-7, respectfully moves this Court for an Order removing the currently appointed Guardian ad Litem, Brandy Daswani, from this matter.

A Guardian ad Litem is appointed to assist the Court as a neutral investigator and advisor regarding the best interests of the minor child. When the guardian abandons that neutral role and instead conducts an investigation that is demonstrably one sided, selectively ignores material information, and relies upon communications with individuals aligned with one party, removal is necessary to preserve the integrity of the judicial process and ensure that the Court receives reliable and impartial recommendations regarding the child s welfare.

As set forth more fully below, the record demonstrates that the Guardian ad Litem has engaged in a selective investigation, failed to investigate material evidence affecting the child s environment, relied heavily upon communications with the Father s partner while failing to scrutinize her conduct, and directed a disproportionate amount of investigative resources toward scrutinizing the Mother s husband, who is not a party to this action.

For these reasons, good cause exists to remove the Guardian ad Litem under Uniform Superior Court Rule 24.9.

## STATEMENT OF FACTS

1. Hannah Long, hereinafter referred to as "Petitioner" or "Mother" and Jarrod Long, hereinafter referred to as "Respondent" or "Father" were previously married and share one minor child, to wit: Jaxon Long, a male child, born in 2015.
2. Hannah Long is now married to Joshua Friedman, hereinafter referred to as "Stepfather". When the minor child is in Mother's care, he resides in a household that includes Mother, Stepfather, and Stepfather s two young children from a prior relationship.
3. Father is currently in a relationship with Stefani Rizzi, hereinafter referred to as "Father's girlfriend". When the minor child is in Father's care he resides in a household that includes his Father and Father's girlfriend.
4. In May 2024 the Court appointed Brandy Daswani to serve as Guardian ad Litem to investigate matters affecting the minor child and to provide recommendations to the Court concerning the child s best interests.
5. The conduct of the Guardian ad Litem during the course of this investigation forms the basis of this motion.

### A. CRIMINAL CONDUCT BY THE FATHER

6. On November 12, 2024, a Bill of Indictment was issued charging the Father with Felony Computer Invasion of Privacy under Georgia law. The indictment arose from conduct involving the interception of private communications belonging to the Mother.
7. Affidavits submitted in connection with those proceedings describe a pattern of conduct involving surveillance of the Mother s electronic communications.
8. The Father ultimately entered a guilty plea related to ***felony criminal invasion with malice.*** As a result of the criminal proceedings, a no contact order was imposed prohibiting the Father from contacting the Mother directly.
9. Despite these restrictions, evidence presented in this matter reflects that the Father continued to attempt to monitor the Mother and obtain information about her household through indirect means, including questioning the minor child regarding the Mother and her husband.
10. The Guardian ad Litem acknowledged awareness of the Father s felony criminal conduct, ***but testified that she did not consider such conduct to be atypical within family law litigation.***

## B. INVESTIGATION CONDUCTED BY THE GUARDIAN AD LITEM

11. During 2025 the Guardian ad Litem continued her investigation.
12. Billing records produced in discovery demonstrate that the Guardian ad Litem and her firm spent substantial time investigating Stepfather, the Mother s husband, who is not a party to this litigation. The billing records reflect that more than thirty hours were spent reviewing Stepfather s emails and documents and conducting what the firm described as issue spotting of Stepfather s communications. Multiple entries reflect that staff members were assigned to review voluminous emails and documents belonging to Stepfather and to identify potential issues arising from those communications. **<u>See</u> attached GAL Billing Statements as Exhibit "A."**
13. The investigation of Stepfather did not arise from allegations of abuse, neglect, or misconduct affecting the child. Instead, the Guardian ad Litem criticized Stepfather for communicating extensively about matters affecting his family, his religious views, the emotional support animals he provided for the children and for being involved in issues surrounding the litigation.
14. Stepfather was subjected to intense scrutiny for what amounted to purely administrative or procedural complaints. He was subjected to a financial audit, criticized for not staying in his lane," sending voluminous emails," being overly protective, raising broad allegations, and contributing to escalation rather than resolution. Nearly eight hours were devoted solely to issue spotting his communications, while an additional seven hours were billed reviewing and indexing those transmissions. **<u>See</u> attached GAL Billing Statements as Exhibit "A."** In essence, his only offense" was advocating vigorously for his family s interests. This investigation included the deployment of paralegals to conduct extensive issue spotting of Mr. Friedman s private communications.
15. The allegations directed toward Mr. Friedman were not allegations of violence, neglect, or misconduct affecting the child. Rather, the Guardian ad Litem criticized him for not staying in his lane, sending detailed emails, and being overly involved in the litigation.
16. Despite dedicating more than thirty hours of billable time scrutinizing a non-party stepfather for these administrative complaints, the Guardian ad Litem spent zero hours investigating Stefani

Rizzi, the Father s live-in girlfriend who resides with the child during the Father s parenting time. **<u>See</u> attached GAL Billing Statements as Exhibit "A."**

