**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| MATTHEW THOMAS HARVEY,<br>Plaintiff,<br><br>v.<br><br>CLAIRE M. HARVEY, et al.,<br>Defendants. | **CIVIL ACTION NO.**<br>**1:25-cv-04688-JPB** |

**DECLARATION OF MATTHEW THOMAS HARVEY CONCERNING POST-JUDGMENT CONTACTS AND REVIEW OF CASE MATERIALS**

I, Matthew Thomas Harvey, declare as follows:

1. I am the pro se Plaintiff. I have personal knowledge of the communications I received, the materials I reviewed, and my own experiences described below. I did not witness the other families' proceedings. When I describe a GAL's account, a comparison summary, or a complaint's allegations, I identify that source rather than adopting the underlying events as my own observations.

2. After the July 24, 2026 judgment, an August 20 introduction connected me with other parents concerned about GAL accountability. Further communications followed on August 23, and I spoke with the parent

designated here as Parent B on or about August 24. These contacts occurred after I completed Document 77 on August 18.

3. Through those contacts I received or reviewed additional case information, including a hearing transcript and evaluator correspondence concerning Parent A, and comparison materials concerning Parent B and other matters. I also reviewed the revised across-case matrix and the revised companion evidence-and-standards memorandum. In early September I obtained public filings in Koura v. Oppenheimer. These summaries organize sources; repetition of an account in two summaries is not independent corroboration.

4. I distinguish the original records I reviewed from accounts described in the comparison materials. In particular, my description of Parent B's cited transcript, appointment order, and correspondence below is based on those materials unless I expressly identify a direct conversation. Reviewing their summaries does not mean I independently verified every cited original. Recent receipt also does not establish prior unavailability. I retain the source distinctions in describing similarities to my own case.

**A. My own case: the parent-child relationship, evaluator language, and the GAL's use of it**

5. I explained to Oppenheimer that my son and I shared autism-spectrum traits and that I recognized aspects of my own childhood in him. I was

concerned about his safety and about losing our relationship. The April 25, 2022 transcript records Oppenheimer describing me as "fused and meshed" with my child and unable to separate my identity from his. Her stated concern also included my statements about whether I could go on living if something happened to him. The record therefore contains more context than the attachment label alone. Apr. 25 Tr. 112–13.

6. The same testimony records that neither my statements to Oppenheimer nor the collateral interviews identified an instance in which I had physically harmed my son. Asked when she reached the relationship-based conclusion, she identified approximately the beginning of April and said it rested primarily on statements I made to her. She had not observed either parent with the child before offering the possible-harm opinions described in the comparison. Apr. 25 Tr. 112–13; revised comparison materials, parent-child observation and label sections.

7. I reviewed the May 4, 2022 transcript of Daswani's presentation. She expressly relied on Oppenheimer's evaluation in discussing possible harm, described my "over-identification" with my child as disturbing, and said messages to him "read like suicide notes when looking through the lens of the psychological evaluation." She also described my concerns about the mother's mental health as having no factual basis that she could discern. This is a specific example of an evaluator's interpretation being taken up in the GAL's

presentation about safety and parenting restrictions. May 4 Tr. 50–51 [also Doc. 76, Ex. A-3].

8. Daswani also referred to other therapists' concerns, acknowledged that no one could definitively say I would hurt my child, and left disputed matters to the court. Oppenheimer had described her assignment as a psychological evaluation, not a parental-fitness or custody evaluation, with parenting inferences left to Daswani and the court. Her testimony also described an earlier failure to obtain a referral question from the GAL. I do not erase those qualifications or use the later presentation to prove every alleged private communication. Apr. 25 Tr. 60–62, 126; May 4 Tr. 50–51 [also Doc. 76, Ex. A-3].