## C. <u>FAILURE TO REPORT THE FATHER S ROLE IN INITIATING COMPLAINTS AND VIOLATING BOND CONDITIONS</u>

17. During the course of the investigation, the Guardian ad Litem was made aware of material information concerning Father s conduct that directly affected the ongoing conflict between the parties and the stability of the child s environment.
18. Specifically, the Guardian ad Litem was aware that the Father, was the individual who repeatedly initiated and made reports to authorities regarding the presence of emotional support animals in the Mother s household. These complaints resulted in multiple contacts with local authorities and regulatory agencies directed at the Mother s residence.
19. The evidence demonstrates that these complaints were not initiated by neutral third parties or concerned neighbors but rather were initiated directly by the Father as part of an ongoing pattern of harassment directed toward the Mother. The repeated complaints resulted in unnecessary investigations and disruptions at the Mother s home, creating instability within the household where the minor child resides.
20. Despite being aware that the Father himself was responsible for initiating these reports, the Guardian ad Litem failed to disclose this fact to the Court and did not include this information in any meaningful evaluation of the Father s conduct.
21. The Guardian ad Litem was also aware that, following the Father s guilty plea related to criminal invasion of privacy, the Father was subject to bond conditions that prohibited him from contacting the Mother. **<u>See</u> attached Father's Criminal documents as Exhibit "B."**
22. Notwithstanding these restrictions, the Father repeatedly engaged in conduct that had the effect of intentionally contacting, disrupting, and intimidating the Mother. Evidence presented to the Guardian ad Litem demonstrated that the Father continued to initiate communications through indirect means, utilized the parenting application in a hostile and disruptive manner, and repeatedly attempted to obtain information about the Mother and her household.
23. In one specific instance, the Guardian's report fails to address repeated conduct by Jarrod that is directly relevant to the family environment and the circumstances surrounding the children. During this case, Jarrod made approximately seventeen separate 911 calls concerning the

children s emotional support animals. These calls were made both directly and indirectly despite the absence of any legitimate emergency or safety concern. Witnesses reported that the children were thriving and that the home environment provided by Josh and Hannah was stable, supportive, and healthy. **See attached Exhibit "C."** The GAL s report does not disclose these repeated emergency calls, nor does it meaningfully address Father s violations of the existing contact order. Instead, the report focuses criticism on whether Stepfather erred in allowing the children to have emotional support animals, even though witnesses consistently indicated that the animals posed no issue and contributed positively to the children s wellbeing. By omitting these facts while emphasizing comparatively minor concerns, the report presents an incomplete picture of the circumstances surrounding the children and the conduct of the parties. Because the Court s determination must be based on a full and accurate understanding of the relevant facts, the omissions in the GAL s report warrant careful scrutiny and reduce the weight that should be afforded to its conclusions.

24. Mother also testified that the Guardian ad Litem discouraged her from contacting or cooperating with law enforcement regarding certain conduct by the Father because doing so could complicate the custody proceedings.
25. Evidence further presented to the Guardian ad Litem included affidavits describing the Father's surveillance behavior, repeated hostile communications, and attempts to use the child as a means of obtaining information about the Mother. **See Mother's Petition for Temporary Protective Order attached as Exhibit "D."**
26. The Father s conduct included attempts to use the minor child as a conduit for information and repeated questioning of the child about the Mother s household, including inquiries regarding communications, household activities, and the conduct of the Mother s husband. The Guardian ad Litem further discouraged the Mother from contacting law enforcement regarding the Father s conduct, stating that pursuing criminal enforcement would make co-parenting more difficult. **See attached Exhibit "E."**
27. Such advice demonstrates a fundamental misunderstanding of the guardian s role, which is to prioritize the child s safety and wellbeing rather than to manage the litigation strategy of the parties.

Rather than vetting the credibility of these materials, the Guardian ad Litem accepted them and incorporated them into the investigation without scrutiny.

28. Despite possessing knowledge of Father's conduct, the Guardian ad Litem did not meaningfully address the Father s violations of his bond conditions in her investigation and did not report the pattern of harassment and intimidation to the Court. The Guardian ad Litem acknowledged that she did not follow up with the Mother regarding the allegations contained in the affidavits and did not communicate this information to the minor child s therapist. **See attached Exhibit "F."**
29. The failure to report this information deprived the Court of critical facts relevant to evaluating the conduct of the parties and the impact of that conduct on the minor child.

### D. FAILURE TO INVESTIGATE THE FATHER S PARTNER

30. On December 12, 2025, Mother provided the Guardian ad Litem with documentation including background checks, court records, and public information requests relating to the Father's girlfriend, Stefani Rizzi.
31. These materials included evidence that Father's girlfriend had falsely represented herself as a combat veteran who served in Afghanistan in order to sit in a seat of honor at a Veterans Day event at the minor child s school.
32. Military records obtained by the Mother indicated that Father's girlfriend had been discharged from basic training due to a preexisting medical condition and had never served in combat. **See attached Exhibit "G."**
33. Additional records reflected that Father's girlfriend had a criminal conviction for fraudulently creating identification to present to a law enforcement officer as well as multiple convictions for driving with a suspended license.
34. The documentation also included allegations involving identity theft, attempts to access private electronic communications belonging to others, parental alienation involving her own child, and incidents of child neglect.
35. Despite the seriousness of these allegations and their direct relevance to the child s environment, the Guardian ad Litem conducted no investigation whatsoever into Father's girlfriend's background or conduct.
36. Instead, the Guardian ad Litem maintained repeated private communications with Father's girlfriend throughout the investigation.

## E. IMPROPER RELIANCE ON COMMUNICATIONS WITH THE FATHER S PARTNER

37. Billing records demonstrate that the Guardian ad Litem conducted multiple private Zoom meetings with Father's girlfriend and repeatedly billed time reviewing emails and attachments provided by her. The GAL repeatedly relied on Father's girlfriend as a source of information, holding multiple private Zoom meetings with her and billing time reviewing her emails and attachments.
38. Rather than treating Father's girlfriend as a subject of investigation, the Guardian ad Litem treated her as a source of information guiding the direction of the investigation.
39. The Guardian ad Litem effectively empowered Father's girlfriend by never conducting an independent review or issue spotting" of her communications. Instead, she treated her as a back-channel proxy for Father, as a primary source of information.
40. The GAL held six exclusive one-on-one Zoom meetings with Father's girlfriend (August 12, December 9, March 13, June 20, September 5, and November 3), while allowing staff to act as a surrogate for Father, who reportedly did not do much" himself. The GAL routinely accepted unvetted information directly from Father's girlfriend, repeatedly billing time for reviewing emails with attachments from Stefani Rizzi" and other communications from her. In September 2025, the firm billed 31.4 hours. In October 2025, the firm billed 15.5 hours. In November 2025, the firm billed 28.4 hours. In December 2025, the firm billed 17.3 hours, including continued communications with Father's girlfriend.
41. However, after the Mother raised concerns regarding Father s girlfriend's conduct in December 2025, Father's girlfriend abruptly disappeared from the billing records. Once Father's girlfriend ceased communications in January 2026, the GAL s investigative activity plummeted by over 80%, demonstrating that the investigation was driven by Father's girlfriend rather than an independent assessment of the child s best interests.
42. The billing records confirm that no time was spent reviewing Ms. Rizzi s criminal history, verifying her claimed military service, or analyzing the extensive documentary evidence submitted to the Guardian ad Litem regarding her conduct. The imbalance between the treatment of Stepfather and Father's girlfriend demonstrates a clear pattern. Stepfather was subjected to extensive scrutiny