9. I supplied Oppenheimer with messages in which Claire threatened homicide and suicide, and I testified that those messages were not brought up in the evaluation testimony. Oppenheimer nevertheless stated categorically that I had choked Claire; cross-examination identified a relayed account, not her own observation or physical corroboration. My own testimony tied the incident to Plaintiff's Exhibit 6 and described a restraint during an alleged attack, without pressure on the throat or interruption of breathing. I identify a disputed account and contrary context, not a judicial finding resolving it. Apr. 25 Tr. 71, 115–16, 176–77; Apr. 26 Tr. 204–05.

10. Oppenheimer's testimony also records that she did not interview Shana Adkins, although Adkins's notes were used for a central threat characterization and a discrepancy had been raised during oral feedback. Other portions address differing test administrations and adjustments for the two parents and uncertainty about source information. These are concrete questions about how information was selected and interpreted; I am not offering a professional opinion that a particular test was invalidly administered. Apr. 25 Tr. 90, 93, 117–18, 121–22.

11. The April 25 testimony also links others' interpretations of my scripture use to concerns about mania or psychosis, while Oppenheimer said she did not really explore that context with me. Separately, when asked about effects of stopping antipsychotic medication, she said she was not qualified to answer that question. These are specific contextual and competence limits, not proof that religious belief is pathology or that a psychologist can never discuss medication. They inform my comparison with the referral and treatment statements described below. Apr. 25 Tr. 109, 128.

12. I did not receive a final written evaluation report. The transcript describes an additional $8,000 and three months for one, with oral feedback used instead. Oppenheimer did testify and was cross-examined in my case. I therefore distinguish my case from the accounts below in which her opinions reached court through a GAL without her own testimony. I also distinguish

the existing restrictions and separation described in my filings from a claim that Oppenheimer alone caused every court order. Apr. 25 Tr. 7, 61; Docs. 76–77.

**B. Parent A: different assessment processes, severe impressions, and the GAL's motion**

13. The revised comparison materials describe the other parent receiving several months of interviews, testing, document review, collateral information, and a substance-use assessment, followed by a written summary. Parent A, the mother, is described as receiving one session, no psychological testing, no child observation, and no report before serious diagnostic and parenting-capacity impressions were communicated to the same GAL. The hearing transcript I reviewed confirms the distinction between the earlier report for the other parent and the absence of one for Parent A.

14. The materials describe different referral tasks: a psychological and substance-use evaluation of the father and a later parental-fitness evaluation of the mother. They also describe the father's written summary declining custody or parenting-time recommendations because Oppenheimer had not met the mother or children. Yet the GAL's later note attributed parenting-incapacity impressions to her after the mother's single session and without

meeting the children. I identify that internal contrast while recognizing that different referrals need not call for identical testing.

15. I reviewed the hearing transcript in which the GAL read notes of a telephone conversation with Oppenheimer following Parent A's initial session. The note attributed impressions of borderline personality disorder, a likely delusional disorder, and an inability to rule out that the mother was a "psychopath." It went on to connect those impressions to likely inability to co-parent and potential inability to parent. These are statements the GAL attributed to Oppenheimer, not diagnoses I can verify. Parent A hearing transcript at 9–10.

16. The same note described Parent A's account of alleged abuse as lacking detail and having a "poverty of content," and described her crying as theatrical and "alligator tears." It also attributed a definite need for medication and a preference for a male psychiatrist. Those specific descriptions matter to my comparison because the reporting parent's account and emotional response were treated as reasons to question her reliability and parenting capacity. I did not hear the private conversation or examine her clinically. Parent A hearing transcript at 9–10.

17. The GAL's note also stated that Oppenheimer would send a summary to attach to a contemplated motion concerning the parental-fitness evaluation. The GAL then explained that a different motion was pursued and

the contemplated summary did not occur. I am describing the recorded plan and its connection to the GAL's request for court action, not claiming that Oppenheimer actually drafted a motion or delivered the promised attachment. Parent A hearing transcript at 10.