and review of his private communications, while Father's girlfriend was permitted to provide information and attachments without independent verification of the materials she supplied.

43. This failure to investigate is particularly troubling because the Mother provided the Guardian ad Litem with extensive documentation on December 12, 2025, including background checks, court records, and public information requests demonstrating serious misconduct by Ms. Rizzi.

44. The imbalance between the treatment of these two non-parties demonstrates a clear pattern of bias. Stepfather was subjected to extensive scrutiny and forensic analysis of his communications for sending emails and advocating strongly in the litigation. Father's girlfriend, by contrast, was granted private access to the Guardian ad Litem, allowed to provide attachments and information, and treated as a cooperative participant in the investigation despite serious allegations of misconduct. **Refer to Exhibit "A".**

## LEGAL STANDARD

45. The GAL is required to maintain neutrality, conduct independent assessments, and advocate for the child's best interests. Abandonment of neutrality, dishonesty, and conduct harmful to the child or the integrity of the court process constitute grounds for removal. O.C.G.A. § 15-11-105.

46. Georgia law prohibits witness tampering, including any attempt to deter a witness from testifying freely, fully, and truthfully. O.C.G.A. § 16-10-93.

47. The confidentiality of court records and information in custody proceedings is protected by law, and unauthorized disclosure by the GAL is grounds for removal and may subject the GAL to contempt. O.C.G.A. § 15-11-704.

48. The Guardian ad Litem s Focus on the Family s Religious Practices Reflects Impermissible Ideological Bias.

49. Removal Is Necessary to Protect the Best Interests of the Child and the Integrity of the Proceedings.

50. Uniform Superior Court Rule 24.9 provides that a guardian ad litem may be removed for good cause shown. The purpose of the rule is to ensure that a guardian appointed to represent the interests of a child performs the role as a neutral investigator and advisor to the Court.

51. Georgia courts have consistently recognized that a guardian ad litem must act as an independent investigator for the Court rather than an advocate for either party. See *Thompson v. Thompson*, 261 Ga. 461, 462 (405 S.E.2d 894) (1991) (recognizing that a guardian ad litem functions as an investigator and advisor to the court regarding the child s best interests).

52. The Court should remove the Guardian ad Litem because the record demonstrates substantial bias, selective investigation, and the failure to report or investigate material information affecting the minor child s welfare. These actions constitute good cause for removal under Uniform Superior Court Rule 24.9 and render the Guardian ad Litem incapable of providing the neutral assistance required by the Court. The Guardian ad Litem s Demonstrated Bias and Failure to Investigate Material Evidence Constitute Good Cause for Removal Under Uniform Superior Court Rule 24.9. Ga. Unif. Super. Ct. 24.9.

53. Additionally, Georgia law requires that Guardian ad Litems avoid both actual conflicts of interest and circumstances creating the appearance of bias. See O.C.G.A. § 15-11-104(a) (requiring guardians ad litem to act in the best interests of the child and avoid conflicts that impair independent judgment). Under O.C.G.A. § 15-11-104(a), a guardian ad litem must remain independent and must avoid conflicts of interest that impair the guardian s ability to exercise independent judgment in representing the best interests of the child.

54. When a guardian becomes aligned with one party, selectively investigates evidence, or fails to disclose material information affecting the child s welfare, removal is appropriate.

55. Although a guardian ad litem does not make the final judicial decision, the guardian s recommendations often carry significant weight with the Court. When a guardian becomes aligned with one party or relies on communications with a non-party acting as a surrogate for that party, the integrity of the proceedings is compromised. The record demonstrates that after her appointment on May 9, 2024, the Guardian ad Litem abandoned her neutral role and instead conducted a disproportionate investigation targeting the Stepfather, while simultaneously refusing to investigate serious and documented allegations involving the Father and the Father s partner.

56. The Guardian ad Litem s repeated emphasis on the family s religious practices reflects an impermissible focus on constitutionally protected beliefs that cannot form the basis for adverse action in a custody investigation.

57. The First Amendment prohibits government actors from targeting individuals because of their religious beliefs or religious practices. Government action that singles out religious exercise for scrutiny or disfavor is subject to strict scrutiny and is unconstitutional unless it is narrowly tailored to serve a compelling state interest. See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993).

58. This principle applies not only to legislation but also to government decision-making in family law matters. A court-appointed Guardian ad Litem acts as an officer of the court and must conduct an investigation that is neutral, fact-based, and focused solely on the child s best interests. Religious beliefs or practices may not be used as a negative factor unless there is concrete evidence that those practices cause harm to the child.

59. Throughout the investigation, the Guardian ad Litem repeatedly focused on the religious practices within the Mother s household in a manner that reflects ideological disagreement rather than legitimate child-welfare concerns. Among the issues highlighted by the Guardian ad Litem were the family s decision to reserve Sundays for religious observance rather than youth sports activities, the characterization of the stepfather s religious beliefs as strict," and the structure of the household in which the Mother consults with her husband regarding family decisions. **See attached Exhibit "H", Page 19.** These matters were treated as areas of concern despite the absence of any evidence that they negatively affect the child. **See attached Exhibit "H", Page 15.**

60. Notably, the Father himself acknowledged that religion was not an area of dispute between the parties. Father expressly stated that he had no disagreements with Mother regarding religion, education, activities, or medical decisions concerning the child. **See attached Exhibit "H", Page 15.** Despite the absence of any parental dispute regarding religious upbringing, the Guardian ad Litem nevertheless made the family s religious practices a focal point of her investigation.