18. The revised materials separately summarize Parent A's agency complaint alleging that, during her appointment, Oppenheimer spoke with the GAL and the other parent's attorney while she waited; that her own attorney did not know of the call; and that a later release did not authorize communication with opposing counsel. That appointment-day account is different from the GAL's recorded account of the later telephone conversation. I have not verified the participants, duration, or authorization through call records, billing, the release, or counsel's confirmation.

19. I reviewed Oppenheimer's cancellation email to Parent A. It says that, after reflection on their session, Oppenheimer was not the best person to conduct the parental-fitness evaluation, was canceling testing, would notify the court and suggest other names, and would transfer the documents, interview notes, and remaining retainer to the replacement professional. The copy I reviewed does not itself state that Parent A was diagnosed or dangerous; it also does not contain an express statement that no diagnosis or danger opinion could be given.

20. The revised materials describe additional explanations for the withdrawal: limiting high-conflict or domestic-abuse work; a need for psychiatric care beyond the evaluator's expertise; and concerns about the evaluator's safety. The GAL's hearing statements include the psychiatric-care and safety explanations. These accounts differ in emphasis. I do not claim, without their full context, that one necessarily proves another was knowingly false.

21. The materials describe Parent A paying her own retainer, later withdrawal, a refund and fee waiver, and later use of the psychiatric-referral account in a GAL motion and court order. They also describe an office demand for a court order before releasing the file despite the earlier promised transfer. The further assertion that a replacement psychiatrist requested but did not receive the file comes from Parent A's agency-complaint account as summarized, not from a statement by that psychiatrist to me. The materials do not establish completion of the transfer or the evaluator's knowledge of every later use of her views.

22. The comparison I draw is specific: a broad and severe assessment communicated before the described evaluation was complete; the GAL's use of those impressions in seeking further intervention; and difficulty obtaining an evaluative explanation or completing the transition to another professional. The record does not show that Parent A received the identical

"enmeshment" label used in the discussion of my case and Parent B. It identifies a related use of credibility and pathology language, with a different factual record and a different GAL.

### C. Parent B: enmeshment, treatment concerns, and opinions carried by the GAL and counsel

23. Parent B told me in our conversation that no written Oppenheimer report had been provided and that her relationship with her child had been characterized as excessive attachment or enmeshment. I understood why she regarded that as similar to my experience. What she told me is distinct from the source-specific descriptions in the revised comparison materials below.

24. Those materials describe GAL testimony attributing to Oppenheimer the view that Parent B was either delusional or dependent on the child and might be depressed, while also stating that Oppenheimer had no diagnosis she could provide. They describe testing being set aside as uninformative. Oppenheimer did not testify in that proceeding, and the materials identify no written report furnished to the parent or placed in the held court record. I do not equate a reported impression, a formal diagnosis, and the GAL's wording.

25. The matrix separately identifies "enmeshed" as a word used by opposing counsel in closing argument and attributed there to Oppenheimer. It is not identified as a quotation from Oppenheimer's own testimony, because she did not testify, or as a word established in the cited GAL

testimony. That source distinction is important: similar relationship-based language appeared in advocacy, but the complete path by which counsel obtained or formulated that additional characterization remains to be established.

26. The materials also describe the GAL relaying that Oppenheimer characterized the child's prescribed psychiatric medication and inpatient treatment as "criminal" and the mother as doctor-shopping. They identify no documented consultation with the child's prescriber, the identified treating therapists, or the mother's therapist before those conclusions, despite an appointment order authorizing provider contact. They do identify school and teacher contact. I therefore describe a gap in documented clinical foundation, not a proven absence of every professional contact or an opinion that psychologists can never discuss treatment.

27. The revised materials describe Parent B submitting diagnosis information, concerns about the child, third-party factual information, and organized supporting material. They report acknowledged receipt and a response from Oppenheimer saying she would forward the concerns to the GAL and independently investigate. They do not identify how that submitted material was addressed in the GAL testimony or report reviewed for the summaries. The promise of independent investigation is part of the account; I

do not replace it with an assertion that forwarding the concerns proved there was no investigation.