61. The investigative focus on these issues stands in stark contrast to the Guardian ad Litem s treatment of other individuals involved in the case. As reflected in the billing records and investigative conduct described elsewhere in this motion, the Guardian ad Litem devoted substantial time scrutinizing the stepfather, spending more than thirty hours reviewing his communications and criticizing him for not staying in his lane," sending voluminous emails," and advocating strongly on behalf of the family. These criticisms were administrative in nature and unrelated to any risk to the child.

62. In the previous case of *Harvey v. Harvey,* No. 1:25-cv-04688, (N.D. Ga. 2025)., where this Guardian ad Litem was also appointed, they were made aware of physical abuse from a wife towards a husband and was provided information and witnesses who would corroborate, however similarly filed no reports, took no remedial action and no protective steps, instead asking individuals

whether they shared [the petitioner's] biblical views on marriage," inserting ideological questions into the investigative process that had no bearing on the child s safety or well-being. (*See Harvey v. Harvey*, No. 1:25-cv-04688 (N.D. Ga. 2025).) These inquiries demonstrate a troubling prioritization of ideological alignment over legitimate child welfare concerns.

63. Witness testimony and other evidence consistently indicate that the child is thriving in the Mother s household. The child maintains a positive relationship with both the Mother and the stepfather, performs well academically, and demonstrates healthy emotional development. No witness identified any harm resulting from the family s religious practices or household structure. **<u>See</u> attached Exhibit "I."**

64. In the absence of any evidence that the child is being harmed, the Guardian ad Litem s repeated emphasis on religious observance, marital decision-making, and the perceived strictness of the stepfather s beliefs reflects an improper substitution of personal or ideological preferences for objective child-welfare analysis. **<u>See</u> attached Exhibit "J."**

65. Because the Guardian ad Litem s investigation repeatedly targeted constitutionally protected religious practices despite the absence of any evidence of harm to the child, the investigation reflects ideological bias rather than a neutral assessment of the child s best interests. This conduct further demonstrates partiality and supports removal of the Guardian ad Litem under O.C.G.A. § 15-11-104.

## <u>CONCLUSION</u>

The Court should remove the Guardian ad Litem because her continued participation would undermine the integrity of these proceedings and prevent the Court from receiving reliable and impartial recommendations regarding the child s best interests.

The Guardian ad Litem was provided affidavits and evidence describing a pattern of harassment directed toward the Mother and her household, including repeated reports and complaints initiated by the Father that caused disruptions at the child s residence. These incidents affected the stability of the child s home environment, yet the Guardian ad Litem failed to meaningfully investigate those events or present them to the Court as part of her evaluation.

The record also raises a serious concern regarding the Guardian Ad Litem's treatment of the father's criminal conduct and the mother's cooperation with law enforcement. The evidence reflects

that Hannah Long reported the unlawful interception of her private communications and cooperated with authorities in an investigation that ultimately resulted in a criminal conviction entered with malice. Yet the Guardian advised Ms. Long that pursuing or cooperating with that criminal investigation could negatively affect her custody case. Such guidance placed the mother in the untenable position of choosing between cooperating with law enforcement and protecting her position in the custody proceedings. This posture is particularly troubling because the criminal conduct at issue—surreptitious interception of private communications—was not merely collateral litigation behavior but resulted in a conviction carrying a finding of malice. Under O.C.G.A. §19-9-3(a)(3), the Court is required to consider patterns of abuse, family violence, and conduct affecting the safety and integrity of the child's environment when determining a child's best interests. By discouraging cooperation with the investigation and later minimizing the significance of the resulting conviction, the Guardian's presentation risked diverting the Court from fully considering a documented pattern of misconduct that the statute specifically directs the Court to evaluate. Conduct that discourages cooperation with lawful authorities investigating abuse-related conduct raises significant concerns regarding the neutrality of the investigative process and the reliability of the resulting recommendation.

The Guardian ad Litem's handling of the unlawfully intercepted communications independently demonstrates a level of prejudice that disqualifies her from further participation in this matter. In her engagement correspondence to the parties, the Guardian expressly represented that although experts may sometimes rely on certain inadmissible materials, illegally obtained evidence would not be relied upon or reviewed in forming her opinions in the case. That representation established a clear investigative boundary governing the scope of her work. Yet the record reflects that the Guardian repeatedly returned to communications obtained through the father's unlawful interception of private messages between Hannah Long and her spouse—conduct that resulted in a criminal conviction entered with malice and that implicated Georgia's statutory marital privilege. Those communications included intimate photographs shared privately between spouses. When questioned during the hearing about these materials, the Guardian declined to acknowledge whether she had actually reviewed the intercepted messages while simultaneously insisting that the parties should produce them so that she could scrutinize their contents. In the same testimony, the Guardian minimized the nature of those materials or Hannah's fundamental right to keep them private, remarking that the existence of intimate photographs in family litigation was essentially routine—"just another day" in such cases. Compounding the concern, the Guardian's billing records do not

transparently reflect how these unlawfully obtained communications were handled despite the extraordinary investigative attention directed toward them. In effect, the Guardian established a rule that illegally obtained evidence would not be used, then pursued those materials anyway, declined to clarify her handling of them under oath, and failed to account for that work in her billing records. Each of these failures independently raises serious questions about the neutrality required of a court-appointed investigator.