28. The comparison also describes brief observations of the child with each parent at different times: with the mother before a temporary custody change and with the father after the change. The circumstances were not the same. Alongside the treatment and dependency characterizations, this raises a concrete question about whether differences in circumstances and contrary clinical information were weighed before the child's presentation was attributed to a particular parent.

29. The materials describe the GAL testifying that she saw no basis for continued supervision and did not consider it necessary, while Parent B described continued restrictions and difficulty obtaining a clear explanation or regular access. Thus, even in this account, relaying evaluator opinions is not the same as endorsing every restriction. The overlap with my concerns is whether restrictions continued without a clear, reviewable connection to current evidence, not a claim that all GALs always took the same position.

30. The comparison describes a later request for the evaluator's file, an office response requiring a subpoena and enclosing an invoice, and counsel's objection based on the standing order and fee allocation. The summarized order allocated the retainer and overages to the other parent, made a written report conditional on a request and replenishment of the retainer, and

included a provision that may limit file review until a report exists. Those qualifications matter. I do not claim an unconditional report requirement or automatic entitlement to every record. The question is what material supported the adverse opinions and how it could be examined.

31. The materials identify opposing counsel's possession or use of evaluator billing records and the additional language attributed to Oppenheimer in closing. These facts identify possible transmission and billing records, but do not by themselves establish a secret or improper conference. I also do not attribute an untransmitted item to the evaluator merely because Parent B wanted counsel to send it. My concern is the described route from an assessment to a GAL's account and counsel's argument, without a reviewable explanation from the evaluator.

**D. Koura: identified public allegations, contrary evidence, and supervision**

32. I obtained and reviewed filings in Koura v. Oppenheimer, DeKalb County Superior Court Civil Action No. 24-CV-1900, together with the comparison materials. The following descriptions concern allegations in the amended complaint filed August 26, 2024, not my observation of her custody proceedings or judicial findings that her accusations were true.

33. Koura alleges that her former husband proposed Oppenheimer and agreed to pay seventy percent of the evaluation expenses. Her pleading

describes two written reports and live evaluator testimony; it alleges the second report was released only days before trial despite earlier requests. These facts differ from the absence-of-report accounts concerning Parents A and B. The fee allocation and timing are reported features, not proof that an opinion or outcome was purchased. Am. Compl. ¶¶ 8–9, 16.

34. Koura alleges that Oppenheimer declined to investigate identified abuse evidence and witnesses, including an Uber driver said to have witnessed an assault, and disregarded contrary psychological evidence and child-protection records. Significantly, paragraph 19 alleges that child-protection reports came from doctors and teachers as well as the mother, but were collectively characterized as problematic for the mother's relationship with the children. That is a concrete parallel to a parent's safety reporting being reframed as evidence against the reporting parent. Am. Compl. ¶¶ 10–14, 19–20, 27.

35. Koura further alleges that Oppenheimer called her a "pathological liar" in court without producing an example when asked, and attributed witchcraft or spell-related material to her through a Pinterest account she denied having. She alleges that requests to correct inaccuracies were refused and the final meeting was itself mischaracterized. I report disputed factual and credibility characterizations, not an established diagnosis, perjury, or religious-discrimination finding. Am. Compl. ¶¶ 16, 24–25, 30.

36. Koura alleges that Oppenheimer continued recommending supervision although her own second report recognized deterioration in the mother-child relationships during supervision. The pleading attributes testimony to Oppenheimer that one child had done better with equal parenting time and worse with less time with the mother. It also describes contrary testimony from four psychological professionals and expressly attributes to the GAL the view that supervision made a bad situation worse. I preserve that alleged GAL disagreement rather than converting it into evidence of agreement. Am. Compl. ¶¶ 17, 22–23, 27.

37. The pleading alleges that sole custody went to the father and the children relocated out of state, notwithstanding the reported deterioration and disputed foundation. The relevance I identify is persistence of adverse interpretations and restrictions despite contrary information. It is not proof of the same evaluator-to-GAL transmission sequence described for Parents A and B, or proof of an unlawful agreement by Koura's GAL. Am. Compl. ¶¶ 20, 26, 28–31.