The practical consequences of this conduct were not abstract. At the courthouse during an emergency hearing, the existence of the intercepted communications was raised in a manner that left Hannah Long uncertain whether the father possessed the intimate photographs she had privately shared with her husband. Faced with the possibility that deeply personal images could be exposed publicly, she collapsed emotionally in the courthouse lobby and consented to an additional day of parenting time rather than risk the humiliation of having those materials revealed. What should have been immediately recognized as a case defined by criminal intrusion into marital privacy instead became an investigation centered on the fruits of that intrusion. The emotional toll of that moment—and the Guardian's continued focus on these materials—has been profound; the mother has since been diagnosed with post-traumatic stress disorder arising from both the unlawful interception itself and the manner in which those communications have continued to be leveraged during the investigation. The law protects marital communications precisely because the intimacy and trust of a marriage deserve protection from this type of intrusion. When a Guardian ad Litem disregards those protections, ignores her own contractual limitation against using illegally obtained evidence, minimizes the gravity of the invasion in sworn testimony, and then seeks to compel production of the same privileged materials, the resulting investigation is irreparably prejudiced. Any one of these circumstances would raise grave concerns about the Guardian's ability to serve as a neutral officer of the Court; taken together, they establish that the Guardian's continued participation cannot produce the impartial, child-centered evaluation that this Court is entitled to expect.

The investigative imbalance is further reflected in the fact that allegations of serious misconduct, including criminal activity, stolen valor, and severe parental alienation, were not investigated, while the stepfather was subjected to extensive scrutiny over relatively minor administrative complaints. This disparity in investigative attention demonstrates that the investigation became focused on disputes between adults rather than the welfare of the child.

Perhaps most concerning, the Guardian ad Litem was made aware of a dangerous individual in the household and despite receiving that information, filed no reports, initiated no remedial action, and took no protective steps to ensure the child s safety, instead maintaining that this individual seemed stable and a positive reference in Jaxon's life.

Instead of prioritizing those serious concerns, the investigation repeatedly focused on stepfather and ideological issues unrelated to the child s welfare, demonstrating a shift away from the core mission of a Guardian ad Litem, protecting the child s interests, and toward an investigation shaped by personal or ideological disagreements. A Guardian ad Litem who selectively investigates one household while ignoring credible evidence involving the other cannot provide the Court with the balanced and objective analysis required in custody proceedings.

The Court s custody determination necessarily relies heavily on the Guardian ad Litem s investigation and recommendations. When that investigation is incomplete, selectively conducted, or influenced by communications with individuals aligned with one party, the Court is deprived of the neutral and reliable assessment that the Guardian ad Litem system is designed to provide. Even if the Court ultimately conducts its own independent evaluation, the presence of a compromised investigation distorts the evidentiary record and risks influencing the Court s understanding of the child s circumstances. Under these circumstances, removal is not merely appropriate but necessary to ensure that the Court receives a balanced and independent evaluation focused solely on the best interests of the child.

Throughout the proceedings, the evidence has consistently reflected that the minor child remains bonded to both parents, performs well in school, and demonstrates no significant behavioral problems in either household. No evidence has been presented suggesting that the child is unsafe or not thriving in the Mother s household.

The most troubling feature of the Guardian's recommendation is not merely its outcome, but the foundation upon which it rests. The Guardian recommended a significant change in custody while admitting under oath that she had not reviewed that recommendation with the child's treating therapist—the professional most directly responsible for evaluating the child's emotional well-being. That omission is particularly alarming because the therapist has since communicated directly to the Guardian that she does not support or understand the recommendation and believes the resulting disruption has been harmful to Jaxon. Despite this, the recommendation was presented to the Court

without meaningful consultation with the therapist and without informing the Court that the treating professional opposed the change. At the same time, the Guardian acknowledged during testimony that Jaxon was performing well in school, participating successfully in extracurricular activities, maintaining relationships with both parents, and exhibiting no behavioral or academic deterioration. Yet the recommendation nevertheless disrupted his custodial arrangement and, critically, separated him from his step-siblings by placing their parenting time on different weekends, eliminating the shared family time they had previously enjoyed together. Preserving sibling relationships is a well-recognized consideration in evaluating a child's best interests, yet the recommendation created a schedule that fractured those relationships without explanation. The record therefore presents only two possibilities: either the Guardian failed to consider the impact of separating Jaxon from his siblings when crafting the recommendation, or she considered it and proceeded despite the foreseeable harm to the child's family relationships. Neither explanation reflects the careful, child-centered analysis expected of a court-appointed investigator. When a recommendation of this magnitude is made without consulting the treating therapist, in the face of objective evidence that the child is thriving, and in a manner that disrupts established sibling bonds while the therapist reports the change itself has harmed the child, the recommendation cannot be viewed as a reliable neutral assessment of the child's best interests.

At this stage, the question before the Court is not whether the Guardian ad Litem's recommendation ultimately proves correct, but whether the process that produced it remains worthy of the Court's reliance. The record now reflects conduct that fundamentally undermines that reliability. The Guardian discouraged the mother from cooperating with law enforcement regarding criminal conduct that resulted in a conviction entered with malice, while later minimizing the significance of that conduct to the Court. She devoted extraordinary investigative attention to unlawfully intercepted, privileged marital communications—despite expressly representing in her engagement correspondence that illegally obtained evidence would not be relied upon—while refusing under oath to clarify the extent to which she reviewed those materials and failing to transparently account for that work in her billing records. She circulated a spreadsheet of alleged criminal charges against a non-party that do not appear in the public record, devoted approximately thirty-one hours of investigative effort to scrutinizing that same non-party while performing little documented investigation of sources directly related to the child, and presented a custody recommendation without consulting the child's treating therapist—who has since communicated that the recommendation is unsupported and has

harmed the child. The cumulative effect of these actions has irreparably prejudiced the investigative process and defiled any reasonable perception that Hannah Long and her child are receiving the fundamentally fair process to which they are entitled. The Court's obligation to safeguard that fundamental right to due process leaves only one remedy: the removal and replacement of the current Guardian ad Litem. If even a fraction of the concerns raised in this motion are accurate, a newly appointed Guardian ad Litem—one who approaches the matter without reliance on unlawfully obtained evidence, without investigative imbalance, and without preconceived conclusions—will have no difficulty determining the relevant facts and providing the Court with the neutral, child-centered evaluation that the profession, and this Court, rightly expect.