38. I reviewed the February 14, 2025 order in Koura. The court dismissed the case on the expert-affidavit pleading requirement under O.C.G.A. § 9-11-9.1; footnote 1 expressly limits the issue being decided. I do not present that disposition as a finding of misconduct, an adjudication that Koura's factual allegations were true, or a ruling rejecting Oppenheimer's immunity defense.

**E. The attorney's email and my understanding of the recurring mechanism**

39. On August 12, 2026, after dismissal but before I completed Document 77, I received and read an email response from a Cobb-area attorney concerning my questions about family access, including grandparent relief and whether visitation could be withheld over unpaid child support. In the same email, the attorney distinguished visitation provided by a court order from access for which no order grants a right. I quote selected passages below, but do not attach the complete email or identify the author, firm, subject line, signature, or contact information.

40. The following passages are quoted directly from that email:

(a) In discussing possible grandparent relief: "In the end, the analysis is very similar and under either statute, it is very difficult for grandparents to obtain rights under either statute absent some back door connection to the judge."

(b) In describing the exception he associated with a personal connection: "One exception to that is if you hire an attorney who knows the judge personally then the Judge will likely give you whatever you want--yes that is how things really work in Georgia."

(c) After describing it as wrong to use child support as leverage at the child's expense: "Courts usually look away knowing that a mother will often times only escalate the circumstances and removing a mother's custody is simply not an option the Court will entertain (unless you hire an attorney who knows the judge)."

I personally received and read those statements. I am reporting the assessment conveyed to me, not claiming personal observation of every event on which the attorney based it. I do not present the attorney as an expert witness or the email as an admission by a Defendant. It does not identify a particular unlawful agreement among Defendants. I retain the email; I am not representing that withholding the complete writing removes any requirement to produce it if the Court finds it necessary.

41. My concern is not limited to whether someone disliked my religion, sex, disability, or efforts to protect my child. The accounts describe a parent's attachment, distress, care-seeking, or reporting being used to discredit that parent; the adverse explanation then being used by a GAL, counsel, or court; and difficulty obtaining or testing the underlying basis. In my case, the record specifically shows Daswani using the psychological evaluation to interpret my messages. The other accounts describe related, but not identical,

methods. I use "protective parent" to describe the conduct being discussed, not to claim that every report was necessarily correct.

42. From the described pattern and the financial facts below, I infer that obtaining and protecting fees and continued paid involvement may have been an underlying objective, with stigmatizing or characteristic-based explanations serving as tools. I also believe reliance on those professionals without adequate scrutiny helped give their positions practical force. This is my inference, not an admission I heard, a finding by a court, or personal knowledge of anyone's unexpressed motive. I do not claim that every actor had the same purpose, that any judge personally shared professional fees or received a kickback, or that the comparison establishes an unlawful agreement. The attorney's quoted assessment contributes context about personal access and judicial inaction, not proof of those propositions.

**F. Financial facts and specific judicial decisions in my case**

43. The office statement in Document 75-1 at page 2 reports that I paid Oppenheimer $12,256.24. Her March 25, 2022 email in Document 76, Exhibit C-2, requested another $8,000 report retainer. I did not receive a final written report; the April 25 transcript describes oral feedback instead. These are the payments and requested work-product charge on which I rely.

44. My counsel raised the late reports and need for the GAL's file. Judge Brown denied file access and a continuance, directing counsel to question the

GAL and her sources while acknowledging that counsel would charge me. The court pointed to cross-examination, stated its independent decision-making responsibility, and denied the opposing side's fee requests for responding to the continuance and motion in limine. I identify the access decision and its rationale, not an absence of all hearing or independent rulings. Apr. 25 Tr. 4–15, 26–28.