Accordingly, to ensure that the Court receives an impartial evaluation centered on the best interests of the minor child, the Court should remove Brandy Daswani as Guardian ad Litem and appoint a neutral guardian capable of conducting an independent investigation focused solely on the welfare of the child.

WHEREFORE, Petitioner respectfully requests:

a) This Court remove Brandy Daswani as Guardian ad Litem in this matter;
b) This Court appoint a qualified and independent Guardian ad Litem to conduct a comprehensive investigation focused exclusively on the best interests of the minor child, and to provide impartial recommendations to the Court. The new Guardian ad Litem should have no prior involvement with the parties, their extended families, or any non-parties who may influence the investigation.
c) This Court orders a review of the investigative practices and billing records of the current Guardian ad Litem to ensure that prior investigative biases, selective inquiry, and unvetted reliance on non-party communications are documented and considered by the Court;
d) This Court orders any immediate protective measures necessary to ensure that the minor child s physical and emotional wellbeing are not further compromised during the transition to a neutral Guardian ad Litem, including supervision of ongoing communications between the parties;
e) Grant any further relief that the Court deems just and necessary to protect the best interests of the minor child and preserve the integrity of these proceedings.

This 12th day of March, 2026.

RESPECTFULLY SUBMITTED
**HOBSON & HOBSON, P.C.**

/s/ Christopher Hobson
Christopher Hobson, Esq.
Georgia Bar No.: 605643
Attorney for Petitioner

1950 Spectrum Circle, Suite 500
Marietta, Georgia 30067
(770) 425-3373 (t)
chris@hobsonlegal.com
hobsone-file@hobsonlegal.com

# Exhibit H-2

January 4, 2026 Messages with Joshua Friedman

## JANUARY 4, 2026 MESSAGES WITH JOSHUA FRIEDMAN

*Focused excerpt from the message export. Original capitalization, spelling, and punctuation are preserved.*

**January 4, 2026, 9:27:10 a.m. - Joshua Friedman**

Hey - she pulled the same crap. Kessler & Solomiany was added to the case by Hannah's ex a week before Brandy's motion to put her BS recommendation into play, and they did a meeting in chambers where the judge threatened Hannah's attorney not to attack Brandy's credibility. Got a botched outcome where she even MADE UP a marijuana change out of thin air and the judge didn't fact check its existence.

Why did you motion to have the judge recused and not Brandy?

**January 4, 2026, 9:31:24 a.m. - Matthew Harvey**

Let me guess, Stefanie potter

**January 4, 2026, 9:32:27 a.m. - Joshua Friedman**

No - it was Fishman. Another partner at the firm

**January 4, 2026, 9:37:00-9:37:07 a.m. - Joshua Friedman**

I didn't know it was the same players. I just discovered that.

I knew about Brandy, but not that firm

# Exhibit I

Affidavit of Allison Renee McDonald

# AFFIDAVIT OF ALLISON RENEE MCDONALD

Before me, the undersigned officer, personally appeared Allison Renee McDonald, who, being duly sworn, states as follows:

**Background and Personal Knowledge**

1. I am over eighteen years of age and competent to make this affidavit. The facts stated herein are based upon my personal knowledge unless I expressly identify another source of information.

2. Matthew Thomas Harvey is my nephew. I have known Matthew throughout his life and knew his former wife, Claire Harvey, before their separation.

3. Before the custody litigation began, I had numerous opportunities to observe Matthew with his son, W.H., and with other children in our family.

4. I never personally observed Matthew physically abuse Claire, W.H., or anyone else. I never observed conduct that caused me to believe Matthew was dangerous to his son.

5. I personally observed Matthew caring for, playing with, comforting, hugging, and showing affection toward W.H. I also trusted Matthew around other young children in our family.

6. My views are not based upon believing Matthew is perfect or believing Claire has no positive qualities as a mother. When I later testified under oath in the divorce proceeding, I acknowledged that I believed Claire was a good mother in some respects.

**Interview with Guardian ad Litem Brandy Daswani**

7. In early 2021, Matthew asked my mother, who is Matthew's grandmother, and me to speak with Guardian ad Litem Brandy J. Daswani because we had longstanding personal knowledge of Matthew, Claire, W.H., and their family relationships.

8. On February 23, 2021, my mother and I participated together in an interview with Ms. Daswani. The interview lasted approximately one hour.

9. During that interview, Ms. Daswani questioned both my mother and me concerning Matthew's Christian beliefs about marriage.

10. I do not presently recall the precise wording and therefore do not represent the following as a verbatim quotation. In substance, however, Ms. Daswani asked whether we also believed in principles of "biblical marriage," including whether we believed that the husband was the "head of the household."

11. I recall this questioning because it seemed unusual and unrelated to the reason I understood that I was being interviewed. I expected to be asked about Matthew's character, his relationship with Claire, his parenting of W.H., and anything I had observed that might bear upon the child's safety or welfare.

12. I did not understand why my personal agreement or disagreement with Matthew's religious beliefs concerning marriage was relevant to those observations.

13. Christianity was not something Matthew adopted during the custody litigation. Christian faith, church attendance, Scripture, sermons, prayer, and religious discussions had been ordinary parts of our family life for years before the divorce.

14. My own communications with Matthew from years before and during the litigation regularly concerned church, Scripture, sermons, prayer, and our Christian faith.

15. My recollection that religion became a subject of Ms. Daswani's interview did not originate with Matthew's later federal lawsuit. The interview occurred in February 2021, years before that action was filed.

16. During my interview with Ms. Daswani, I also provided information concerning my observations of Matthew as a father and my lack of any personal experience suggesting that he was violent or dangerous.