45. On May 13, Daswani requested a ruling and compliance hearing on her remaining fees. She described an outstanding balance and future billing, including preparation for cross-examination, and requested payment within forty-five days. The court allowed sixty days, directed a compliance hearing, and permitted unpaid fees to be taken from home-sale escrow. This identifies her request for enforcement of her own fees, including forthcoming billing. May 13 Tr. 130–31.

46. The court adopted the mother's safety plan and required continuing treatment and periodic testing, with testing at my expense. It directed her counsel to prepare the order and counsel to confer about financial balances. The transcript also contains extensive oral reasons and adjustments. I did not observe the judge's private review or establish a word-for-word comparison of draft and signed orders. My concern is the foundation and process for the adopted restrictions, not authorship alone. May 13 Tr. 89–105, 123–29.

47. I connect these charges, access conditions, and enforcement requests with the discrediting-and-restriction sequence. I do not know what additional treatment, supervision, or testing payments reached a Defendant, and I do not allege a referral kickback. Parent A's refund, differing fee allocations, and GAL disagreements remain material. Financial motive is my inference requiring further support, not proof that fees were unearned, an opinion purchased, or every participant shared one objective.

**G. Privacy and limits of this submission**

48. Parents A and B are not currently agreeing to be publicly identified or to sign declarations for this submission. Their expressed concerns about retaliation explain the anonymous labels and request for a procedure before further disclosure; those fears do not independently prove a threat by any Defendant. I have omitted their names and identifying case details, and have not attached their source records, either comparison document, the complete attorney email, or an identity list. The motion and this declaration do disclose the selected email passages quoted above.

49. I am retaining the materials I received. If the Court requires a source record for authentication, admissibility, completeness, or a fair response, I request an appropriate procedure before identifying disclosure, not secret merits consideration or exemption from lawful obligations. I understand that

detailed facts, the email's date, or its verbatim wording may nevertheless allow an involved person to infer a source's identity.

50. This declaration explains the information behind my present request. Later-received material did not supply the basis for earlier filings, does not itself make my earlier claims timely, and does not establish their truth. I am not asking for technical testing conclusions, new diagnoses, or findings of liability based solely on my reading of summaries.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 9, 2026.

Matthew Thomas Harvey

**CERTIFICATE OF SERVICE**

I certify that on September 9, 2026, I caused a true and correct copy of *Plaintiff's Motion for Leave to Supplement Pending Rule 59(e) Motion and Fee Opposition with Declaration*, including the accompanying declaration and the separately submitted proposed order, to be served by electronic mail upon all counsel of record as follows:

**Noah Green — Counsel for Claire M. Harvey**

Henefeld & Green, P.C.
2480 Briarcliff Road NE, Suite 6-328
Atlanta, Georgia 30329
ngreen@henefeldgreen.com

**Christine L. Mast and Jamie McDowell — Counsel for the Kessler Defendants**

Hawkins Parnell & Young, LLP
303 Peachtree Street NE, Suite 4000
Atlanta, Georgia 30308-3243
cmast@hpylaw.com; jmcdowell@hpylaw.com

**Courtney B. Walker and Tia Brown — Counsel for Kim C. Oppenheimer**

Hall Booth Smith, P.C.
191 Peachtree Street NE, Suite 2900
Atlanta, Georgia 30303
cwalker@hallboothsmith.com; tbrown@hallboothsmith.com

**James R. Doyle — Counsel for Brandy J. Daswani**

Lewis Brisbois Bisgaard & Smith LLP
600 Peachtree Street NE, Suite 4700
Atlanta, Georgia 30308
james.doyle@lewisbrisbois.com

**William L. Tomlin — Counsel submitting Document 81**

Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334-1300
wtomlin@law.ga.gov

Respectfully submitted this 9th day of September, 2026.

*<u>/s/ Matthew Thomas Harvey</u>*
**Matthew Thomas Harvey**
Plaintiff, pro se

c/o 501 North Slappey Boulevard #1112
Albany, Georgia 31701
Mharvey7744@gmail.com
(912) 346-5299