**July 20, 2021 Proceeding**

17. I was physically present at the Cobb County courthouse on July 20, 2021, for a contempt proceeding involving Matthew.

18. Immediately before the hearing, I became aware that Ms. Daswani participated in a private meeting in the judge's chambers with the presiding judge and attorneys involved in the case while Matthew himself was not present in the meeting.

19. I was not inside chambers and therefore cannot testify to everything that was said during that meeting. I do not attempt to do so in this affidavit.

20. I can testify to what occurred afterward because I remained at the courthouse for the proceeding.

21. During the proceeding, I personally heard the court discuss Matthew either going to jail or entering a mental-health facility.

22. I do not recall hearing testimony from a treating mental-health professional at that proceeding recommending that Matthew be involuntarily hospitalized before that choice was presented.

23. Because the possibility of placing Matthew in a mental-health facility was being discussed, I left the courtroom area and attempted to locate a facility in the Albany area that might accept him.

24. I personally contacted a mental-health facility during the proceeding.

25. The facility informed me that an involuntary psychiatric admission of the type being discussed would require a "1013" or comparable emergency-commitment procedure.

26. Matthew was ultimately taken into custody following the proceeding.

27. I found the sequence troubling: a substantive private meeting involving the Guardian ad Litem occurred immediately before a hearing from which Matthew was excluded from that meeting, and the hearing then resulted in the threat or imposition of an extraordinary deprivation of Matthew's liberty.

28. I do not offer a legal opinion in this affidavit concerning whether the judge, Guardian ad Litem, attorneys, or other persons had lawful authority to take any particular action. I state only the events I personally witnessed and participated in.

**Information Contrary to a Dangerousness Narrative**

29. My own observations of Matthew before the litigation, during the litigation, and during my interactions with him did not cause me to believe that he posed a danger to W.H.

30. On April 26, 2022, I testified under oath during the final divorce proceedings concerning my knowledge of Matthew and the family.

31. During that testimony, I described my observations of Matthew's parenting and the relationship I had observed between Matthew and W.H.

32. I also testified concerning whether I had personally heard Matthew threaten Claire, Ms. Daswani, attorneys involved in the litigation, Claire's mother, or other persons.

33. My testimony was that I had never heard Matthew make such threats.

34. My testimony was not intended to portray Matthew as flawless. It reflected what I had actually observed over the course of knowing him for his entire life.

35. During the same final proceedings, I heard Matthew's treating therapist, Shana Adkins, testify concerning whether Matthew had expressed an intent to harm himself or others and whether he met the criteria for an emergency involuntary psychiatric commitment. I understood her testimony to be inconsistent with the characterization of Matthew as an imminent danger that had previously been used during the proceedings.

**Basis for My Concerns**

36. My concern about Ms. Daswani did not arise merely because the ultimate custody outcome was unfavorable to Matthew.

37. I personally experienced religious questioning during my own GAL interview that I did not understand to have a connection to child safety or my observations of Matthew as a parent.

38. I personally attended the July 20, 2021 proceeding and observed the sequence surrounding the private pre-hearing meeting and the subsequent threat of incarceration or psychiatric confinement.

39. I also knew from my own lifelong experience with Matthew that the portrayal of him as a person who posed a danger to his child was inconsistent with what I had personally observed.

40. The matters described in this affidavit occurred years before I was asked to prepare this statement and before Matthew filed his federal lawsuit.

41. I have reviewed contemporaneous communications and court records solely to refresh my recollection regarding dates and sequence. I have not adopted an allegation merely because Matthew made it in a pleading or believes it to be true.

42. Where I do not remember exact words, I have expressly said so. Where I did not personally witness an event, I have not represented that I did.

43. I have not been paid or promised compensation for making this affidavit.

44. I am willing to testify truthfully concerning these matters if required.

**I swear or affirm that the foregoing statements are true and correct to the best of my knowledge and belief.**

Allison Renee McDonald

**Allison Renee McDonald, Affiant**

Sworn to and subscribed before me on this 14 day of August, 2026.

LaSherry Javone Wallace

**Notary Public**

My Commission Expires: 02/15/2030

Notary Seal:

LaSherry Javone Wallace
NOTARY PUBLIC
Dougherty County, Georgia
My Commission Expires February 15, 2030

# Exhibit J

January 20-22, 2022 Communications Concerning Bond
Modification, Recusal, and Settlement

# JANUARY 20-22, 2022 COMMUNICATIONS CONCERNING BOND MODIFICATION, RECUSAL, AND SETTLEMENT

*Focused Gmail excerpts. Standard signature blocks and confidentiality notices are omitted; substantive headers and text are preserved.*

**J-1. January 20, 2022 email from Brandy Daswani**

Date: January 20, 2022, 8:24 a.m. EST
From: Brandy Daswani <brandy@dsfamilylaw.net>
To: Chris Hobson <chris@hobsonlegal.com>
Cc: Matthew Harvey <Mharvey7744@gmail.com>
Subject: Outstanding Balance

Mr. Hobson,

I have reached out previously about the outstanding balance of Mr. Harvey. In response, it was stated that unless I agreed to a modification of the protections afforded me through the state in this case that I would need to recuse my services. I prepared an affidavit and sent the information to counsel so a modification could be made.

It is my understanding that Mr. Harvey canceled the hearing related to modifying the bond so that he could speak to me regarding the case.

The balance as of December 31, 2021, of $1,709.59 remains outstanding and there should be no impediments in payment for the services provided. Please have Mr. Harvey pay the balance on or before January 30, 2022, so that further action will not be necessary.

Thank you,
Brandy Daswani, Esq.

**J-2. January 21, 2022 email from Karen Harvey Austin to Brandy Daswani**

Date: January 21, 2022, 8:17 a.m. EST
From: Karen H Austin <kaustinmd@yahoo.com>
To: Brandy Daswani <brandy@dsfamilylaw.net>
Subject: Re: Harvey vs.Harvey

Ms. Daswani,

Matthew has dropped the services of Hobson & Hobson, as well as not met any of his monthly obligations to Claire, because he doesn't have the money to pay for any of it. He therefore doesn't have the money to pay you. The well is dry as they say.

Ms. Owens acted without his knowledge or consent when discussing and acting on the bond modification motion.

Please do our family a favor and recuse yourself from this case in a timely manner. You are biased and not impartial. For example, we know you notified Ms.Potter of the home inspection the week prior to your visit. Claire just happened to mention it to Matthew the weekend prior.

Hopefully this nightmare will come to a conclusion sooner than later.

Karen Harvey Austin MD

**J-3. January 21, 2022 response from Brandy Daswani**

Date: January 21, 2022, 8:52 a.m. EST
From: Brandy Daswani <brandy@dsfamilylaw.net>
To: Karen H Austin <kaustinmd@yahoo.com>
Subject: Re: Harvey vs.Harvey

Ms. Austin,

It is unfortunate that he suffers from financial concerns. That does not stop the financial obligations he has, particularly since the case is ongoing.

There was no notification of a home visit - there is never a notification to any party (especially since my home visits are always determined the day of and based on my schedule which is ever changing).

Mr. Harvey has the ability to end this case by entering into an agreement. Thus far, those things have not happened. Until the case is finalized, the investigation continues whether he chooses to participate or not. The modification was so that he could participate without any fear of retribution through the state. It is unfortunate that he chooses not to do so.

It is always difficult when our children are struggling. I commend you for helping your son through these difficult times.

Respectfully,
Brandy Daswani, Esq.

**J-4. January 22, 2022 email from Matthew Harvey to Kim Oppenheimer**

Date: January 22, 2022, 12:48 p.m. EST
From: Matthew Harvey <mharvey7744@gmail.com>
To: Kim Oppenheimer <ccsoppenheimer@gmail.com>
Subject: Re: Appointment Tuesday
Attachment: Screenshot 2022-01-22 at 10.59.57 AM.jpeg

Yes ma'am. Thank you for letting me know.

I've attached a screenshot of texts between her and my mom this AM. While I remain guarded and skeptical as to her intentions, Claire seems to have had a change of heart. She is now concerned about focusing on co-parenting and what's best for Wells.

Have a great rest of your weekend.

Matt

**J-5. January 22, 2022 messages between Claire Harvey and Karen Harvey Austin**



AT&T 10:59 AM 88%

CM

Claire

Maybe it would be best for all involved to settle the divorce.

Today 9:47 AM

I agree. It is best to settle the divorce

I think so too. Is matt open to that? A house down the street just listed at $430,000. It is still a great market to sell the house

I will talk to him later today and get back with you

Read 10:57 AM

Ok. We can settle the whole thing out of court. Re Focus on co parenting and wells

Subject

iMessage

Pay

# Exhibit K

November 3, 2022 Contemporaneous Email

# NOVEMBER 3, 2022 CONTEMPORANEOUS EMAIL

*Focused copy of the message sent from Plaintiff's Gmail account. Quoted prior correspondence and email signature boilerplate are omitted.*

**November 3, 2022 email from Matthew Harvey to Carrie Owens**

Date: November 3, 2022, 7:16 a.m. EDT
From: Matthew Harvey <mharvey7744@gmail.com>
To: Carrie Owens <carrie@gafamilylawyers.com>
Subject: Re: CASE UPDATE- PLEASE READ CAREFULLY

Carrie,

I hope you are doing well. I'm contacting you because I filed a motion for reconsideration, new trial, set aside final order, and I was granted a rule nisi hearing on 10/17/22 for 12/12/22. I haven't seen Wells since July 18, 2021. My relationship with him was effectively severed with the decree. Final hearing was over the span of 4 days in late April and early May. They (you know who I mean) went all out on their lies and deceit. Luckily, I have the majority of the transcripts now, and the vast majority of their lies are easily provable (see attached; that particular lie was so her mom wouldn't get her subpoena). Claire also admitted to 4 acts of violence at trial (plates, knives, hitting me while driving with Wells in the backseat, and hitting my friend Devin), as well as telling me in Fall 2020 I should kill myself. Since then I've also been officially diagnosed with traumatic stress disorder and received a very positive psychological evaluation. Despite all of this, Brandy and Stefanie are still filling the head of the DA's guy assigned to my criminal case with BS about me being dangerous, etc., and last month he threatened to revoke my bond in order to get me to give up on custody.

I can't tell you how many times I've prayed and wished that I could just walk away and give up, but I can't bring myself to do it. Almost every second of every minute of every day since last year, unless I'm working or distracted, I think about him. Walking away won't remedy my sense of loss. I re-read the July 20 transcript after the nisi hearing was granted, and I realized that you were spot on in your summation of my case: she wants to use Wells to control me, and when I don't obey, she witholds him from me. She also doesn't want him spending too much time with me or my family because she knows he'll always prefer us cuz... we normal, and she also wants child support.

Anyway, I have been having a hard time trusting people lately, which is why I've been pro se since July 1 (that and I was tired of throwing money down the drain). I trust you though. If you'd be willing to represent me, and with the right preparation, I really think we can improve my situation, and my son can have his dad again. I have allocated up to 2 weeks of PTO from work in the coming weeks up until 12/12 in order to prep. I'd really like to get a whole mess of affidavits refuting all the disgusting BS I've been accused of and the lies. They went for broke at the final hearing because they thought the ball game was over. It's not though, not yet. Please, I'd be so grateful if you could help me. I can help out a lot this time around also. You're also not just helping me. You're also helping my entire family.

I'm currently kind of in a jam with subpoenas. I tried issuing some but didn't realize they were procedurally deficient. Anyway, I look forward to hearing back from you.

Thanks,
Matt